**A**

LEXSEE 231 N.Y.S.2D 410

**In the Matter of HOWARD G. CARR, et al., Respondents, v. ST. JOHN'S UNIVERSITY, NEW YORK, Appellant.**

**SUPREME COURT OF NEW YORK, APPELLATE DIVISION, SECOND DEPARTMENT**

*17 A.D.2d 632; 231 N.Y.S.2d 410; 1962 N.Y. App. Div. LEXIS 8666*

**July 2, 1962 - Decided**

**LexisNexis(R) Headnotes**

**OPINION: [***1]**

[*632] [**411] In a proceeding pursuant to article 78 of the Civil Practice Act, the University appeals from an order of the Supreme Court, Kings County, entered June 8, 1962 which: (1) granted the petitioners' application and [**412] annulled the University's determination dismissing petitioners as students at the University; (2) directed the University to place petitioner, Howard Glenn Carr, on the January, 1962 graduation list (since he had fully completed all courses toward the degree for which he matriculated) and to confer said degree on him in June, 1962; and (3) directed the University to reinstate forthwith the other two petitioners in their respective classes as of April 18, 1962, with their status and credits as such students as of said date.   Order reversed on the law, without costs, application denied and proceeding dismissed.    The findings of fact implicit in the decision are affirmed. Subdivision (1) of *section 313 of the Education Law* provides that it "is a fundamental American right for members of various religious faiths to establish and maintain educational institutions exclusively or primarily for students of their own religious faith or to effectuate [***2] the religious principles in furtherance of which they are maintained." The University is operated and conducted by a Roman Catholic order of priests. Although admission to study in the University is open to qualified applicants irrespective of [*633] religious faith, over 94% of the students attending the University are of the Roman Catholic faith.    The University's general objective, as stated in its bulletins, is the offering of "such opportunities to achieve traditionally classical and professional education as will enable men and women to develop in learning and culture according to the philosophical and theological principles and traditions of the Roman Catholic Church." The University's bulletins from 1957 to and including 1961-1962 included a regulation as follows: "Regulation on Discipline. In conformity with the ideals of Christian education and conduct, the University reserves the right to dismiss a student at any time on whatever grounds the University judges advisable. Each student by his admission to the University recognizes this right.  The continuance of any student on the roster of the University, the receipt of academic credit, graduation, the granting of [***3] a degree or a certificate, rest solely within the powers of the University." In September, 1957, the petitioner Howard Glenn Carr matriculated at the University for the degree of Bachelor of Science; he completed all the courses required for said degree in January, 1962; and he paid all tuition fees and charges requested by the University. He was scheduled to receive his degree at the June, 1962 commencement. The other two petitioners matriculated at the University in September, 1958.  [**413] On March 13, 1962, the petitioners Carr were civilly married in the presence of two witnesses: the petitioner Catto and another student. The four students involved are members of the Roman Catholic faith.   According to the Canon Law of the Roman Catholic Church, Catholic parties to a marriage must conform to the requirements of a Catholic marriage, that is, they must be married before a Catholic priest and two witnesses. In the eyes of the Catholic Church, a civil marriage in the United States of members of the Catholic faith is invalid, and the act of each person who participates in such a ceremony, whether as a party to the marriage or as a witness, is seriously sinful. On or about [***4] April 6, 1962, petitioner Catto made it known publicly at the University that petitioners Carr had been

civilly married and that she (Catto) and the fourth student had been the witnesses. The four students were given full opportunity to justify and explain their actions. They admitted that they were familiar with the regulation on discipline, and they gave no satisfactory explanation either for their failure to live up to their obligations as Catholic students at a Catholic University or for their failure to seek the advice and counsel of a priest. On April 12, 1962, petitioner Catto and the other witness were orally informed of the determination of the Executive Committee of the University's Board of Trustees that the four students should be dismissed. On the same day the petitioners Carr were married by a priest in the presence of the aforesaid witnesses to the civil marriage. On April 18, 1962 formal notices were sent to the four students, notifying them of their dismissal. Petitioners thereupon instituted this proceeding. When a student is duly admitted by a private university, secular or religious, there is an implied contract between the student and the university that, [***5] if he complies with the terms prescribed by the university, he will obtain the degree which he sought. The university cannot take the student's money, allow him to remain and waste his time in whole or in part (because the student might regard it as a waste of time if he does not obtain the degree), and then arbitrarily expel him or arbitrarily refuse, when he has completed the required courses, to confer on him that which it promised, namely, the degree ( *People ex rel. Cecil v. Bellevue Hosp. Med. Coll., 60 Hun 107, affd. 128 N. Y. 621; Goldstein v. New York Univ., 76 App. Div. 80).* "Obviously and of necessity there is implied in such contract a term or condition that the student will not be guilty of such misconduct as would be subversive of the discipline of [*634] the college or school, or as would show him to be morally unfit to be continued as a member thereof. The power of suspension or expulsion of students is an attribute of government of educational institutions" ( *Goldstein v. New York Univ., supra, p. 83).* "'Misconduct' perhaps [**414] refers particularly to demeanor within the walls of the institution or in connection [***6] with the ordinary activities of student life * * *. But the implied stipulation of good conduct, variable in its meaning and

incapable of precise definition as that term must always be, is not * * * to receive the restricted construction that the student's conduct may be the subject of control only in so far as it relates to his actions in his capacity and status of student" ( *Samson v. Trustees of Columbia Univ., 101 Misc. 146, 150, affd. 181 App. Div. 936).* The regulation on discipline provides that "In conformity with the ideals of Christian education and conduct, the University reserves the right to dismiss a student at any time on whatever grounds the University judges advisable." To the Catholic students and authorities at the University, "Christian education and conduct" meant and means "Catholic education and conduct." The petitioners do not claim that they understood it to mean anything else, nor do they claim that they did not understand what they were doing or the consequences of their act in the eyes of their Church. When a university, in expelling a student, acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on [***7] facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion ( *People ex rel. Goldenkoff v. Albany Law School, 198 App. Div. 460; People ex rel. O'Sullivan v. New York Law School, 68 Hun 118; People ex rel. Cecil v. Bellevue Hosp. Med. Coll., supra).* Here, the discretion exercised by the University was of that character. Under the circumstances, the court may not review the University's exercise of its discretion in dismissing petitioners as students. Kleinfeld, Brennan and Hopkins, JJ., concur; Beldock, P.J., and Hill, J., dissent and vote to affirm the order, with the following memorandum: In our opinion, under the facts in this case, there was no basis for the University's exercise of discretion to dismiss these petitioners. The University is a public institution, chartered by the State, open to persons of all religious faiths, and engaged in providing secular learning leading to a general academic degree. Such a University may not enforce against a student an ecclesiastical law, the breach of which is not immoral according to the standards of society in general, or which it does [***8] not enforce equally against all students at the University, whether Catholic or nonCatholic. [ *34 Misc 2d 319.* ]