C

LEXSEE 514 F2D 622

HAYES SLAUGHTER, Appellee, v. BRIGHAM YOUNG UNIVERSITY, a corporation, Appellant

No. 74-1208

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

*514 F.2d 622; 1975 U.S. App. LEXIS 15178*

**April 14, 1975, Decided**

**SUBSEQUENT HISTORY:** [**1]

Rehearing Denied June 10, 1975.

**PRIOR HISTORY:** Appeal From The United States District Court For the District of Utah Central Division (D.C. # C-307-72).

**LexisNexis(R) Headnotes**

**COUNSEL:**

Stuart L. Poelman, of Worsley, Snow & Christensen, Salt Lake City, Utah, for Appellant.

Bryce E. Roe, of Roe and Fowler, Salt Lake City, Utah, for Appellee.

**JUDGES:**

Seth, Barrett and Doyle, Circuit Judges.

**OPINIONBY:**

SETH

**OPINION:**

[*623] SETH, Circuit Judge.

Brigham Young University appeals from judgment upon jury verdict awarding Hayes Slaughter $88,283.00 in damages in a diversity action based on his expulsion by the University from its graduate school.

As indicated, the case was tried to a jury after the University's motion for summary judgment had been denied. The University requested the jury. After [*624] the plaintiff's case the University moved to dismiss, and at the end of the trial it moved for a directed verdict which was denied. The jury found for the plaintiff, judgment was entered, and this appeal was taken by the University.

The operative facts will be described as the several issues on appeal are considered. The complaint is upon contract theory alone. The University is not a tax-supported school, but instead [**2] is owned, supported, and operated by the Church of Jesus Christ of Latter-day Saints.

Plaintiff's status as a graduate student working toward a doctorate required that he meet the academic requirements of the University, and that he abide by its rules of conduct or ethical standards. He had been in attendance for several years, and without question he was familiar with both sets of standards. The committee supervising his work and the administrative officials here concerned had the authority to determine whether plaintiff was meeting both requirements.

The incident which precipitated the review of plaintiff's performance by the University authorities was one on the conduct or ethical side rather than an academic deficiency. It arose from the assertion that plaintiff had used the name of Professor Thorne, one of his advisors, as a coauthor with plaintiff of two articles submitted to a technical journal for publication. The articles were so published without the knowledge in advance of Dr. Thorne, without his review of them nor participation in any way as an author. It was apparent that this was done by the plaintiff to improve his chances to have the articles published. Prior efforts [**3] to have the articles published in plaintiff's name alone had not been successful. The work on the material published for

the most part was done by plaintiff before coming to the University.

The question raised was whether these acts were a violation of the University rules as to conduct. The Code of Student Conduct in part required that students observe ". . . high principles of honor, integrity and morality," also that they: "Be honest in all behavior. This includes not cheating, plagiarizing, or knowingly giving false information." These regulations were reasonable, were clear, and as definite as possible in view of the subject treated. There are no First Amendment issues.

Overtones in the proceedings before the Committee suggested that plaintiff's academic performance was not adequate, but this was not a central issue. This academic matter appears somewhat as an afterthought or perhaps an additional factor developed at the disciplinary hearing. The expulsion of plaintiff was for a violation of the Student Code of Conduct. There is not sufficient evidence either way relating to compliance or noncompliance with the academic standards to raise it as an issue. There was evidence [**4] that plaintiff had met some of the academic requirements, and was classified as a candidate for a doctorate. Some steps had been completed by plaintiff but there was much more to be done which was far from routine, including completion of a dissertation and the defense thereof. The trial court, however, assumed facts not shown and instructed the jury as a matter of law that plaintiff was progressing satisfactorily toward the degree he sought. The trial judge also assumed without evidence that the plaintiff would in the future have met the academic requirements he had not yet undertaken, or was excused therefrom.

As to procedural due process, plaintiff, before the conferences or hearings began, was aware of the subject to be considered. There is no issue as to the notice aspect of the due process problem, and the issues to be considered were narrow. The question basically was whether the articles were offered for publication without the knowledge and consent of Dr. Thorne, and if so, was this dishonest or otherwise a violation of the Code of Student Conduct?

The Dean of the Graduate School had notified plaintiff personally of the charges, and the hearing was before the [*625] [**5] Dean, the head of the Chemistry Department, the assistant head, two members of plaintiff's faculty advisory committee, and Dr. Thorne. The matter had been investigated by the University for several months and plaintiff had been discussing the problems with the faculty and friends several days before the hearing. Some three or four months before the hearing, Dr. Thorne had reprimanded plaintiff for the publication of the first article. The charge that the use of Dr. Thorne's name without his permission and for the purposes used was dishonest was again made known to plaintiff, and he was asked to explain. His explanation was that he thought he had Dr. Thorne's implied permission to use his name, apparently because he was an advisor. The facts as to the use of Dr. Thorne's name were there fully developed, and all concerned were present. The meeting continued, considered also plaintiff's academic progress, and at its conclusion the committee members and the Dean voted to expel plaintiff on the ground of dishonesty. Thus they found that the use of Dr. Thorne's name was without his permission; that the use made of it was dishonest, and was in violation of the Student Code. Plaintiff was formally [**6] notified of the decision and of his expulsion. Plaintiff was permitted to, and did, tape the hearing, and it was transcribed. There is nothing in the record to indicate a need for nor request for any further proceedings.

It must be held that there was an adequate hearing on the charge with a meaningful opportunity given to plaintiff to participate, to present his position, and to hear the witnesses presenting the facts they had knowledge of. We hold that these proceedings met the requirements of the constitutional procedural due process doctrine as it is presently applied to public universities. It is not necessary under these circumstances to draw any distinction, if there be any, between the requirements in this regard for private and for public institutions. The trial court was thus in error in deciding as a matter of law that the proceedings were deficient or inadequate. His instruction to the jury as to his erroneous conclusion was error.

