# EXHIBIT 6

LEXSEE 125 F3D 503

NICHOLAS C. JANNOTTA, individually and as executor of the Estate of VICTORIA A. JANNOTTA, and CARMEIN D. BLASUCCI, as executor of the Estate of VICTORIA A. JANNOTTA, Plaintiffs-Appellees, v. SUBWAY SANDWICH SHOPS, INC., FREDERICK A. DELUCA, PETER H. BUCK, and DOCTOR'S ASSOCIATES, INC., Defendants-Appellants.

No. 96-1620

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

125 F.3d 503; 1997 U.S. App. LEXIS 23650; 47 Fed. R. Evid. Serv. (Callaghan) 1061

September 5, 1996, Argued
September 9, 1997, Decided

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 94 C 3834. William T. Hart, Judge.

**DISPOSITION:** VACATED AND REMANDED.

**COUNSEL:** For NICHOLAS C. JANNOTTA, CARMEIN D. BLASUCCI, Plaintiffs - Appellees: Jeffrey A. Berman, Jacquelyn F. Kidder, ROSS & HARDIES, Chicago, IL USA. David M. Duree, Robert L. Carter, REINERT & DUREE, St. Louis, MO USA.

For SUBWAY SANDWICH SHOPS, INCORPORATED, FREDERICK A. DELUCA, PETER H. BUCK, DOCTOR'S ASSOCIATES, INCORPORATED, Defendants - Appellants: Jack R. Bierig, Thomas W. Merrill, Susan M. Davies, SIDLEY & AUSTIN, Chicago, IL USA. Edward W. Dunham, Kevin M. Kennedy, WIGGIN & DANA, NEW HAVEN, CT USA. James T. Rohlfing, SAITLIN, PATZIK, FRANK & SAMOTNY, Chicago, IL USA.

**JUDGES:** Before CUDAHY, MANION, and ROVNER, Circuit Judges. MANION, Circuit Judge, concurring.

**OPINIONBY:** ROVNER

**OPINION:**

[*505] ROVNER, *Circuit Judge*. After a lengthy trial in this diversity case, a jury found for plaintiff Nicholas C. Jannotta individually, and for Jannotta and plaintiff Carmein D. Blasucci, as co-executors of the estate of Victoria A. Jannotta, on their claims for breach of contract and fraud. The jury awarded plaintiffs $ 328,993.99 in compensatory [**2] damages and $ 10 million in punitive damages. The district court subsequently denied defendants' post-trial motion and entered judgment on the jury's verdict. In this appeal, defendants challenge only the judgment for punitive damages, arguing that they are entitled to judgment as a matter of law on that issue or, alternatively, to a new trial. Having carefully reviewed the evidence before the jury, we must reject defendants' contention that it does not support an award of punitive damages. Unfortunately for plaintiffs, however, we agree that the instructions provided to the jury on the punitive damages question were not in accord with Illinois law. And because that instructional error cannot be deemed harmless on this record, we must vacate the punitive damages judgment and remand for a new trial on that issue.

I.

A.

We describe the trial evidence in a manner consistent with the jury's verdict--that is, in the light most favorable to plaintiffs. We therefore resolve any conflicts in plaintiffs' favor and accord them the benefit of all reasonable inferences that can be drawn from the evidence. *Frazell v. Flanigan*, 102 F.3d 877, 879 (7th Cir. 1996).

In 1985, Victoria [**3] Jannotta owned a parcel of property at 3613 North Harlem Avenue in Chicago that she wished to lease for business purposes. Her son Nicholas Jannotta, n1 who handled Victoria's business

Case 1:04-cv-11572-JLT   Document 35-7   Filed 02/14/2006   Page 3 of 16

Page 2
125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

affairs, posted a sign on the property indicating that it was available for leasing. Shortly thereafter, Thomas McSwiggan approached Jannotta on behalf of Subway Sandwich Shops, Inc. ("SSS" or "Subway"). He indicated that SSS was interested in leasing the property for the purpose of opening Chicago's first Subway store. At the time, Jannotta was unfamiliar with Subway's operations, and McSwiggan explained to him that Subway was a national fast food chain with 486 existing stores and approximately 200 more in the development stage. After a series of discussions between the two, Jannotta learned that if he leased the property to SSS, a franchisee would operate the Subway store. Jannotta said that in that circumstance, he would require the parent company to sign the lease so that he could look to that company if the franchisee failed to satisfy its rental or insurance obligations. McSwiggan explained that Subway's parent company generally did not get involved in the signing of leases, and Jannotta responded [**4] that he then did not want Subway as a tenant. McSwiggan assured Jannotta that he would make some calls, "talk to the folks back east," and get back to him. n2

n1 Because the facts of this case primarily involve Nicholas Jannotta and not his mother, we shall refer to him as "Jannotta." To distinguish her from Nicholas, we shall use Victoria Jannotta's full name, or refer to her simply as "Victoria."

n2 Subway was based in Connecticut at the time.

[*506] When he did, McSwiggan indicated that the parent company would sign the lease for the property at 3613 North Harlem Avenue. He reiterated at that point the number of Subway shops in operation and in development across the country, and also represented that SSS was a financially qualified, expanding operation. At one of their meetings, in response to a request for financial information, McSwiggan showed Jannotta a financial statement indicating that SSS had assets of approximately $ 1 million. McSwiggan also provided Jannotta with a list of the employees in SSS' leasing [**5] department and a list of the company's references, including landlords, bankers, and suppliers. Jannotta wrote at the bottom of the leasing department list: "486 total open; 200 in development--in 2 months." Jannotta learned only much later that SSS in fact was not the parent company of the Subway enterprise, but was merely a related leasing company with no employees and virtually no assets. Indeed, SSS' only assets were the leasehold interests it acquired as the prime tenant of various properties. It turned out that the true parent company and franchisor in the Subway enterprise--the one with $ 1 million in assets, a leasing department, hundreds of Subway stores, and solid references--was defendant Doctor's Associates, Inc. ("DAI"), a sub-chapter S corporation with two fifty percent shareholders-- defendants Frederick A. DeLuca and Peter H. Buck. Jannotta did not learn the truth about SSS and DAI until it was revealed to him by his current counsel in May 1994.

In addition to McSwiggan, Jannotta also spoke over the telephone with Brian Kaligian, who represented himself as SSS' Connecticut-based Director of Leasing. Because SSS had no employees, however, it turned out that Kaligian [**6] actually worked for DAI. Like McSwiggan, Kaligian assured Jannotta that SSS was a responsible company and that it was financially capable of paying the rent for the 3613 North Harlem Avenue property. Based on his conversations with McSwiggan and Kaligian, Jannotta believed that SSS had sufficient assets to pay the rent in the event that a franchisee failed to do so.

