West Reporter Image (PDF)

389 Mass. 47, 449 N.E.2d 331, 11 Ed. Law Rep. 595
Supreme Judicial Court of Massachusetts,
Norfolk.
Lisa MULLINS
v.
PINE MANOR COLLEGE et al. [FN1]

FN1. William P. Person.

Argued Oct. 7, 1982.
Decided May 2, 1983.

Student filed suit against college seeking damages for injuries suffered when she was raped on campus. The Superior Court, Norfolk County, Vallely, J., entered judgment in favor of the student, after reducing the amount of the jury's verdict to $20,000. The college and its vice-president of operations appealed. The Supreme Judicial Court, Liacos, J., held that: (1) the college had a duty to provide security for its students; (2) the evidence was sufficient to sustain the conclusions that the college was negligent in performing that duty and that the negligence was the proximate cause of the student's injuries; and (3) the vice-president was not entitled to avoid liability on the grounds that he was an officer of a charitable corporation.
Judgments affirmed.
O'Connor, J., dissented with opinion.

West Headnotes

[1] KeyCite Notes

⇌81 Colleges and Universities
   ⇌81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

Where college allowed male guests to stay overnight on weekends, presence of males in women's dormitory could create risks and to the extent that those risks were foreseeable, college was required to take reasonable measures to guard against them.

[2] KeyCite Notes

⇌81 Colleges and Universities
   ⇌81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

Fact that college need not police the morals of its resident students does not entitle it to abandon any effort to ensure their physical safety.

[3] KeyCite Notes

⇌81 Colleges and Universities
   ⇌81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

Parents, students and general community have reasonable expectation, fostered in part by colleges

themselves, that reasonable care will be exercised to protect resident students from foreseeable harm.

[4] KeyCite Notes

⇒272 Negligence
 ⇒272III Standard of Care
  ⇒272k234 k. Voluntarily Assumed Duties. Most Cited Cases
   (Formerly 272k2)

A duty voluntarily assumed must be performed with due care.

[5] KeyCite Notes

⇒81 Colleges and Universities
 ⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

When college voluntarily undertook duty to protect its students from criminal acts of third parties, college was required to perform that duty with due care.

[6] KeyCite Notes

⇒81 Colleges and Universities
 ⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

Where students and their parents relied on willingness of college to exercise due care to protect students from foreseeable harm, college had duty to exercise due care in providing security.

[7] KeyCite Notes

⇒81 Colleges and Universities
 ⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

Colleges must act to use reasonable care to prevent injury to their students by third persons whether their acts were accidental, negligent or intentional.

[8] KeyCite Notes

⇒81 Colleges and Universities
 ⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
   (Formerly 81k9)

Risk that student at women's college could be raped was not only foreseeable, but was actually foreseen by college and, therefore, college could be held liable for injuries sustained by student when she was raped on campus.

[9] KeyCite Notes

⇒81 Colleges and Universities
 ⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases

(Formerly 81k9)

Student who was raped on college campus was not required to introduce evidence of prior criminal acts on campus before college could be held liable for breaching its duty of protecting student from criminal acts.

[10] KeyCite Notes

→272 Negligence
    →272XVIII Actions
        →272XVIII(D) Questions for Jury and Directed Verdicts
            →272k1694 k. Standard of Proof; Evidentiary Showing Required. Most Cited Cases
              (Formerly 272k136(14))

Only when no rational view of evidence warrants finding that defendant was negligent may issue of negligence be taken from jury.

[11] KeyCite Notes

→81 Colleges and Universities
    →81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
        (Formerly 81k9)

Evidence was sufficient for jury to conclude that college was negligent in providing security when student was raped on campus.

[12] KeyCite Notes

→272 Negligence
    →272XVIII Actions
        →272XVIII(C) Evidence
            →272XVIII(C)5 Weight and Sufficiency
                →272k1674 Proximate Cause
                    →272k1675 k. In General; Degrees of Proof. Most Cited Cases
                    (Formerly 272k134(11))

In negligence cases, plaintiffs are not required to eliminate entirely all possibility that defendant's conduct was not a cause; it is enough that they introduce evidence from which reasonable men may conclude that it is more probable than not that event was caused by defendant.

[13] KeyCite Notes

→81 Colleges and Universities
    →81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
        (Formerly 81k9)

Evidence was sufficient for jury to conclude that negligence of college caused student's injury when student was raped on campus.

[14] KeyCite Notes

→81 Colleges and Universities
    →81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
        (Formerly 81k9)

Evidence was sufficient for jury to conclude that proper locking system on dormitory doors would have prevented assailant who raped student from gaining entry to the dormitory and, therefore, that negligence of college in providing security caused injury sustained when student was raped.

[15] KeyCite Notes 

⊙⇒81 Colleges and Universities
    ⊙⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

In action by student against college seeking damages for injuries suffered when student was raped on campus, jury was entitled to discount possibility that assailant was a person lawfully on the premises and, therefore, evidence supported conclusion that college breached its duty of providing security to its students.

[16] KeyCite Notes 

⊙⇒81 Colleges and Universities
    ⊙⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

Evidence was sufficient for jury to conclude that attack in which student was raped would not have successfully occurred had college installed adequate locking system on doors to student's dormitory room.

[17] KeyCite Notes 

⊙⇒81 Colleges and Universities
    ⊙⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

Few minutes student spent talking to a friend did not break chain of causation between college's negligence in performing its duty to provide security and subsequent rape suffered by student where student's assailant could not have entered her room without passing directly in front of the student and her friend as they were talking.

[18] KeyCite Notes 

⊙⇒81 Colleges and Universities
    ⊙⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

In action by student against college seeking damages for injuries suffered when student was raped on campus, jury could find that it was more likely than not that assailant and student would have been discovered had college established an adequate system for supervising guards and had employed three or four guards during evening hours.

[19] KeyCite Notes

⊙⇒81 Colleges and Universities
    ⊙⇒81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

In action by student against college seeking damages for injuries suffered when student was raped on

campus, jury could have concluded that reasonable persons in position of college would have hired two additional security guards so that three guards would be patrolling campus at any one time and that it was more probable than not, had college deployed three guards, that at least one of those guards would have seen student and assailant at some point during incident.

