```
 1   A. No, I didn't.
 2   Q. But you would agree that clinical
 3 psychology programs that are APA accredited have a
 4 substantially smaller student to faculty ratio than
 5 Saybrook's program?
 6   MS. GARCIA: Objection.
 7   THE WITNESS: I think I've already stated that
 8 I don't know what the ratios are.
 9   BY MR. MORENBERG: Q. Was it a concern of the
10 board that to move in that direction would be an
11 extremely expensive undertaking due to the need to
12 add faculty and add clinical internships and add
13 resources that were not being currently offered to
14 Saybrook students?
15   MS. GARCIA: Objection.
16   THE WITNESS: The Board didn't particularly
17 raise those issues.
18   BY MR. MORENBERG: Q. Dr. O'Hara, why did you
19 resign from Saybrook?
20   A. The circumstances of my resignation from
21 Saybrook are subject to a confidentiality agreement
22 as part of my continuing relationship with the
23 school.
24   Q. And the court ruled on a protective order
25 that your attorney filed and denied it, which allows
420
```

```
 1 me to ask those questions.
 2   MS. GARCIA: I respectfully disagree. I am not
 3 instructing her not to answer, but the Court ruling
 4 against my motion did not give you or give -- you
 5 did not obtain an order that would allow her to
 6 violate her own contract.
 7   MR. MORENBERG: Well, I disagree.
 8   MS. GARCIA: That's fine. I'm not instructing
 9 her in any means. I just heard what you had said,
10 and I'm correcting it for the record because I
11 believe it was inaccurate.
12   MR. MORENBERG: I think what I said was
13 accurate, but we can agree to disagree.
14   Q. Dr. O'Hara, why did you resign from
15 Saybrook?
16   A. I'm under a nondisclosure agreement with
17 Saybrook's board that covers the degree -- the
18 agreement of my settlement and I am not at liberty
19 to disclose that. But it has nothing -- in my
20 opinion, has not to do with the Cooney affair.
21   Q. Does it have anything to do with
22 significant policy differences about accreditation
23 or monitoring licensure?
24   A. I'm under a nondisclosure agreement with
25 the school to not disclose the conditions of my
421
```

```
 1 resignation, and I'm not going to do it.
 2       (Exhibit 60 marked.)
 3   MR. MORENBERG: Q. Dr. O'Hara, do you
 4 recognize this document?
 5   A. I do.
 6   Q. And what is it's?
 7   A. It's a message that was put out by
 8 Saybrook on the occasion of my resignation from
 9 Saybrook.
10   Q. And do you indicate in the second
11 paragraph: "Saybrook's board of trustees and I have
12 experienced several very difficult weeks, during
13 which time it has become clear to me that my
14 continuation as president is no longer possible.
15 The members of the board of trustees care deeply
16 about Saybrook and so do I. When passionate people
17 share the same ends but differ in how they believe
18 these are to be accomplished, sometimes fundamental
19 conflicts arise that cannot be reconciled without
20 parting ways, and so it has been for us."
21       Am I correct in interpreting this to mean
22 that a parting of ways was required because of
23 fundamental conflicts in the way Saybrook should
24 operate?
25   MS. GARCIA: Objection.
422
```

```
 1   THE WITNESS: The only information that I am
 2 willing to disclose is -- and by agreement will
 3 disclose is the text of this document and not more.
 4   BY MR. MORENBERG: Q. And please understand
 5 that I am not saying this in any means to threaten
 6 or badger you, but I do have the right to suspend
 7 this deposition and to reserve the right to recall
 8 you if a judge determines that I'm allowed to
 9 explore that, and it's also quite possible that
10 Saybrook is going to be -- or it's insurance carrier
11 is going to be forced to have us all come out to
12 California again to do so, although we may be able
13 to do it in a different manner.
14   A. Uh-huh.
15   Q. Does your confidentiality agreement
16 preclude you from answering yes or no to the
17 following question: Were there substantial and
18 irreconcilable policy differences on the issue of
19 APA accreditation?
20   A. I'm under a nondisclosure agreement with
21 the school, and the only information I can give you
22 is that the text of this document.
23       But it's my conviction that it had nothing
24 to do with the Cooney case.
25   Q. But you're unable to say that it had
423
```

nothing to do with APA accreditation?
A. I'm under a confidentiality agreement that precludes me from saying that.
Q. That confidentiality agreement is intended to protect you, is it not?
MS. GARCIA: Objection.
THE WITNESS: It's a mutual confidentiality agreement. The school is constrained, and so am I.
Q. And both parties would have the opportunity to waive it if they so chose, correct?
MS. GARCIA: Objection.
THE WITNESS: I wouldn't have -- I wouldn't have the authority to do it.
BY MR. MORENBERG: Q. I'm not saying you specifically, but I'm saying, if you were willing to waive it and Saybrook was willing to waive it, you would be permitted to testify about the circumstances of your resignation.
MS. GARCIA: Objection.
THE WITNESS: I really don't know what the law is on that.
BY MR. MORENBERG: Q. Did you explore whether Saybrook would agree to waive that provision to allow you to testify at this deposition?
A. No, I didn't.

424

Q. Can you tell me whether your resignation was related to substantial and irreconcilable differences between you and the board in terms of Saybrook's growth and enrollment goals?
A. My nondisclosure agreement with Saybrook specifies that I cannot discuss the circumstances of my change in status except as is published in documents which were agreed upon by the board and myself.
Q. I understand that, and I'm not asking the question in different ways to harass you.
I am just trying to make sure I understand the scope of the restriction --
A. Uh-huh.
Q. -- to see if there is any areas that I'm allowed to explore.
It's your position that you can say nothing about the circumstances of your resignation except what's in this letter?
A. Precisely.
Q. And yet you seem to be able to say, in your opinion, that it is not related to the Cooney affair.
How do you reconcile those positions?
A. I thought I was being helpful.

425

Q. Well, you may have thought so, but you're providing information as to your opinion on the circumstances of the resignation.
A. I was.
MS. GARCIA: Objection.
THE WITNESS: I was giving you --
MS. GARCIA: There is no question.
THE WITNESS: There is no question.
Q. And finally, Dr. O'Hara, are you permitted to tell me whether your resignation had anything to do with substantial and irreconcilable policy differences on Saybrook's obligation to advise students of licensing restrictions that are known to Saybrook?
A. My nondisclosure agreement with the school precludes me from saying anything at all about my separation from Saybrook except what is in this document.
Q. I understand.
Dr. O'Hara, it's your position that Saybrook took action, in or about February 2004, to advise its student body of known licensure obstacles in 18-plus jurisdictions because that's when it first became concerned that students were encountering significant obstacles to licensure?

426

MS. GARCIA: Objection.
THE WITNESS: I'm not sure what's -- that's not what I said.
BY MR. MORENBERG: Q. Okay. What did you say in that regard?
A. What I said was that, after receiving the Cooney complaint, it became clear to us that despite our repeated exhortation of students to contact their licensing boards and remain current with their licensing boards that, despite all of that, Susan Cooney had not done that, and that we wanted to make doubly sure that we were skipping a separate letter to get the students attention.
And we felt that it was important that students be given an alert as to what our belief was about the current situation.
Q. But you didn't feel it was important to do that at an earlier date, because there wasn't a specific concern that a significant number of students were facing licensure obstacles?
A. We gave students the information consistently throughout my whole tenure at Saybrook, and before that there was no way that Saybrook could undertake to monitor all the changes and all the licensing laws in all the jurisdictions -- and that

427