When the courts lay down requirements for procedural due process in these situations as required by the Constitution, and when the school administrators follow such requirements (and other basic conditions are met), some weight must then [**7] be given to their determination of the facts when there is substantial evidence to support it. Thus if the regulations concerned are reasonable; if they are known to the student or should have been; if the proceedings are before the appropriate persons with authority to act, to find facts, or to make recommendations; and if procedural due process was accorded the student, then the findings when supported by substantial evidence must be accorded some presumption of correctness. The adequacy of the procedure plus the substantial evidence element constitute the basis and the record to test whether the action was arbitrary. The fact-finding procedures were adequate.

There was here substantial evidence to support the findings of the committee and the Dean. It was clear that Dr. Thorne gave no permission to use his name to the plaintiff and there was no basis for any implied

permission. There was also substantial evidence at the hearing to support the finding that the acts were "dishonest" as the term was used in the Student Code. The committee finding that the acts were "dishonest" was made in the context of a church school. The "honesty" standard in the Student Code is thus one applied [**8] in such a school. The Code of Conduct refers expressly to the standards of the church sponsoring the school. Thus the "honesty" determination was the measure of the act in an academic context, and also in such context at a church school. Since this evaluation of the acts was by those charged with the application of the Code in this particular school, it is more than ordinarily a matter within their expertise.

The argument is made that the committee and the Dean were not disinterested [*626] persons, but school discipline problems must first be resolved in the school and by its constituted authorities. This is a function of the educational process and has always been considered a basic element. The student places himself in the school community and traditionally those with immediate supervision plus one or more in an administrative position, or combined position, enforce the rules of discipline. This has to be the starting place at least.

There remained, after the dismissal of this action as to the individual defendants, no issue of malice toward the plaintiff. There was the assertion that the dismissal was wrongful and was an arbitrary application of the rules. A university [**9] has of course the inherent right to discipline students. *Speake v. Grantham, 317 F. Supp. 1253* (S.D.Miss.); *Esteban v. Central Missouri State College, 290 F. Supp. 622* (W.D.Mo.).

The complaint was based on a contract theory and that alone, but neither the conclusory allegations of the complaint showed, nor did the proof submitted by the plaintiff establish, a contract between plaintiff and the University in the disciplinary context. The Graduate School Catalogue and the conduct-honor codes were the only evidence as to the "contract." The trial court's rigid application of commercial contract doctrine advanced by plaintiff was in error, and the submission on that theory alone was error.

It is apparent that *some* elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the University to provide some framework into which to put the problem of expulsion for disciplinary reasons. This does not mean that "contract law" must be rigidly applied in all its aspects, nor is it so applied even when the contract analogy is extensively adopted. There are other areas of the law which are also used by courts and writers to provide [**10] elements of such a framework. These included in times past *parens patriae*, and now include private associations such as church membership, union membership, professional societies; elements drawn from "status" theory, and others. Many sources have been used in this process, and combinations thereof, and in none is it assumed or required that all the elements of a particular doctrine be applied. The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category. It may also be different at different schools. There has been much published by legal writers advocating the adoption of various categories to be applied to the relationship. See 72 Yale L.J. 1387; 48 Indiana L.J. 253; 26 Stanford L.Rev. 95; 38 Notre Dame Lawyer 174. There are also many cases which refer to a contractual relationship existing between the student and the university, especially private schools. See *Carr v. St. John's University, 17 A.D.2d 632, 231 N.Y.S.2d 410; University of Miami v. Militana, 184 S.2d 701* (Fla. App.); *Zumbrun v. University of Southern California, 25 Cal.App.3d 1, 101 Cal. Rptr. 499; Drucker v. New York University, 59 Misc. 2d 789,* [**11] *300 N.Y.S.2d 749.* But again, these cases do not adopt *all* commercial contract law by their use of certain elements.

In contrast, the complete adoption of commercial contract doctrine by the trial court as to this disciplinary matter resulted in its conclusion that since the University had breached the "contract" by its dismissal of plaintiff, he was entitled to damages based on what he would have earned had he received his doctorate. This was some sort of substantial performance remedy. It assumed that plaintiff was excused from, or would have completed, his academic requirements. This was an unwarranted assumption by the court under the facts, but was necessary to support the damage theory it had adopted. The court thus erroneously instructed the jury:

> "The court has also determined as a matter of law, and charges that you are obliged to follow the court's view on this matter, that by virtue of his [*627] expulsion plaintiff was excused from submission of a dissertation, from the final oral examination and from any other performance of his contractual obligations after March 14, 1972, which is the date he was expelled."

In its strict contract application, [**12] the trial court also instructed that only "substantial" compliance by plaintiff with the Student Code was required. By this "substantial" compliance standard, the jury was in effect instructed that a little dishonesty would not matter. This cannot be the measure and the court cannot so modify the Student Code. Again the blanket application of commercial contract doctrines led to such a result.

Ordinarily the remedy available in these circumstances would be reinstatement rather than damages. It is, however, apparent that damages arising from a wrongful dismissal could in the proper case be alleged and be shown without an assumption that the academic requirements were met, but these elements would be quite different from the ones here asserted, and would look more like those applied in tort actions. Under plaintiff's proof and theory, no damages could be recovered, and it was error to submit the issues to the jury.

There was no contract established at trial as alleged in his complaint, and no breach of contract by the University. There was, in short, a failure to prove the cause of action. The motion of the University for a directed verdict should have been granted.

The judgment [**13] is set aside, and the case is reversed with instructions to enter judgment for the defendant.