After a series of negotiations, Jannotta, McSwiggan, and Kaligian agreed on the terms of a lease for the premises. Kaligian executed the lease agreement on Subway's behalf and forwarded it to Jannotta for his mother's signature. The lease was for a period of twelve years commencing on August 15, 1985, and included two unique provisions proposed by Jannotta to which Subway subsequently agreed--a percentage-of-sales rent clause and a provision designating a restricted trade area. Both provisions were added after Subway initially objected to the rent Jannotta had proposed for the property. The lease's rental clause provided that SSS would pay a specified base rent plus additional rent calculated as the amount by which 5.5 percent of the Subway store's gross sales exceeded that year's base rent. The territorial restriction [**7] provided that neither SSS nor its "subsidiaries, affiliates, franchisees [or] their subfranchisees" would operate a Subway Sandwich Shop within a designated area surrounding the 3613 North Harlem Avenue location. (Pl. Ex. 1, PP 23 & 37.) The lease further required SSS to pay the property's utility bills and to keep the property and its improvements in good repair. Based upon Jannotta's understanding that SSS was the parent company/franchisor, that it had substantial assets, and that it would pay the rent if its franchisee failed to do so, Jannotta recommended that his mother sign the lease. He testified at trial that he would not have made that recommendation had he known that SSS was not the parent company/franchisor, that it had no assets or employees, and that it did not have the resources to pay the rent if a franchisee did not.

In the first eight years after execution of the lease, three subtenants (Claude Stenvig, Sandra and Raymond Bickel, and John Conover) successively operated a Subway Sandwich Shop on the premises. Each subtenant

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 4 of 16

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Page 3

first entered into a franchise relationship with DAI and then into a sublease with SSS or an affiliated company, which enabled the subtenant [**8] then to operate the Subway franchise on the property. The rent charged to each franchisee under the sublease was the same as that charged to SSS under the master lease, and each sublease required the [*507] franchisee to pay rent directly to the property's landlord.

Approximately two years into the twelve-year master lease, while Stenvig was still the franchisee on the property, Jannotta noticed that another Subway Sandwich Shop had opened within the restricted trade area designated by the lease. Jannotta therefore sent a certified letter to Leonard Axelrod, the Chief Legal Officer and Vice President of DAI, who also served as counsel for SSS, notifying Axelrod that SSS was in violation of the restricted trade area. When he received no response, Jannotta sent a second letter approximately six weeks later. n3 He also attempted to speak with Axelrod by telephone but was instructed to talk with Tony Samander instead. When Jannotta explained to Samander that Subway had opened another store within the area restricted by the lease, Samander said, "Sue us." Jannotta therefore followed up with a third letter, this time to Samander, explaining again that the new Subway store was in violation of the [**9] restricted trade area and that the franchisee was concerned because the store was damaging his business. Jannotta received no response to that letter either. He thereafter attempted to speak with Axelrod by telephone, but this time, he was referred to Caroline Kennedy, a paralegal in Subway's legal department. Kennedy advised Jannotta to forward his previous correspondence to her and assured him that she would follow through on it. Jannotta did so, but he never heard from Kennedy again.

   n3 Before sending the second letter, Jannotta learned that Subway was taking the position that it had never received the first letter. Thus, Jannotta included with the second letter a copy of the first letter and a copy of the "receipt for certified mail" showing that Subway had received it.

In March 1988, Jannotta complained to the Illinois Attorney General about Subway's violation of the restricted trade area, and he sent a copy of that complaint to Axelrod. Only at that point did Axelrod agree to speak with Jannotta. Although [**10] he apparently did not communicate this to Jannotta, it was Axelrod's position that the new store did not violate the restricted trade area because another Subway leasing company (Subway Restaurants, Inc.) had been used to execute the lease and sublease for that property. According to Axelrod, Subway's other leasing companies were not bound by the restriction in the Jannotta lease and were therefore free to place new stores in the restricted trade area. n4 Consistent with Axelrod's position, DAI, through two different leasing companies, opened six new Subway Sandwich Shops within the restricted trade area by November 1990. Jannotta continued to complain to Subway that these stores violated his mother's lease.

   n4 Prior to 1991, there were at least twelve leasing companies used by DAI to enter into leases with property owners such as Victoria Jannotta. Like SSS, these other leasing companies had virtually no assets, no employees, and no taxable income; their officers all were employees of DAI. When a lease was to be signed with a property owner, an individual in DAI's leasing department would decide which of the leasing companies would be used to execute the lease. It was Axelrod's position that by using a different leasing company, DAI could open new Subway Sandwich Shops within a restricted trade area without violating the restriction imposed by an existing lease.

[**11]

Not surprisingly, with each new Subway Sandwich Shop that opened in the restricted trade area, sales at the 3613 North Harlem Avenue store dropped precipitously. In 1986, for example, before any competing Subway stores had opened in the restricted area, the Harlem Avenue store had gross sales of $ 235,632. By 1993, however, when seven stores were operating in the restricted area, the Harlem Avenue store had gross sales of only $ 19,353. By the time Conover became the franchisee in June 1990, in fact, the Harlem Avenue store was no longer profitable. Conover stopped paying his share of the real estate taxes in late 1992, stopped paying the rent in January 1993, and vacated the premises entirely two months later.

When Conover stopped paying the rent, Jannotta contacted two Chicago representatives of the Subway organization and was told that Subway was working to find a replacement franchisee. When Jannotta pressed them about SSS' obligation to pay the rent in the interim, the representatives were nonresponsive. Even after Jannotta complained, SSS did not pay the rent due [*508] under the lease. It also permitted the vacant property to fall into disrepair. One of DAI's two shareholders testified [**12] at trial that it was the company's policy not to have a leasing company step forward and perform its obligations under a lease once a franchisee failed:

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 5 of 16

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Page 4

> Now, in terms of paying the rent, when the store closes and the franchisee stops paying, our policy is to work it out with the landlord. But if we simply just pay rent each month, then the landlord doesn't have any obligation to mitigate, nor does he have any motivation to do anything. So we simply take the approach of, okay, the rent stream has stopped. Let's try to solve this in the best way for everybody. We get right to work on it.

(Tr. at 943.) Yet that policy was never disclosed to Jannotta at the time he recommended to Victoria that she sign a lease obligating SSS to pay the rent in the event of a franchisee failure.