[20] KeyCite Notes 

◐━81 Colleges and Universities
   ◐━81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

Evidence warranted conclusion that college's negligence was substantial cause of attack on student and, therefore, college could be held liable for damages for injuries suffered by student when she was raped on campus.

[21] KeyCite Notes 

◐━81 Colleges and Universities
   ◐━81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases
      (Formerly 81k9)

Where college had foreseen risk of criminal attack on its students, criminal act of assailant who raped student on campus did not sever chain of proximate causation between college's negligence in performing its duty to provide security to its students and injuries sustained by student.

[22] KeyCite Notes 

◐━30 Appeal and Error
   ◐━30V Presentation and Reservation in Lower Court of Grounds of Review
      ◐━30V(A) Issues and Questions in Lower Court
         ◐━30k170 Nature or Subject-Matter of Issues or Questions
            ◐━30k170(1) k. In General. Most Cited Cases

On appeal from judgment in favor of student in action against college seeking damages for injuries suffered when student was raped on campus, although issue of whether college officer was entitled to protection of charitable immunity doctrine and whether he could not be held liable for mere negligence in performance of discretionary function were not raised in trial court, questions would be considered on appeal given public importance of questions and fact that considering those questions would not change result.

[23] KeyCite Notes 

◐━75 Charities
   ◐━75II Construction, Administration, and Enforcement
      ◐━75k45 Rights, Duties, and Liabilities of Charitable Societies and Trustees
         ◐━75k45(2) k. Liability for Torts. Most Cited Cases

Charitable immunity provides that charitable institutions are immune from liability for their torts.

[24] KeyCite Notes 

◐━308 Principal and Agent
   ◐━308III Rights and Liabilities as to Third Persons
      ◐━308III(F) Actions

◯═308k186 k. Defenses by Principal or Agent. Most Cited Cases

Agent is not entitled to protection of his principal's immunity even if agent is acting on behalf of principal.

[25] KeyCite Notes 

◯═81 Colleges and Universities
　◯═81k8 Staff and Faculty
　　◯═81k8(1) k. In General. Most Cited Cases

Officer of college could not avoid liability for injuries sustained when student was raped on campus on theory of charitable immunity.

[26] KeyCite Notes

◯═81 Colleges and Universities
　◯═81k8 Staff and Faculty
　　◯═81k8(1) k. In General. Most Cited Cases

Officer of college which was charitable institution could be held liable for negligent performance of discretionary function in connection with providing security for students.
**333 *47 Cynthia J. Cohen, Boston (Philander S. Ratzkoff & James F. Meehan, Boston, with her), for defendants.
Albert P. Zabin, Boston, for plaintiff.

Before HENNESSEY, C.J., and WILKINS, LIACOS, NOLAN and O'CONNOR, JJ.


LIACOS, Justice.
The plaintiff, a female student at Pine Manor College (college), was raped on campus by an unidentified assailant who was never apprehended. She commenced this action against the college and its vice president for operations, William P. Person, to recover damages for injuries suffered. The case was tried before a jury in the Superior *48 Court. The jury returned verdicts against the college and Person in the amount of $175,000. [FN2] Pursuant to G.L. c. 231, § 85K, the trial judge reduced the amount of the judgment against the college to $20,000. The college and Person appeal from the denial of their motions for directed verdicts and for judgments notwithstanding the verdicts. We granted their applications for direct appellate review. We affirm the judgments.

> FN2. Person was added as a party defendant after the original
>
> complaint was filed. The plaintiff also joined the college's director of security, but the action against him was dismissed by stipulation.

There was evidence of the following facts. Pine Manor College is a four year college for women located in the Chestnut Hill section of Brookline. In 1977, approximately 400 students attended the school. The campus is surrounded on all sides by a six foot high chain link fence, except for an area on either side of the main entrance to the campus where the fence stands four feet tall. The college's dormitories are clustered together in three villages. Each village is comprised of a commons building and a number of separate dormitory buildings. The buildings are arranged to form a square. To gain access to a dormitory, a student must enter an enclosed courtyard through either the commons building or one of three exterior gates. Between 5 p.m. and 7 a.m., these gates and the door to the commons building are locked. Students enter their dormitory through locked doors which open directly into the courtyard. Each student had one key which unlocked the doors to her commons building, her dormitory building, and her individual room.
After 8 p.m., all visitors were admitted by a security guard at the main entrance to the campus. The guard would direct them to the appropriate commons building. At the entrance to the commons building, visitors

would be stopped by a student on duty and would be registered. [FN3] *49 The student **334 hostess would be notified and was required to come to the commons building to act as the visitor's escort. No visitors were permitted anywhere on campus unescorted after 1 a.m. on weekends.

> FN3. The record is unclear as to whether there was a student stationed at the entrance to the commons building after midnight. The process of registering visitors and ensuring that every visitor had an escort, however, was also performed by the guard at the main entrance to the campus.

At the time of the rape, the college had two guards on duty after midnight. One guard was stationed in an observation post at the main entrance. The second guard was assigned to patrol the campus. He was responsible for making rounds to the villages every fifteen to thirty minutes to check the doors and gates to see that they were locked. The college had no formal system of supervising the guards. Rather, the director of security at the college would make random checks on their work.

Mullins was a first year student and, as required by the college, she lived on campus. Her dormitory housed thirty women. Under college regulations, male visitors were permitted to stay overnight. [FN4] Mullins was assigned to a single room at the end of a corridor. Another student resided in a room located adjacent to hers. The doors to these two rooms were at a right angle to each other.

> FN4. The college offered its students a choice of parietal plans. One plan prohibited any male guests from staying overnight; a second plan allowed male guests to stay overnight on weekends; and a third plan contained no restrictions. Mullins selected the second plan.