On September 29, 1993, Jannotta issued a "notice of default" which informed SSS that, among other things, base rent in the amount of $ 18,350 was currently due and owing. When Jannotta received no response to that notice, he filed a lawsuit in state court, claiming that SSS had violated the lease by failing to pay the base rent and its portion of the real estate taxes, by failing to keep the [**13] property in good repair, and by opening six stores within the restricted trade area. After settlement discussions failed, Jannotta decided to dismiss the state court suit and to initiate this action in federal court.

Victoria Jannotta had passed away in the meantime, and for estate tax purposes, the property at 3613 North Harlem Avenue was appraised as having a value of $ 335,000 on April 15, 1993. At the time of the appraisal, the property was vacant and in a state of disrepair, and six competing Subway stores were operating within the restricted trade area. On April 10, 1995, Jannotta sold the property for $ 365,000. He testified at trial that if Subway had maintained the property as it was required to do under the lease, the property would reasonably have been worth $ 500,000 at the time of the sale.

B.

Plaintiffs' federal court complaint alleged claims for breach of contract and common law fraud. In this appeal, we are concerned solely with the fraud count because punitive damages are available in Illinois for a claim of fraud, but not generally for a breach of contract. *Stafford v. Puro*, 63 F.3d 1436, 1443 (7th Cir. 1995); *Morrow v. L. A. Goldschmidt Assoc.*, 112 Ill. 2d 87, 492 N.E.2d 181, 183, 96 Ill. Dec. 939 [**14] (Ill. 1986). Plaintiffs alleged in their fraud claim that the four defendants, who were alleged to be alter egos of one another, had misrepresented material facts to Jannotta through their agents McSwiggan and Kaligian. Plaintiffs specifically alleged that defendants had represented to Jannotta that SSS was the parent company in the Subway enterprise with stores across the nation, that SSS not only was solvent but had a substantial net worth, and that SSS had the ability to pay the rent due under the lease if the franchisee failed to do so. Plaintiffs further alleged that McSwiggan and Kaligian had represented that Subway would not open any new stores in the area designated by the agreement. In making those representations, the complaint alleged, defendants had concealed the following facts: that SSS actually was a shell corporation without sufficient assets to satisfy its obligations under the lease, that SSS was not the parent or the franchisor of the Subway enterprise, and that the remaining defendants had executed the lease through SSS to avoid any liability to the landlord. Plaintiffs further alleged that this fraudulent conduct was consistent with defendants' [**15] standard practice in dealing with landlords across the country, qualifying their conduct as "outrageous, malicious, and intentional," and entitling plaintiffs to punitive damages.

To establish this "standard practice," plaintiffs introduced two types of evidence: the first addressed to the way in which defendants trained their development agents to negotiate leases with potential landlords, and the second relating to the claims of other Subway landlords against SSS or other leasing companies for the nonpayment of rent.

[*509] DAI trained development agents for its franchising operations at its home office in Connecticut. Buck testified that DAI exercised complete control over the Subway development agents and that it essentially told them what to do. Most of the specifics about development agent training was introduced through David Otis, a former Subway franchisee who later received training as a development agent within the DAI system. Otis testified that his training included a series of "role-plays" in which he would act as a development agent in negotiating a lease while a DAI leasing representative would play the role of a potential landlord. Trainees were taught to tell the landlords [**16] that a tenant leasing company would sign the lease on Subway's behalf, that the leasing company was not a shell corporation, and that Subway stood behind it with five to six thousand stores. Although the development agents were told that the leasing companies had no assets, they were instructed not to mention that fact to potential landlords. The agents also were told that the leasing companies were set up for the protection of DAI and for the agents themselves, n5 and that because the companies had no assets, it would be very difficult if not impossible for landlords to collect judgments from those companies. If a potential landlord asked to see the financial statements of a leasing company, the agents were instructed to say that the company

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 6 of 16

Page 5

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

was privately held and that financial statements were unavailable. If the landlord persisted, the agent was to provide the landlord with a leasing packet comprised of bank and supplier references and franchise disclosure documents, which included the financial statements of the franchisor DAI. n6

n5 This structure benefitted the development agents because individual agents were required to reimburse DAI for one-third of any litigation expenses arising from landlord or franchisee claims within their development territories. Axelrod confirmed, moreover, that DAI used the various leasing companies to execute leases in part to avoid imposing rental or other obligations on DAI.

[**17]

n6 The evidence also revealed that in 1991, the Federal Trade Commission required that the following statement be included in the offering circular provided by DAI to prospective franchisees:

Notwithstanding the arbitration clause in the Franchise Agreement, in the event that the franchisee fails to pay rent or otherwise breaches the Franchise Agreement and/ or the Sublease, the entity sub-letting the premises to the franchisee may elect to terminate the Sublease and require the franchisee to vacate the premises by summary process, unlawful detainer or other form of civil action, brought in a court of competent jurisdiction. The following corporations may act as sublessors of restaurant premises:

Franchise Real Estate Leasing Corp.

Subway Central, Inc.

Subway Development of America, Inc.

Subway East, Inc.

Subway Leasing Corp., Inc.

Subway Real Estate Development, Inc.

National Franchise Realty, Inc.

Subway South, Inc.

Subway Restaurants, Inc.

Subway Restaurants of California, Inc.

Subway West, Inc.

Subway Sandwich Shops, Inc.

Subway Sandwiches, Inc.

Subway Real Estate Corp.

Subway Sandwiches & Salads, Inc.

Each of these entities may now be involved in litigation in various jurisdictions with landlords claiming breaches of leases and seeking back rent and other forms of relief and/or in litigation with franchisees. Each entity may have insufficient assets to pay a damage award in any one of these suits with landlords, and/or in any litigation with a franchisee.

(Pl. Ex. 76.) DAI and the leasing companies were not required to provide this information to prospective landlords, however, and its policy was not to do so.

[**18]

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 7 of 16

Page 6

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Plaintiffs also presented testimony from five former Subway landlords to establish that the development agents regularly followed these practices in negotiating leases. Like Jannotta, these landlords were not told that the leasing company who would execute the lease on behalf of Subway had virtually no assets and would be unable to satisfy its obligations under the lease if the franchisee either failed to pay the rent or vacated the premises. Each landlord was instead told that Subway would be able to pay the rent if the franchisee did not. One potential landlord who objected to the fact that his tenant would be able to sublease the property without his consent was told that he should not be concerned because his lease would be with the parent company itself, which certainly had the financial resources to pay the rent if the subtenant did not. Certain of the landlords also were provided with the leasing [*510] packet containing the references and franchise disclosure materials that, unbeknownst to the landlords, related to DAI and not to the particular leasing company involved. Each of the five landlords testified, moreover, that Subway had failed to pay the rent once a franchisee defaulted. [**19] Some of those landlords filed lawsuits to collect the past-due rent only to find that the leasing companies had no assets on which a judgment could be collected. As a result, none of the landlords was ever paid the amounts due under their leases.