On December 11, 1977, Mullins returned to her dormitory at approximately 3 a.m. with two friends. It was a bitter cold night. They entered the village through one of the exterior gates to the courtyard. It was unlocked. They opened the door to their dormitory and proceeded to their rooms. After changing into her night clothes, Mullins, leaving the door to her room open, went to talk with a friend who resided in the room next door. They talked for a few minutes, apparently near the open door to the friend's room. Mullins returned to her room, locked her door, and went to sleep. Between 4 a.m. and 4:30 a.m., she was awakened by an intruder. He asked her where her car was located, and she responded that she did not have a car. The *50 intruder then threatened her and placed a pillow case over her head. He led her out of the building and across the courtyard. They left the courtyard by proceeding under the chains of one of the exterior gates which was not secured tightly. They walked down a bicycle path toward the refectory, the college's dining hall. After marching about in front of the refectory, they entered the refectory through an unlocked door and spent several minutes inside. They proceeded out of the refectory and marched around in front. They then went back inside, and the assailant raped her. The entire incident lasted sixty to ninety minutes, and they were outside on the campus for at least twenty minutes.

Pine Manor is located in an area with relatively few reports of violent crime. In the years prior to this attack, there had been no incidents of violent crime on the campus. The record discloses, however, that one year before the attack a burglary had occurred in one of the dormitory buildings. Additionally, the evening before the rape, a young man scaled the outer fence around the campus and walked into the commons building of Mullins's village, which was the first building he saw. The door to the building was open. The college is also located a short distance from bus and subway lines which lead directly to Boston.

Additional facts, including the testimony of expert witnesses, will be discussed as they become relevant.

1. *Duty to protect against criminal acts.* The defendants argue that they owe no duty to protect students against the criminal acts of third parties. They rely on the general proposition that there is no duty to protect others from the criminal or wrongful activities of third persons. See Restatement (Second) of Torts § 314 (1965). Cf. W. Prosser, Torts § 33, at 173-174 (4th ed. 1971) (actor may usually assume others will obey criminal law). But see Restatement (Second) of Torts §§ 302B, 314A & 448 (1965). We conclude that this rule has little **335 application to the circumstances of this case.

The duty of due care owed the plaintiff by the defendants in the present case can be grounded on either of two well *51 established principles of law. First, we have said that a duty finds its "source in existing social values and customs." Schofield v. Merrill, 386 Mass. 244, 247, 435 N.E.2d 339 (1982). See Pridgen v. Boston Hous. Auth., 364 Mass. 696, 711, 308 N.E.2d 467 (1974); Mounsey v. Ellard, 363 Mass. 693, 706-708, 297 N.E.2d 43 (1973). We think it can be said with confidence that colleges of ordinary prudence customarily exercise care to protect the well-being of their resident students, including seeking to protect them against

the criminal acts of third parties. An expert witness hired by the defendant testified that he had visited eighteen area colleges, and, not surprisingly, all took steps to provide an adequate level of security on their campus. He testified also that standards had been established for determining what precautions should be taken. [FN5] Thus, the college community itself has recognized its obligation to protect resident students from the criminal acts of third parties. This recognition indicates that the imposition of a duty of care is firmly embedded in a community consensus.

> FN5. This expert, the chief of campus police at Wellesley College, testified that the task of designing and implementing security systems on college campuses is being recognized as a separate profession. He noted that a number of professional organizations exist which are devoted solely to this task.

This consensus stems from the nature of the situation. The concentration of young people, especially young women, on a college campus, creates favorable opportunities for criminal behavior. The threat of criminal acts of third parties to resident students is self-evident, and the college is the party which is in the position to take those steps which are necessary to ensure the safety of its students. No student has the ability to design and implement a security system, hire and supervise security guards, provide security at the entrance of dormitories, install proper locks, and establish a system of announcement for authorized visitors. [FN6] Resident students typically live in a particular room for a mere nine months and, as a consequence, lack the incentive and capacity *52 to take corrective measures. College regulations may also bar the installation of additional locks or chains. Some students may not have been exposed previously to living in a residence hall or in a metropolitan area and may not be fully conscious of the dangers that are present. [FN7] Thus, the college must take the responsibility on itself if anything is to be done at all. Cf. *Young v. Garwacki*, 380 Mass. 162, 168, 402 N.E.2d 1045 (1980).

> FN6. The record demonstrated that students at Pine Manor had no responsibility for making any decisions relating to these matters.

> FN7. The defendant's expert witness testified, "I think that the initial problem you have in security on a college campus is you are dealing with a very young population, primarily eighteen to twenty-two, maybe twenty-three, perhaps a little bit older if you have graduate school. So that, first of all, the age of the people that you are concerned with. They tend to be, many cases, first time away from home. So you are dealing with problems of young people away from home for the first time. They tend to be quite independent. Because they are deemed adults, they say they have expectations of what adulthood means without really having experienced it. First time they are experiencing it is basically when they are living on a college campus. So you are dealing with young people who are legally adults and have not understood really what adulthood
>
> perhaps means."

[1] [2] [3]    Of course, changes in college life, reflected in the general decline of the theory that a college stands in loco parentis to its students, arguably cut against this view. [FN8] The fact that a college need not police the morals of its resident students, however, does not entitle it to abandon any **336 effort to ensure their physical safety. Parents, students, and the general community still have a reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect resident students from foreseeable harm.

> FN8. We note that the college allowed male guests to stay overnight on weekends, and that the presence of males in a women's dormitory may create risks. To the extent that those risks are foreseeable, the college should take reasonable measures to guard against them. *Carey v. New Yorker of Worcester, Inc.*, 355 Mass. 450, 452, 245 N.E.2d 420 (1969). See *Samson v. Saginaw Professional Bldg., Inc.*, 393 Mich. 393, 404-409, 224 N.W.2d 843 (1975).