Plaintiffs also established that landlords held at least twelve unpaid judgments against Subway leasing companies, some of which had been entered as far back as 1987. The judgments totaled $ 744,296.18 and had been entered in courts across the country. n7 DeLuca testified at trial, moreover, that between January 1 and November 20, 1995, DAI had paid more than $ 1.3 million to settle the claims of seventy-two additional landlords. A number of those claims involved judgments that had been outstanding for a number of years. Plaintiffs argued to the jury that DAI had provided the money to settle those claims in 1995 only because of the punitive damage claim in this case.

n7 Axelrod acknowledged, in fact, that the Subway organization generally did not defend lawsuits filed in states other than Connecticut because, until recently, a default judgment entered against a Connecticut corporation outside that state could not be collected in Connecticut without retrying the case. As Axelrod explained:

I'm not sure you're aware, but in Connecticut law as it used to be, a default judgment against a foreign corporation outside of Connecticut had to be retried in the State of Connecticut. That was true until not long ago. It had to be started all over again.

So one of the purposes was-- I'm not going to say that ultimately we're very proud of it--but a landlord would start an action, let's say, in the State of Alabama, and we wouldn't appear. He would find that he would have to come to Connecticut to retry the case, and it was a way of saving legal fees and trying it here on our home turf.

(Tr. at 163.) Even then, of course, the landlord would end up with a Connecticut judgment that the leasing company had no assets to satisfy. The landlord could collect on the judgment only by ultimately succeeding in piercing the leasing company's corporate veil.

[**20]

Finally, a stipulation was read to the jury indicating that DAI is structured so that its net annual income is paid to the corporation's two shareholders in equal shares. DeLuca and Buck, as those shareholders, each received $ 27 million from DAI in 1990, $ 32 million in 1991, $ 42 million in 1992; $ 54 million in 1993, and in 1994, the year before the trial in this case, both men received $ 60 million.

C.

The nine-member jury unanimously found against each of the four defendants on plaintiffs' claims for breach of contract and fraud. That meant that the jury necessarily found that SSS was the alter ego of DAI, DeLuca, and Buck. The jury awarded compensatory damages on the two claims totaling $ 328,993.99, which included the base, additional, and percentage rent due under the lease, the lost market value of the 3613 North Harlem Avenue property, and prejudgment interest. Defendants have not challenged either the jury's liability findings or its award of compensatory damages. The jury then determined that plaintiffs also were entitled to punitive damages, and it apportioned that award amongst the four defendants as follows: $ 1 million against SSS, and $ 3 million apiece against [**21] defendants DAI, DeLuca, and Buck, for a total punitive damage award of $ 10 million.

Case 1:04-cv-11572-JLT   Document 35-7   Filed 02/14/2006   Page 8 of 16

Page 7

125 F.3d 503, \*; 1997 U.S. App. LEXIS 23650, \*\*;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Defendants filed a timely post-trial motion, asking the district court, in the alternative, to enter judgment as a matter of law on the issue of punitive damages, to grant a new trial on that issue, or to reduce the amount of the award. At the same time, plaintiffs requested an award of attorney's fees and costs under a provision in the lease. The district court denied defendants' motion in its entirety and awarded attorney's fees and costs to plaintiffs in the amount of $ 196,325.88.

II.

A.

We first must consider defendants' argument that the evidence was legally insufficient to support an award of punitive damages. n8 [\*511] The district court concluded that it was not and therefore submitted the issue to the jury. The court later denied defendants' renewed motion for judgment as a matter of law and also rejected defendants' contention that the punitive damage award was excessive. We review the district court's decision to submit the issue to the jury de novo, asking whether the evidence, when considered in the light most favorable to plaintiffs, is legally sufficient to satisfy Illinois' standard [\*\*22] for an award of punitive damages. *Medcom Holding Co. v. Baxter Travenol Lab., Inc.*, 106 F.3d 1388, 1402 (7th Cir. 1997); *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 275 (7th Cir.), cert. denied, 136 L. Ed. 2d 215, 117 S. Ct. 297 (1996); *Stafford*, 63 F.3d at 1443.

> n8 Because this is a diversity case governed by Illinois law, that state's law provides the substantive standard for an award of punitive damages. See *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1276 (7th Cir. 1993); *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043-44 (7th Cir. 1990).

We often have noted that punitive damages are not favored in Illinois and that an award of such damages is appropriate only in cases of intentional, outrageous misconduct. *Roboserve*, 78 F.3d at 275; *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1276 (7th Cir. 1993); *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir. 1990); see also *Deal v. Byford*, 127 Ill. 2d 192, 537 N.E.2d 267, 272, 130 Ill. Dec. 200 [\*\*23] (Ill. 1989) ("Because of their penal nature, punitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded."). In a fraud action like this one, "deceit alone cannot support a punitive damage award," but such an award is appropriate "'where the false representations are wantonly and designedly made.'" *Home Sav. and Loan Ass'n v. Schneider*, 108 Ill. 2d 277, 483 N.E.2d 1225, 1228, 91 Ill. Dec. 590 (Ill. 1985) (quoting *Laughlin v. Hopkinson*, 292 Ill. 80, 126 N.E. 591, 595 (1920)). Thus, a plaintiff seeking to recover punitive damages on a fraud claim must show, in addition to simple fraud, "gross fraud, breach of trust, or 'other extraordinary or exceptional circumstances clearly showing malice and willfulness.'" *AMPAT/Midwest*, 896 F.2d at 1043 (quoting *Schneider*, 483 N.E.2d at 1228); see also *Europlast*, 10 F.3d at 1276; *West v. Western Cas. and Sur. Co.*, 846 F.2d 387, 398 (7th Cir. 1988). One way to satisfy that standard is through evidence indicating that a fraud was designed to enrich the defendant without regard to its effect on others or was intended by him to harm the plaintiff. See *AMPAT/Midwest*, 896 F.2d at 1044; *West*, 846 F.2d at 398-99; [\*\*24] see also *Roboserve*, 78 F.3d at 276.