[4]     The duty of care in this case can be grounded in another theory. It is an established principle that a duty voluntarily assumed must be performed with due care. *Black v. New York, N.H., & H.R.R.*, 193 Mass. 448, 79 N.E. 797 (1907). See *Phillips v. Chicago Hous. Auth.*, 89 Ill.2d 122, 123, 59 Ill.Dec. 281, 431 N.E.2d 1038 (1982); ***53** Cross v. Wells Fargo Alarm Servs.*, 82 Ill.2d 313, 45 Ill.Dec. 121, 412 N.E.2d 472 (1980); *Pippin v. Chicago Hous. Auth.*, 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979). Restatement (Second) of Torts § 323 (1965), states: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." [FN9]

> FN9. This concept of a duty of care arising out of a particular relationship between the parties is also embedded in our law. See, e.g., *Upham v. Chateau de Ville Dinner Theatre, Inc.*, 380 Mass. 350, 403 N.E.2d 384 (1980) (theater to patron); *Carey v. New Yorker of Worcester, Inc.*, supra (restaurant to patron); *Kane v. Fields Corner Grille, Inc.*, 341 Mass. 640, 171 N.E.2d 287 (1961) (saloon keeper to patron); *Quigley v. Wilson Line of Mass., Inc.*, 338 Mass. 125, 154 N.E.2d 77 (1958) (common carrier to passenger); *McFadden v. Bancroft*
>
> *Hotel Corp.*, 313 Mass. 56, 46 N.E.2d 573 (1943) (hotel or innkeeper to patron); Restatement (Second) of Torts § 314A (1965). Cf. *Young v. Garwacki*, 380 Mass. 162, 402 N.E.2d 1045 (1980) (landlord and tenant; discussion of modern trend away from focus on property interests to that of general tort principles, including relationships between the parties).

[5]     Colleges generally undertake voluntarily to provide their students with protection from the criminal acts of third parties. The evidence warrants the conclusion that Pine Manor undertook such a duty. It is clear that this undertaking by Pine Manor was not gratuitous. [FN10] Students are charged, either through their tuition or a dormitory fee, for this service. Adequate security is an indispensable part of the bundle of services which colleges, and Pine Manor, afford their students.

> FN10. Person testified that the college required freshmen and sophomores to live on campus and encouraged juniors and seniors to do so in part to generate the maximum amount of revenue from the rental of the dormitories. We note that we have treated gratuitous undertakings differently than does the Restatement. See *Motta v. Mello*, 338 Mass. 170, 172, 154 N.E.2d 364 (1958) (duty is only to refrain from gross negligence). Our decision today does not indicate that we depart from our
>
> prior treatment of gratuitous undertakings as distinct from those undertaken, as here, for consideration.

[6]     We recognize that the mere fact that Pine Manor had voluntarily undertaken to render a service is not sufficient to ***54** impose a duty. It must also be shown that either (a) the failure to exercise due care increased the risk of harm, or (b) the harm is suffered because of the students' reliance on the undertaking. As to the latter, it is quite clear that students and their parents rely on colleges to exercise care to safeguard the well-being of students. When students are considering enrolling in a particular college, they are likely to weigh a number of factors. But a threshold matter is whether the college has undertaken to provide an adequate level of security. Thus, prospective students and their parents who visit a college are certain to note the presence of a fence around the campus, the existence of security guards, and any other visible steps taken to ensure the safety of students. They may inquire as to what other measures the college has taken. If the college's response is unsatisfactory, students may choose to enroll elsewhere. The record

indicates that Mullins visited several colleges, including Pine Manor, with her father during the summer before her senior year of high school. Thus, the jury could have found that students and their **337** parents rely on the willingness of colleges such as Pine Manor to exercise due care to protect them from foreseeable harm. [FN11]

> FN11. Implicit in Pine Manor's requirement that freshmen live in dormitories provided by the college is the representation that the college believed that it could provide adequately for the safety and well-being of its students.

[7] These two principles of law provide a sufficient basis for the imposition of a duty on colleges to protect their resident students against the criminal acts of third parties. Colleges must, therefore, act "to use reasonable care to prevent injury" to their students "by third persons whether their acts were accidental, negligent, or intentional." _Carey v. New Yorker of Worcester, Inc._, 355 Mass. 450, 452, 245 N.E.2d 420 (1969).

[8] We reject the argument advanced by the college and Person that the criminal attack here was not foreseeable. This contention is untenable in light of Person's testimony which admitted that he had foreseen the risk that a student at Pine *55 Manor could be attacked and raped on campus. Indeed, the precautions which Pine Manor and other colleges take to protect their students against criminal acts of third parties would make little sense unless criminal acts were foreseeable. The director of student affairs testified that she warned students during freshman orientation of the dangers inherent in being housed at a women's college near a metropolitan area only a short distance from bus and train lines which lead directly to Boston. The risk of such a criminal act was not only foreseeable but was actually foreseen.

[9] The college and Person, however, urge us to adopt an arbitrary limitation on liability by requiring that a student must introduce evidence of prior criminal acts on the campus. They rely on cases from other jurisdictions which hold that an owner or occupier of land is under no duty to protect persons lawfully on the premises against the criminal acts of third persons unless prior criminal acts occurred on the premises. See e.g., _Riley v. Marcus_, 125 Cal.App.3d 103, 109, 177 Cal.Rptr. 827 (1981); _Scott v. Watson_, 278 Md. 160, 169, 359 A.2d 548 (1976); _Gulf Reston, Inc. v. Rogers_, 215 Va. 155, 157-159, 207 S.E.2d 841 (1974). We choose not to follow those cases, at least in the circumstances before us. [FN12] Those cases consider the general duty of *56 an owner or occupier of land to persons lawfully on the premises. That duty implicates a wide range of interests that are not present here. The instant case concerns only the distinctive relationship between colleges and their students. But see _Relyea v. State_, 385 So.2d 1378 (Fla.Dist.Ct.App.1980). Moreover, the standard of foreseeability turns on an examination of all the circumstances. _Mounsey v. Ellard_, 363 Mass. 693, 708-709, 297 N.E.2d 43 (1973). Prior criminal acts are simply one factor among others that establish the foreseeability of the act of the third party. _Samson v. Saginaw Professional Bldg., Inc._, 393 Mich. 393, 406-407, 224 N.W.2d 843 (1975).