Like the district court, we find the evidence in this case more than sufficient to establish "gross fraud." When first approached by McSwiggan, Jannotta was unfamiliar with Subway's operations, and McSwiggan told him that Subway was a growing national enterprise with nearly 500 existing stores and approximately 200 more stores under development. Once he learned that a Subway franchisee would be responsible for operating the store, however, Jannotta made it clear that his mother would sign a lease only with the parent company itself, and although McSwiggan initially indicated that the Subway parent generally did not get involved with leases, he assured Jannotta after talking "to the folks back east" that the parent company would sign this particular lease. When Jannotta asked to see the financial statements of that company, moreover, McSwiggan showed him a statement indicating that SSS had approximately $ 1 million in assets. At the same time, Jannotta was shown a list of employees allegedly comprising SSS' leasing department and a list of references, including landlords, bankers, and suppliers. These materials, Jannotta learned [\*\*25] only later, actually depicted the assets, employees, and references of DAI, the parent company and franchisor in the Subway enterprise, and not those of SSS, which unbeknownst to Jannotta was merely one of several Subway leasing companies with no employees and virtually no assets.

There was further evidence that Brian Kaligian, who presented himself to Jannotta as SSS' Director of Leasing, made misrepresentations in the course of negotiating the lease. [\*512] Like McSwiggan, Kaligian assured Jannotta in a series of telephone conversations that Subway was a responsible company and that it was financially capable of paying the rent if a franchisee did not. Kaligian, in fact, executed the Jannotta lease on SSS' behalf, thereby obligating that company to pay the rent

Case 1:04-cv-11572-JLT   Document 35-7   Filed 02/14/2006   Page 9 of 16

Page 8

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

and to keep the Jannotta property in good repair. In all of their discussions prior to execution of the lease, however, neither McSwiggan nor Kaligian ever disclosed to Jannotta that SSS was merely a shell corporation with no employees and virtually no assets, or that DAI actually was the parent/franchisor in the Subway enterprise. Indeed, David Otis testified that defendants instructed their development agents to conceal from prospective [**26] landlords that the company signing the lease was essentially a shell corporation with no assets.

Of course, once the Subway franchisee on the Jannotta property ceased to pay the rent and vacated the premises in 1993, SSS failed to honor its contractual obligation to pay the rent and to keep the property in good repair. Indeed, one of DAI's two fifty percent shareholders testified that it was defendants' policy not to perform the leasing company's obligations under a lease once a franchisee failed; they would instead only attempt to find a new franchisee for the property, as they attempted to do in this case. Yet that policy was not disclosed to Jannotta while the parties were negotiating the present lease. Indeed, Jannotta was repeatedly assured that Subway was able to pay the rent in those circumstances.

The evidence at trial further demonstrated that DAI routinely used leasing companies like SSS to execute leases with landlords in order to avoid imposing rental obligations on DAI. In the event of a subtenant/franchisee failure, the leasing company was obligated to but would not step forward to pay the rent. Defendants would instead require a landlord to file suit against the leasing [**27] company in order to attempt to recover the amount due. Plaintiffs proved, in fact, that at the time of trial (November 1995), various Subway landlords held no fewer than twelve unpaid judgments against Subway leasing companies, some more than seven years old. In the first eleven months of 1995, moreover, DAI paid in excess of $ 1.3 million to settle the claims of seventy-two additional landlords. A number of old judgments against Subway leasing companies were included amongst those claims.

Finally, in addition to the evidence suggesting that Subway had no intention of paying the rent and keeping the property in good repair, plaintiffs also presented evidence from which a reasonable jury could have found that Subway had no intention of honoring the restricted trade area in the Jannotta lease. The evidence established that most Subway leases do not include this type of restriction, but SSS agreed to the restriction in this case in order to procure a lesser rent. Yet defendants then ignored the provision and proceeded to open six new sandwich shops in the restricted area in less than six years. When Jannotta complained, he initially received little or no response from Subway, but eventually, [**28] Axelrod assured Jannotta that there was no breach because leasing companies other than SSS had determined the stores' locations. Those leasing companies, according to DAI's Chief Legal Officer, were not bound by the restriction in the Jannotta lease.

Given this overwhelming evidence, a reasonable jury easily could have found that the defendants "wantonly and designedly" made a series of utterly false representations in order to induce Victoria Jannotta to execute the instant lease. See Schneider, 483 N.E.2d at 1228. Such a jury could have inferred, in fact, that defendants made these false representations and concealed the true facts in order to enrich themselves at Victoria's expense. We therefore have no doubt that the far-reaching fraud proven in this case could be found to satisfy the stringent punitive damage standard employed in the State of Illinois. As a result, the district court did not err in determining to submit the issue to the jury.

B.

Defendants insist, however, that even if "gross fraud" was shown below, they cannot be subjected to punitive damages for that fraud because it was neither authorized nor [*513] ratified by any officer or director of the corporate defendants, [**29] or by either of the individual defendants themselves. In Illinois, punitive damages cannot be assessed against a corporation for the acts of its agents or employees under a theory of respondeat superior. It must be shown, rather, that "the responsible employee was acting in a managerial capacity" or that his acts "were authorized or ratified by the corporation." West, 846 F.2d at 399; see also Douglass v. Hustler Magazine, Inc., 769 F.2d 1128, 1145-46 (7th Cir. 1985), cert. denied, 475 U.S. 1094, 89 L. Ed. 2d 892, 106 S. Ct. 1489 (1986); Kochan v. Owens-Corning Fiberglass Corp., 242 Ill. App. 3d 781, 610 N.E.2d 683, 692-93, 182 Ill. Dec. 814 (Ill. App. Ct. 1993), cert. denied, 510 U.S. 1177, 127 L. Ed. 2d 565, 114 S. Ct. 1219 (1994); Kemner v. Monsanto Co., 217 Ill. App. 3d 188, 576 N.E.2d 1146, 1157, 160 Ill. Dec. 192 (Ill. App. Ct. 1991); Tolle v. Interstate Sys. Truck Lines, Inc., 42 Ill. App. 3d 771, 356 N.E.2d 625, 626-27, 1 Ill. Dec. 437 (Ill. App. Ct. 1976). This is known in Illinois as the "corporate complicity rule." Douglass, 769 F.2d at 1145; Oakview New Lenox Sch. Dist. No. 122 v. Ford Motor Co., 61 Ill. App. 3d 194, 378 N.E.2d 544, 548, 19 Ill. Dec. 43 (Ill. App. Ct. 1978).