> FN12. The rule requiring evidence of prior criminal acts often leads to arbitrary results and distinctions. It is not clear how serious the prior acts must be to satisfy the rule. Compare _Graham v. M & J Corp._, 424 A.2d 103, 105 (D.C.App.1980) (minor acts of trespass and vandalism held sufficient), with _Gulf Reston, Inc. v. Rogers_, 215 Va. 155, 207 S.E.2d 841 (1974) (activities of trespassers, including putting a hole in the roof, held insufficient). Under the _Graham_ case, the burglary of a dormitory room and the trespass the night before the attack would have been sufficient evidence of prior criminal acts to trigger a duty.
>
> It is also not clear how close in time the criminal act must be. Would the attack on a student in 1977 be sufficient to impose a duty today or in another five years? We note that some courts have adopted an approach that focuses on all the circumstances of the case even in the context of the relationship between a landlord and tenant. _Trentacost v. Brussel_, 82 N.J. 214, 223, 412 A.2d 436 (1980) (one attempted theft coupled with high level of criminal activity in general area held sufficient to establish foreseeability). _Braitman v. Overlook Terrace Corp._, 68 N.J. 368, 382-283, 346 A.2d 76 (1975) (notice of defective lock and prior

criminal activity in vicinity of defendant's building held sufficient). *Samson v. Saginaw Professional Bldg., Inc.*, 393 Mich. 393, 404-409, 224 N.W.2d 843 (1975) (no evidence of prior acts required; notice of danger held sufficient).

**\*\*338** 2. *Sufficiency of the evidence.* We construe the evidence most favorably to Mullins to determine "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Poirier v. Plymouth*, 374 Mass. 206, 212, 372 N.E.2d 212 (1978), quoting *Raunela v. Hertz Corp.*, 361 Mass. 341, 343, 280 N.E.2d 179 (1972). "We are mindful that the inferences must be based on 'probabilities rather than possibilities' and not the result of 'mere speculation and conjecture.' *Alholm v. Wareham*, 371 Mass. 621, 627, 358 N.E.2d 788 (1976)." *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 848, 443 N.E.2d 1308 (1983).

[10] [11] a. *Negligence.* Usually "the question of negligence is one of fact for the jury. Only when no rational view of the evidence warrants a finding that the defendant was negligent may the issue be taken from the jury. *Luz v. Stop & Shop, Inc. of Peabody*, 348 Mass. 198, 203-204, 202 N.E.2d 771 [1964]. *Beaver v. Costin*, 352 Mass. 624, 626, 227 N.E.2d 344 [1967]." *Zezuski v. Jenny Mfg. Co.*, 363 Mass. 324, 327, 293 N.E.2d 875 (1973). There was sufficient evidence from which the jury could have concluded that the defendants were negligent.

Person admitted that he designed and supervised the installation of the security system. He acknowledged that he was responsible for establishing the patrol pattern and the network of locks. The jury could have found the following deficiencies in the college's security system. An observation post near the main entrance is situated at such a distance **\*57** from the fence that an intruder could climb over the fence without being detected by the guard on duty. The exterior gates leading into the courtyards were not difficult to scale or to open. The walls surrounding the courtyards were too low to be adequately protective. The college used a single key system whereby the same key would open the door to the commons building, the door to the dormitory, and the door to the individual room. Only two security guards were on duty at any time. No system was utilized to ensure that the guards were performing their patrols around the campus. The locks on the doors to the dormitory and the individual rooms were easy to pick, and neither deadbolts nor chains were used. The jury also could have credited the opinion of the plaintiff's expert that the security provided by Pine Manor was inadequate to protect a student in the position of the plaintiff. Additionally, there was evidence that after the evening of the attack, the college hired two additional guards to patrol the villages from 11:30 p.m. to 7:30 a.m. and installed chains on the interior side of the doors to individual rooms. [FN13] There was also ample evidence that the guards failed to perform their duties both prior to the attack and on the evening of the attack. There was evidence that the locks to the individual rooms could be opened with a credit card. There was also evidence that the door to Mullins's dormitory lacked a knife guard which the defendants' expert witness indicated should have been present.

> FN13. We need not consider the question whether evidence of these precautions by the defendants after an accident was admissible as proof of negligence. See *Ladd v. New York, N.H. & H.R.R.*, 335 Mass. 117, 120, 138 N.E.2d 346 (1956). The defendants did not object to the admission of the evidence in a timely fashion and therefore waived any objection to the testimony. *Abraham v. Woburn*, 383 Mass. 724, --- - --- n. 1, 421 N.E.2d 1206 (1981). The jury were therefore entitled to give it as much probative value as they pleased. *Id.* Such evidence may permit an otherwise deficient case to be submitted to the jury. See *Commonwealth v. Reynolds*, 338 Mass. 130, 135-136, 154 N.E.2d 130 (1958).
>
> Also, evidence that the college replaced its one-key system with a two-key system and changed the procedures for checking visitors at the security gate was admitted for the purpose of demonstrating feasibility. The
>
> defendants have not argued any of these points before this court.

*58 [12]   b. *Causation.* The question of causation is generally one of fact for the jury. Zezuski v. Jenny Mfg. Co., supra 363 Mass. at 327, 293 N.E.2d 875. A plaintiff need only show "that there was greater **339 likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause. McLaughlin v. Berstein, 356 Mass. 219, 226, 249 N.E.2d 17 (1969). An expert's opinion based on facts in evidence is sufficient proof of causation. Black v. Boston Consol. Gas Co., 325 Mass. 505, 91 N.E.2d 192 (1950). The plaintiffs are not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that they introduce evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. Restatement (Second) of Torts § 433B, Comment b (1965)." Carey v. General Motors Corp., 377 Mass. 736, 740, 387 N.E.2d 583 (1979). Miles v. Tabor, 387 Mass. 783, 787, 443 N.E.2d 1302 (1982). Zezuski v. Jenny Mfg. Co., supra 363 Mass. at 328-329, 293 N.E.2d 875.

[13]   The jury could have found that the negligence of the defendants caused the plaintiff's injury. First, the chain of events resulting from the defendants' negligence clearly extended to permitting the assailant to reach the point where he stood outside Mullins's locked door. An expert witness testified that the deficiencies of the college's security system were a substantial cause of the attack. He testified that an assailant could gain access easily to the campus as a result of the low fence near the front entrance, the placement of the observation post, and the absence of adequate patrols around the perimeter. Once an intruder was on the campus, the courtyard was readily accessible. The expert testified that the exterior gates were like stepladders and could be scaled without any difficulty. A photograph of a gate introduced in evidence confirmed this testimony. Moreover, Mullins testified that she and her friends entered the courtyard through an open gate. She also testified that she and the assailant later left the courtyard through a gate that was not properly secured. The design of those gates, as well as the fact that they were not tightly secured, was properly attributable to the negligence of the defendants.