Defendants' argument under this rule takes two forms. First, they again maintain that judgment as a matter of law is proper because the evidence does not support a finding of corporate [**30] complicity. In that regard, they argue that any "gross fraud" the jury may have found was perpetrated solely by the development agent Thomas McSwiggan and that there is no evidence

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 10 of 16

Page 9
125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

suggesting that the corporate defendants ever authorized or approved McSwiggan's misconduct. To the extent defendants' argument is addressed to the sufficiency of plaintiffs' proof of corporate complicity, it is completely without merit. As we explained above, plaintiffs' fraud theory was premised not only on fraudulent misrepresentations made to Jannotta by McSwiggan in the field, but also on misrepresentations and material omissions made to Jannotta over the telephone by Kaligian from DAI's home office in Connecticut. Kaligian presented himself to Jannotta as SSS' Director of Leasing and later executed the Jannotta lease on SSS' behalf as a "Vice-President" of that corporation. A reasonable jury could therefore have found that Kaligian was acting in a managerial capacity and that his acts were authorized by the corporation itself. Even with respect to McSwiggan's misconduct, there was evidence from which a reasonable jury could have found that McSwiggan merely followed defendants' standard procedures in [**31] making the representations that he did. Thus, a reasonable jury could also have found corporate complicity by finding that McSwiggan's actions were authorized by the corporate defendants.

Plaintiffs' proof of corporate complicity went further even than that, however. A reasonable jury also could have found that DAI, DeLuca, and Buck had a policy of using shell leasing companies like SSS to incur rental obligations to landlords without ever intending that the leasing company would satisfy its obligations under the lease. The same jury also could have found that those defendants agreed to a restricted trade area in the Jannotta lease without any intention that it would be honored. In either circumstance, it could not be said that a superior officer of the corporation had failed to authorize or to ratify the misconduct occasioning the punitive damage award.

For these reasons, we necessarily must reject the cramped reading of the record that leads defendants to suggest that corporate complicity is absent as a matter of law.

C.

The foregoing discussion, however, deals with what a properly instructed jury could have found based upon the evidence, and defendants' alternative argument [**32] is that they are entitled to a new trial on punitive damages because this particular jury was not properly instructed on the requirements of Illinois' corporate complicity rule. Defendants specifically argue that they were prejudiced by the district court's refusal to give the following instruction:

Punitive damages can properly be awarded against the master or other principal because of [the] act of an agent if, but only if,

[*514] (a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of his employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.

(R. 141, Ex. D.) The district court explained that defendants' tendered instruction was "unnecessary" because the court had "covered that in other instructions." (Tr. at 989.) With all due respect to the able district judge, however, we are unable to agree.

The tendered instruction, derived from the *Restatement (Second) Agency § 217C* (1958), accurately captures the corporate complicity rule [**33] employed by the Illinois courts. See *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31, 330 N.E.2d 509, 512 (Ill. 1975) (approving complicity rule expressed in Restatement § 217C); *Deal*, 537 N.E.2d at 272-73; *Kennan v. Checker Taxi Co.*, 250 Ill. App. 3d 155, 620 N.E.2d 1208, 1213, 189 Ill. Dec. 891 (Ill. App. Ct. 1993); *Pendowski v. Patent Scaffolding Co.*, 89 Ill. App. 3d 484, 411 N.E.2d 910, 913, 44 Ill. Dec. 544 (Ill. App. Ct. 1980); *Tolle*, 356 N.E.2d at 627; see also Illinois Pattern Jury Instructions (Civil) 35.02 (1995) (hereafter "IPI") (incorporating Restatement rule). Before a corporation may be held liable for punitive damages based upon the act of an agent, Illinois law requires a plaintiff to show that the agent was acting in a managerial capacity, or that his acts were expressly authorized or ratified by the principal. See *West*, 846 F.2d at 399. The question we must answer here, then, is whether this aspect of Illinois law was accurately captured in the district court's jury instructions. In doing so, we focus not on any single instruction, but consider whether the instructions as a whole accurately informed the jury of the applicable law. See *Knox v. State of Indiana*, 93 F.3d 1327, 1333 (7th Cir. 1996); *DePaepe v. General Motors* [**34] *Corp.*, 33 F.3d 737, 743 (7th Cir. 1994).

The district court first instructed the jury as to when a corporation will be bound by the acts of its agents and employees:

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 11 of 16

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Page 10

> When a corporation is involved, it may act only through natural persons as its agents or employees; and, in general, any agent or employee of a corporation may bind the corporation by his or her acts and declarations made while acting within the scope of his or her authority delegated to him or her by the corporation *or within the scope of his or her duties as an employee of the corporation.*

(Tr. at 1101 (emphasis added).) The italicized portion is problematic here because it suggests that a corporation will be bound by the acts and declarations of its agent or employee while acting within the scope of his employment. But the Illinois corporate complicity rule requires something more than that; the general "scope of employment" rule applies only to managerial employees. *See Deal, 537 N.E.2d at 272-73; Kemner, 576 N.E.2d at 1159; Pendowski, 411 N.E.2d at 913-14; see also Kochan, 610 N.E.2d at 693.* So we move on to later instructions. The jury subsequently was instructed that a particular [**35] defendant could be found liable for fraud based upon: "(1) his own conduct; (2) the conduct of an agent acting within the scope of the agent's authority; and/or (3) the conduct of an agent of an alter ego corporation acting within the scope of the agent's authority." (Tr. at 1106.) The instruction continued:

> An agent is acting within the scope of the agent's authority if he or she is engaged in the transaction of business which has been assigned to the agent by his or her principal, or if the agent is doing anything which may reasonably be said to have been contemplated as part of the agent's employment. *It is not necessary that an act or failure to act be expressly authorized by the principal.*

(*Id.* at 1107 (emphasis added).) Again, the italicized portion, while unobjectionable with respect to the fraud claim, does not convey the complicity required in Illinois before punitive damages may be assessed against a corporation. *See Mattyasovsky, 330 N.E.2d at 512* [*515] (principal must authorize the doing and manner of the agent's act); *see also* IPI 35.02 (setting out separate standards for award of compensatory damages and award of punitive damages against a corporation). [**36] Finally, the instructions specifically addressed to punitive damages do not cure the defect:

> If you find for the plaintiffs on the fraud claim, and if you additionally find that defendant's conduct was willful and wanton and caused damages to plaintiffs, and if you believe that justice and the public good require it, you may, in addition to any compensatory damages to which you find plaintiffs are entitled, award an amount of punitive damages which will serve to punish that defendant and deter that defendant and others from similar conduct.
>
> The purpose of punitive damages is to punish the liable defendant for his or its misconduct and to deter that defendant or other parties from engaging in similar conduct in the future. If you decide to award punitive damages, in determining the amount, you should take into ac-

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 12 of 16

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Page 11

count all facts of the case and award only so much as you think is necessary to serve the two purposes of punishment and deterrence.

When I use the expression "willful and wanton," I mean a course of action which shows actual or deliberate intention to harm, or which shows an utter indifference to or conscious disregard for the rights of others.