*59 [14]   The jury could have traced the chain of causation one step further. The expert testified that the lock to the dormitory was inadequate and could be picked easily. Moreover, a photograph of the doors [FN14] indicated that the college had not installed a knife guard. The defendants' expert witness testified that a knife guard would have been an important element of an adequate system of security. The jury could have concluded that a proper locking system on those doors would have prevented the assailant from gaining entry to the dormitory.

> FN14. A photograph of the entry to Mullins's dormitory revealed that it was comprised of two separate doors which came together. Thus, without a knife guard, an object could be inserted between the doors which would push aside the bolt.

[15]   We think also that the jury were entitled to discount the possibility that the assailant was a person lawfully on the premises. The only fact in the record which suggests this possibility is that males were permitted to stay overnight in Mullins's dormitory on weekends. There is no evidence in the record, however, that any male visitors in fact stayed overnight on the night of the rape. [FN15] It is therefore mere conjecture to suggest that the assailant was lawfully on the premises, and Mullins is not required to eliminate every possibility. Carey v. General Motors Corp., supra 377 Mass. at 740, 387 N.E.2d 583. Furthermore, the dormitory housed only thirty women. Male guests were required to be registered and escorted by a Pine Manor student. They were not permitted to roam freely. The jury could have concluded that it was more probable than not that the assailant was a trespasser.

> FN15. Since all male visitors were required to be registered, the college had within its possession evidence which would have established the number and identity of all visitors.

[16]   The jury also could have found that the defendants' negligence permitted the assailant to enter Mullins's room. An expert **340 witness testified that the lock on the door was inadequate. There was

ample evidence indicating that the lock on Mullins's door could be picked with a credit card. An expert witness also pointed to the absence of either a chain or a ***60** deadbolt as a deficiency in the locking system. He also testified that the presence of a chain could have prevented the attack. [FN16] Testimony of the defendants' expert witness confirmed this view. The jury, therefore, could have concluded that the attack would not have successfully occurred had the college installed an adequate locking system on the doors to Mullins's room.

> FN16. Read in context, the expert's statement that Mullins was "marched around the campus for one to two hours" did not compel the jury to discount his testimony. The jury could have interpreted the statement as a simple slip whereby the expert momentarily confused the length of the entire incident with the length of time Mullins spent outside.

[17] The few minutes Mullins spent talking with a friend did not break the chain of causation. Mullins testified that she went next door for a few minutes. The door to her friend's room was open as they talked. A photograph introduced in evidence reveals that Mullins's room formed the end of a narrow dead end corridor. The view out of her room is directly down the length of the corridor to a lounge room. Her friend's door was located a few feet down the hall toward the lounge room. Her door was at a right angle with Mullins's door. Therefore, the assailant could not have entered Mullins's room without passing directly in front of Mullins and her friend as they were talking. Given these facts, the jury could have concluded that the assailant would have been detected if he had attempted to slip into Mullins's room during the few minutes that she spent next door.

Furthermore, Mullins lived in a single room. The opportunities for concealment in a single room of this type are exceedingly limited. [FN17] The assailant also did not awaken Mullins until well over an hour after she went to sleep. These facts support the view that the assailant entered the room after Mullins had returned from her friend's room. In light of the evidence, it is entirely speculative to say that the assailant might have entered the room during the few minutes when Mullins went next door.

> FN17. Her room did not have a bathroom. The dormitory itself is of modern construction and appears to be rather stark.

**\*61** [18] The jury also could have found that it was more likely than not that the assailant and Mullins would have been discovered had the defendants established an adequate system for supervising the guards and had employed three or four guards during the evening hours. The record is replete with evidence demonstrating that the guards did not carry out their duties. The guards were responsible for seeing that the gates to the village courtyards and the doors to the various buildings on campus were locked. One guard was assigned to patrol the campus every fifteen to thirty minutes and was required to check the gates and doors on each patrol. One of the guards on duty the night of the attack testified that if the gates to the courtyard were open, that fact would indicate that the guard had not performed those functions assigned to him. There was evidence that the gates were not locked and secured. Mullins testified that one gate to the courtyard was open at 3 a.m. when she returned to the village. She also testified that she and the assailant proceeded underneath the chains of another gate which was not adequately secured. Further, the door to the refectory was unlocked and, the evening before, the door to the commons room of Mullins's village was wide open. These facts warrant the conclusion that the guards had not made their rounds.

[19] Second, the jury could have concluded that reasonable persons in the position of the defendants would have hired two additional guards. These additional guards would have permitted three guards to be patrolling the campus at any one time. A guard would have been beginning a round of the campus every five to ten minutes. **\*\*341** Mullins testified that she and the assailant spent at least twenty minutes outside. The jury could have inferred that the actual period was longer. Mullins also testified that the assailant marched her back and forth in front of the refectory for a considerable period of time. From these facts, the jury could have concluded that it was more probable than not that, had the college deployed three guards, at least one of those guards would have seen Mullins, who had a pillow **\*62** case over her head, and the assailant at some point during the march out of the dormitory, across the courtyard, down the bicycle path, and back and

forth in front of the refectory.

[20] The jury also could have considered the fact that the refectory should have been locked. Had it been locked, the assailant would have been faced with a choice. Given the bitter cold temperature, the rape most likely would not have been performed outdoors. [FN18] The assailant most likely would have been compelled to either abandon his plan or begin a new search for some other sheltered location. The latter alternative would have required the assailant to march Mullins around the campus for a considerable period of time. The likelihood of discovery would have been increased, especially if three guards had been patrolling the campus. We conclude that the evidence warranted the conclusion that the defendants' negligence was a substantial cause of the attack. [FN19]

> FN18. The assailant's original design apparently was thwarted by the fact that Mullins did not have an automobile. The march to the refectory appears to have been an afterthought.