(Tr. at 1117-18.) [**37] These instructions do not in any way modify the agency instructions given earlier once the jury found for plaintiffs on the fraud claim and turned its attention to punitive damages. The instructions therefore permit the jury to award punitive damages against a corporate defendant based solely upon the conduct of a non-managerial agent or employee acting within the scope of his employment. As we have established, that is improper under Illinois law.

Plaintiffs pay scant attention to the Illinois complicity rule in their brief, but the argument they do make is two-fold. First, plaintiffs say, the instructions we have quoted are perfectly proper under Illinois law, as "the necessity that 'complicity' be found could not have been more clear." (Pl. Br. at 45.) For the reasons we have stated, we cannot agree. Which leaves plaintiffs' alternative argument-- that "the evidence of DeLuca's and Buck's 'complicity' in the wrongful acts of the company they wholly owned and controlled, was overwhelming." ( *Id.* at 45.) Although we are not inclined to disagree with that assessment of the trial evidence, we do not believe that the strength of plaintiffs' case means in this circumstance that the [**38] instructional error can be overlooked.

Although *Fed. R. Civ. P. 61*'s harmless error rule applies in this diversity case ( *DePaepe, 33 F.3d at 743; Sokol Crystal Prods., Inc. v. DSC Communications Corp., 15 F.3d 1427, 1434 (7th Cir. 1994))*, an instructional error like this cannot be characterized as harmless if the instructions as a whole provided the jury with an inadequate understanding of the law and the complaining party was prejudiced. *Bronk v. Ineichen, 54 F.3d 425, 430 (7th Cir. 1995); DePaepe, 33 F.3d at 743; Walsh v. Emergency One, Inc., 26 F.3d 1417, 1420 (7th Cir. 1994)*. The Illinois courts have held that the identical error we have identified in this record is not harmless because the lack of an instruction on corporate complicity leaves the jury free to assess punitive damages against a corporate defendant for an act that the corporation never "ordered, participated in, or ratified." *Pendowski, 411 N.E.2d at 914* (reversal required for instructional error even where plaintiff presents adequate evidence of corporate defendant's complicity); *see also Kemner, 576 N.E.2d at 1159* (same); *cf. Kochan, 610 N.E.2d at 693* (finding instructional error [**39] but concluding that issue was waived by defendant's failure to tender complicity instruction).

That is the case here despite the overwhelming nature of the evidence on which a properly instructed jury could have relied in finding corporate complicity. This jury, for example, was never asked to find that McSwiggan was employed by SSS or DAI in a "managerial capacity." *See West, 846 F.2d at 399* (jury must determine whether particular employee is a "managerial employee"). [*516] Nor was it asked to consider whether McSwiggan's fraudulent representations or intentional omissions were specifically authorized or ratified by those defendants. This jury was instructed, in fact, that it was *not* necessary that an agent's act or failure to act be expressly authorized for it to be attributed to the principal. (Tr. at 1107.) We do not believe that the significance of these instructional errors can be discounted here, particularly in light of the jury's instruction on the fraud count. The jury was permitted to return a verdict for the plaintiffs under the fraud instruction, and then to award punitive damages based on that fraud, so long as it found that a defendant, its agent, or an agent of its [**40] alter ego corporation made *any one* of six false statements,

Case 1:04-cv-11572-JLT   Document 35-7   Filed 02/14/2006   Page 13 of 16

Page 12

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

*or* knowingly omitted *either* of two facts. (*Id.* at 1104.) n9 Under its instruction, the jury could have based its fraud verdict on a single false statement or intentional omission of the development agent Thomas McSwiggan, and punitive damages could then have followed from that fraud if the jury found it to be "willful and wanton." (*See id.* at 1117.) Thus, the jury could have assessed punitive damages against all defendants based upon an unauthorized and unratified statement of the development agent. Because such a verdict would be inconsistent with the requirements of Illinois law in the absence of a finding that the development agent also qualified as a "managerial employee," we must conclude that the instructional error prejudiced defendants. n10 We therefore cannot dismiss the [*517] instructional error as harmless. *See DePaepe, 33 F.3d at 744* (where instructional error permitted verdict on improper ground, error was not harmless); *see also Kemner, 576 N.E.2d at 1159* (identical instructional error not harmless); *Pendowski, 411 N.E.2d at 914* (same). As a result, we must grant defendants' request [**41] for a new trial on the issue of punitive damages. n11

n9 The fraud instruction provided as follows:

Plaintiffs bring a fraud claim against each defendant. In order for plaintiffs to recover on their fraud claim, they must prove each of the following propositions by clear and convincing evidence as to a particular defendant:

(1) Defendant, defendant's agents or an agent of defendant's alter ego corporation, with intent to induce Victoria Jannotta to enter into the lease with Sandwich Shops, knowingly made one or more of the following statements of fact:

(a) Sandwich Shops was the parent franchisor of the Subway franchise chain;

(b) Sandwich Shops had opened 456 Subway stores across the country, and 200 more were in development;

(c) Sandwich Shops was solvent and could pay rent in the event the franchise failed at the lessee premises;

(d) Sandwich Shops had a net worth in excess of a million dollars;

(e) Sandwich Shops had hundreds of stores across the country; and

(f) Sandwich Shops had employees, including managers, of its various departments.

Or, knowingly omitted one or more of the following facts:

(a) Provided plaintiffs with documents containing Subway logo and trademark on the letterhead of Sandwich Shops

Case 1:04-cv-11572-JLT   Document 35-7   Filed 02/14/2006   Page 14 of 16

Page 13

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

indicating Sandwich Shops was the parent franchisor while withholding that it was not the franchisor;

(b) Provided plaintiffs with a list of employees of Sandwich Shops while withholding that Sandwich Shops did not have sufficient liquid assets to pay rent in the event that a subtenant defaulted and that Sandwich Shops was without any employees;

(2) The false or omitted facts were material;

(3) Victoria Jannotta reasonably relied on the false facts, or not knowing the admitted facts, in deciding to enter into the lease; and

(4) The aforementioned conduct was a proximate cause of damages to plaintiffs.

(Tr. at 1104-05.) We note that although this instruction was read to the jury by the district court along with the other instructions in the case, it was not included amongst the final jury instructions filed in the record. The fraud instruction included there did not specify the particular false representations or omissions on which the jury could base its verdict, but only more generally indicated that a verdict for plaintiffs could be based on the finding that a defendant or its agent "knowingly made false statements of fact or knowingly concealed facts concerning the business and assets of the lessee, Sandwich Shops . . . ." (*See* R. 101.) The record offers no clue into the discrepancy between the two instructions, although it appears that the district court intended to give the lengthier instruction we have quoted above. (See Tr. at 990-94.) That instruction also apparently was included in the materials provided to individual jurors. (See *id.* at 1094-95.)