> FN19. We also reject the claim that the testimony of the plaintiff's expert witness was deficient. Of course, "[a] verdict may not be based on conjecture and surmise, and expert opinion does not help if it is demonstrated that it rests on speculation." _LaClair v. Silberline Mfg. Co.,_ 379 Mass. 21, 32, 393 N.E.2d 867 (1979). A fair reading of the expert's testimony clearly indicates that it was based on facts in the record.

[21] c. _Proximate causation._ The college and Person next argue that the judge should have ruled, as matter of law, that the intervening criminal act of an unknown third person was a superseding cause which severed the chain of proximate causation. Our holding that the defendants had foreseen the risk of criminal attack largely disposes of the issue. The act of a third party does not excuse the first wrongdoer if such act was, or should have been, foreseen. [FN20] *63 See _Gidwani v. Wasserman,_ 373 Mass. 162, 166, 365 N.E.2d 827 (1977); _Carey v. New Yorker of Worcester, Inc.,_ 355 Mass. 450, 452-453, 245 N.E.2d 420 (1969); _Lane v. Atlantic Works,_ 111 Mass. 136, 139-140 (1872); Restatement (Second) of Torts § 448 (1965). There was no error in submitting the case to the jury. [FN21]

> FN20. Cases like _Slater v. T.C. Baker Co.,_ 261 Mass. 424, 425, 158 N.E. 778 (1927), holding that a defendant, as matter of law, is not bound to anticipate the intervening acts of third parties have been largely confined to their facts. See _Jesionek v. Massachusetts Port Auth.,_ 376 Mass. 101, 105, 378 N.E.2d 995 (1978).

> FN21. The college and Person also object to the judge's instructions to the jury. As all of the challenged instructions are in accord with our holdings today, we reject this argument.

[22] 3. _Liability of an officer of a charitable corporation in tort._ Person contends that he is entitled to the protection of the charitable immunity doctrine and that he cannot be held liable for mere negligence in the performance of a discretionary function. These questions were not raised below and, if we followed our usual practice, we would not consider them on appeal. However, because the questions presented are of some public importance and the result we reach is not changed by our consideration of them, we choose to state our views briefly. _Royal Indem. Co. v. Blakely,_ 372 Mass. 86, 88, 360 N.E.2d 864 (1977).

[23] [24] [25] The common law doctrine of charitable immunity provides that charitable institutions are immune from liability for their torts. _McDonald v. Massachusetts Gen. Hosp.,_ 120 Mass. 432, 436 (1876). The general rule, however, is that an agent is not entitled to the protection of his principal's

immunity even if the agent is acting on behalf of his principal. Restatement **342 (Second) of Agency § 347 (1) (1958). In 1971, the Legislature abolished entirely the defense of charitable immunity from tort liability "if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes." G.L. c. 231, § 85K, inserted by St.1971, c. 785, § 1. "[I]f the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes" of a charitable institution, liability may not exceed $20,000. *Id.* This reflects a legislative determination to confine narrowly the doctrine of charitable *64 immunity. We decline to ignore the wishes of the Legislature and expand the doctrine beyond its original boundaries.

[26] We also reject the contention that an officer of a charitable institution may not be held liable for the negligent performance of a discretionary function without evidence of bad faith. Person relies primarily on our decision in *Whitney v. Worcester,* 373 Mass. 208, 217-218, 220-221, 366 N.E.2d 1210 (1977), [FN22] where we said that governmental entities and officials should be immune from liability when the conduct causing the injury involves the exercise of judgment and discretion. Our decision there rested on overriding considerations of public policy affecting the very quality and efficiency of government itself. *Id.* at 218, 366 N.E.2d 1210. These considerations are not present in the instant case. [FN23] Cf. *LaClair v. Silberline Mfg. Co.,* 379 Mass. 21, 28-29, 393 N.E.2d 867 (1979) (corporate officer is not immune from liability for acts and omissions which occur while performing corporate business).

> FN22. After the decision in *Whitney v. Worcester,* 373 Mass. 208, 366 N.E.2d 1210 (1977), the Legislature enacted the Massachusetts Governmental Tort Claims Act. G.L. c. 258. Person also relies on *Gram v. Liberty Mut. Ins. Co.,* 387 Mass. 841, ---, Mass.Adv.Sh. (1981) 2287, 2292, 429 N.E.2d 21, which concerns the liability of corporate
>
> officers for inducing a breach of contract. The case is inapposite. See *LaClair v. Silberline Mfg. Co., supra* 379 Mass. at 28-29, 393 N.E.2d 867.
>
> FN23. Person also urges us to resurrect the discredited dichotomy between misfeasance and nonfeasance. In light of our holding that the defendant was under a duty to act and our reasoning in *Whitney v. Worcester, supra* 373 Mass. at 221, 366 N.E.2d 1210, we reject the argument. See *LaClair v. Silberline Mfg. Co., supra.*

*Judgments affirmed.*

O'CONNOR, Justice (dissenting).
I agree with the opinion of the court except for its conclusion that the evidence warrants a finding that the defendants' negligent acts or omissions proximately caused the plaintiff's injury.
The court holds that the jury could have found that the assailant was an intruder, rather than a guest whose entrance into the dormitory was lawful, and that the assailant gained *65 entrance to the plaintiff's room because of an inadequate locking system on the room door. I disagree with both propositions. The assailant, who was never identified, surprised the plaintiff early on a Sunday morning in a dormitory in which male guests were allowed to stay overnight on weekends. The court reasons that there was no evidence that any male visitors stayed overnight on the night of the rape, and that "[i]t is therefore mere conjecture to suggest that the assailant was lawfully on the premises." *Supra* at 339. Sounder reasoning would be that the plaintiff has the burden of proof and that there was no evidence that male visitors did *not* stay overnight on the night of the rape. That male visitors were required to be registered is inconsequential. There was no evidence that no male visitors were registered or that all registered visitors had left the campus before the incident. Therefore, the plaintiff failed to show that the defendants' negligent failure to exclude possible intruders from the plaintiff's dormitory proximately caused her injury.
The next inquiry is whether, if the assailant was a lawful visitor, the jury could have found that he gained entrance to the plaintiff's room due to the defendants' negligence. I agree that the jury could have **343 found that the system for locking the room door was inadequate due to the defendants' negligence, but I do not agree that the jury could have found that entry into the room was gained by disengaging a lock. The plaintiff testified that when she returned to her dormitory at about 3 a.m., she entered her room and

changed into pajamas. She then went to her friend's room to talk for a few minutes, leaving her door open. The door to her friend's room was located a few feet down the hall at a right angle with the plaintiff's door, and was open while they talked. The court concludes that the assailant could not have entered the plaintiff's room without passing directly in front of the plaintiff and her friend as they were talking, and that this warranted a finding that the assailant would have been detected if he had attempted to slip into the plaintiff's room during the time she spent next door. *66 Supra at 340. The court's reasoning is not persuasive because there is no evidence as to where in the friend's room the plaintiff and her friend were located or whether they were facing, or could even see, the door to that room and beyond it to the corridor and the plaintiff's door.