[**42]

n10 Although a properly instructed jury certainly could have found from this record that superior officers of the defendant corporations, including DeLuca and Buck themselves, either authorized or approved McSwiggan's misconduct, those matters were not undisputed at trial. The jury was instructed, in fact, that "if any misrepresentations were made, each defendant denies responsibility for any such misrepresentations . . . ." (Tr. at 1103.) Nor have plaintiffs suggested that a reasonable jury would have been required to conclude that McSwiggan was employed in a managerial capacity, although it is possible that a reasonable and properly instructed jury could have found that he was. Such a jury certainly could have found that Kaligian, as SSS' Director of Leasing and the individual who executed the Jannotta lease on Subway's behalf, was employed in a managerial capacity, but as we demonstrated above, the jury could, under the instructions given it, have assessed punitive damages against all defendants without ever considering Kaligian's conduct.

n11 Because we must vacate the punitive damage judgment and order a new trial, we need not consider defendants' alternative argument that the jury's total award of $ 10 million was excessive.

[**43]

D.

Defendants make an additional argument that we shall briefly consider, as it relates to an evidentiary dispute that no doubt will recur on retrial. As we mentioned earlier, the district court permitted plaintiffs to present

Case 1:04-cv-11572-JLT    Document 35-7    Filed 02/14/2006    Page 15 of 16

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Page 14

the testimony of five former Subway landlords, each of whom explained that misrepresentations similar to those alleged here had been made to him while negotiating a lease with Subway. The court further allowed plaintiffs to establish that at the time of trial, twelve present and former landlords held unpaid judgments against Subway leasing companies, some dating back to 1987. The district court concluded that this evidence was admissible, subject to foundation, competency, and cumulativeness objections, for the purpose of showing defendants' intent under *Fed. R. Evid. 404(b)*. (R. 99; *see also* Tr. at 111-13.) As we indicated earlier (supra at 16), defendants' intent with respect to the conduct found to be fraudulent is relevant to the jury's determination of whether punitive damages should be assessed for that fraud. *See Roboserve, 78 F.3d at 276; AMPAT/Midwest, 896 F.2d at 1044*. Like the district court, we find the evidence offered here highly [**44] probative of defendants' intent, and we agree that the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice. *See Fed. R. Evid. 403*. By admitting the evidence for that limited purpose, the district court would not abuse its considerable discretion over the admission of evidence in a civil trial. *See United States v. Smith, 103 F.3d 600, 602 (7th Cir. 1996)* (admission of "other acts" evidence under Rule 404(b) reviewed for an abuse of discretion); *Kelly v. Municipal Courts of Marion County, Indiana, 97 F.3d 902, 912 (7th Cir. 1996)* (decision to admit or exclude evidence reviewed for an abuse of discretion).

III.

Because the trial evidence, when assessed in the light most favorable to plaintiffs, was more than sufficient to satisfy the standard for an award of punitive damages under Illinois law, the district court did not err in submitting the punitive damage issue to the jury. We are unable to uphold the jury's punitive damage verdict, however, because the district court failed to properly instruct the jury on the requirements of the Illinois corporate complicity rule. Because that instructional error served to prejudice defendants [**45] by permitting the jury to assess punitive damages against each defendant under a theory that is inconsistent with Illinois law, we cannot characterize the error as harmless. For these reasons, we vacate the district court's judgment insofar as it assesses punitive damages against each defendant and remand for a new trial on that issue. The parties shall bear their own costs in this appeal. Circuit Rule 36 shall not apply on remand.

VACATED AND REMANDED.

CONCURBY: MANION

**CONCUR:** MANION, *Circuit Judge*, concurring.

I join the court's opinion and the thorough analysis of the instructions set out in part II.C of the opinion. I agree that the defendants are entitled to a new trial on the issue of punitive damages. I also concur with part II.D that concludes that under the circumstances in this case the admission of testimony from previous Subway landlords was not an abuse of discretion.

I am not as convinced, however, that punitive damages were warranted in the first [*518] place, even if the jury had been properly instructed. SSS indeed had no assets to speak of; initially Jannotta detrimentally relied on the representations that the company had the substantial value that would enable it to pay [**46] rent if the franchise subtenant did not. When the tenants did not pay, neither did SSS, thus damaging Jannotta. But Nicholas Jannotta was a sophisticated landlord who negotiated what he thought was a fairly strong lease (it included a revenue-sharing provision and a market area restriction). And he did collect rent payments from various tenants for nearly eight years. The Jannottas even executed "estoppel certificates" on two occasions that stated that the lease had not been breached, although they claim that was simply to get a new paying tenant on board. Furthermore, the Jannottas fully recovered what they had lost, albeit by filing suit. So there can be little doubt that the real losers here are the subtenants who opened a Subway business only to be subjected to inevitable failure because of the unwarranted competition—not from other fast food chains, but from their own. In my view (obviously it is only mine, since the issue was not before the jury) if anyone merited punitive damages it was the tenants who lost everything, including all the rent they had paid.

That being said, I accept the fact that a jury could have seen fit to award punitive damages, even under the instructions [**47] given. The question is how much. Even if the evidence established gross fraud with intent to injure (*see Roboserve v. Kato Kagaku, 78 F.3d 266, 275-76 (7th Cir. 1996)*), and punitive damages were warranted, the amount awarded in this case was much too high. (Punitive damages are not beyond an appellate court's review. *See Tincher v. Wal-Mart Stores, Inc., 118 F.3d 1125 (7th Cir. 1997).*) When denying the motion for remittitur, the district court commented that the owners were extremely wealthy. They were wealthy indeed, but that is not the only factor to be considered (nor should it be one of the most important). The jury principally must look at the enormity of the wrong and the potential liability of the defendant resulting from multiple claims. Any punitive damages should be confined to *this* case, and I would consider appropriate a three-to-one ratio (approximately $ 1 million), as opposed to the thirty-to-one ratio the jury actually awarded.

Case 1:04-cv-11572-JLT Document 35-7 Filed 02/14/2006 Page 16 of 16

Page 15

125 F.3d 503, *; 1997 U.S. App. LEXIS 23650, **;
47 Fed. R. Evid. Serv. (Callaghan) 1061

Enough said. The parties will present the punitive damages issue to a fresh jury under restructured instructions from the court. What went on before will be instructive to the parties and the court but will not be of any consequence [**48] in the next jury decision.