The court asserts that the opportunities for concealment in a single room of the type occupied by the plaintiff "are exceedingly limited," and states in a footnote that the room did not have a bathroom and "[t]he dormitory itself is of modern construction and appears to be rather stark." The court further states that "[t]he assailant ... did not awaken Mullins until well over an hour after she went to sleep," and concludes that these facts support the view that the assailant entered the room after the plaintiff had returned from her friend's room and locked her door. Supra at 340. The facts that the room was a single room without a bathroom, and that the dormitory building was modern and stark, do not warrant an inference that the construction and furnishing of the room made it unsuitable for a hiding place. The plaintiff testified on direct examination that the assailant awakened her between 4 a.m. and 4:30 a.m. On cross-examination she testified that between 4 a.m. and 4:30 a.m. was a guess on her part, and that she "didn't exactly ask him what time it was." The plaintiff's testimony that she returned to the dormitory at 3 a.m., changed into pajamas, went next door for a few minutes, and guessed the assailant awakened her between 4 a.m. and 4:30 a.m. does not support the court's assertion that the plaintiff was asleep for "well over an hour" before she was awakened. Even if such an inference were warranted, the delay was no more indicative of forced entry into the room than of the patience of the assailant. I agree that it is speculative to say that the assailant entered the room while the plaintiff was next door, but it is also speculative to say that the assailant entered after the door was locked. The burden was on the plaintiff to establish, beyond speculation, that entry occurred after the door was locked. She failed to do so.

*67 The court's holding as to causation rests on the further premises that had the defendants employed three or four guards instead of two, and had the guards been properly supervised, and had they performed efficiently, the plaintiff and her assailant would have been discovered "during the march out of the dormitory, across the courtyard, down the bicycle path, and back and forth in front of the refectory." Supra at 341. There was evidence, in addition to the evidence described in the court's opinion, that the bicycle path was in a wooded area and that the campus consisted of about seventy-five acres on which there were about seventeen dormitories and twelve other buildings. In view of the size of the campus, the numerous buildings, the darkness of night and the opportunity for clandestine flight, it is entirely speculative that two, three, or four well supervised and efficient guards would have seen what the two guards on duty did not see. The fact that three or four guards would see more than two does not mean that if three or four guards were on duty one of them probably would have been in a position to detect the assailant and the plaintiff making their way to the refectory or walking in front of it.

**344 The plaintiff testified that en route from the dormitory to the refectory, she and the assailant proceeded underneath the chains of a courtyard gate which was not adequately secured, and that the door to the refectory, where the rape occurred, was unlocked. Even if the rape would not have occurred but for those conditions, the jury was unwarranted in finding that those conditions proximately caused her injury. The plaintiff had the burden of proving "that the defendant[s] took a risk with respect to the plaintiff's safety that a person of ordinary prudence would not have taken, and that the plaintiff suffered a resulting injury that was within the foreseeable risk." Cimino v. Milford Keg, Inc., 385 Mass. 323, 330, 431 N.E.2d 920 (1982). Carey v. New Yorker of Worcester, Inc., 355 Mass. 450, 454, 245 N.E.2d 420 (1969). The foreseeable risk of an inadequately secured gate is that an intruder might enter the premises for mischievous purposes. The jury could not properly have found that there was a foreseeable *68 risk that a student would be hurt as a result of being led out through the gate by one who had entered the premises lawfully. While prudence may have dictated securing the gate to keep people out, the jury would not have been warranted in finding that prudence required securing the gate to keep people in. Similarly, the jury would not have been warranted in finding that a prudent person in the defendants' circumstances would have locked the refectory to prevent rape. Rape was not within the foreseeable risk of failure to lock the refectory.

The plaintiff produced an expert witness who testified that there was a causal relationship between the defendants' negligence and the rape of the plaintiff. An expert's opinion on the issue of causation has no probative value if it rests on speculation alone. LaClair v. Silberline Mfg. Co., 379 Mass. 21, 32, 393 N.E.2d 867 (1979) ("[a] verdict may not be based on conjecture and surmise, and expert opinion does not help if it is demonstrated that it rests on speculation"). Carey v. General Motors Corp., 377 Mass. 736, 741, 387 N.E.2d 583 (1979) ("expert testimony on the issue of causation does not help when it is based on speculation alone"). Swartz v. General Motors Corp., 375 Mass. 628, 633, 378 N.E.2d 61 (1978) (same as LaClair).

*Currie v. Lee Equip. Corp.*, 362 Mass. 765, 768, 291 N.E.2d 403 (1973). *Kennedy v. U-Haul Co.*, 360 Mass. 71, 73-74, 271 N.E.2d 346 (1971). "A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend toward that conclusion any more than toward a contrary one has no evidential value." *Kennedy v. U-Haul Co., supra*. The facts adduced at trial did not tend any more toward the conclusion that the plaintiff's rape was caused by the defendants' negligence than to the contrary conclusion. Therefore, the expert's opinion testimony had no probative value.

In my opinion the plaintiff failed to introduce sufficient evidence to warrant a finding that action or inaction of the defendants was the proximate cause of her injury, and the defendants were entitled to directed verdicts and judgments in their favor.

Mass.,1983.
Mullins v. Pine Manor College
389 Mass. 47, 449 N.E.2d 331, 11 Ed. Law Rep. 595
END OF DOCUMENT

West Reporter Image (PDF) 

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.