13

1  Q. Did you provide any seminars or lead any
2  information meetings regarding licensing standards
3  for psychologists?
4  A. At JFK?
5  Q. Yes.
6  A. We talked about ethical issues involved in
7  the practice of psychology in some of the courses,
8  but I didn't -- they had -- we talked about ethical
9  issues involved in the practice of psychology and
10 some of the practicum supervision courses there.
11 Q. But apart from ethical issues discussed in
12 practicum supervision, do you recall any assistance
13 or services that you provided to help students
14 understand licensure regulations?
15 A. No.
16 Q. And did you provide any assistance or
17 services to the administration or to other faculty at
18 John F. Kennedy University regarding licensure
19 standards for psychologists?
20 A. No.
21 Q. Could you tell me what years you were
22 affiliated with the California Institute of Integral
23 studies?
24 A. From 2005 to the present.
25 Q. And what is your title there?

14

1  A. Associate Professor, Adjunct Professor of
2  Psychology.
3  Q. Do you teach any courses at the California
4  Institute of Integral Studies regarding licensing
5  standards for psychologists?
6  A. I do not.
7  Q. And do you provide any guidance to graduate
8  students in that program regarding licensing
9  standards for psychologists?
10 A. I do not.
11 Q. And do you provide any assistance or
12 guidance to the administration or to fellow faculty
13 at the California Institute of Integral Studies
14 regarding licensing standards for psychologists?
15 A. I do not.
16 Q. Tell me about when you joined Saybrook and
17 what position you assumed there?
18 A. I joined Saybrook I think in 2003 and I
19 joined as an executive faculty member full-time.
20 Q. Could you be more specific about the month
21 when you joined Saybrook?
22 A. I think it's February, but that's all I can
23 recall.
24 Q. And do you recall who recruited you to join
25 Saybrook?

15

1  MS. GARCIA: Objection.
2  MR. MORENBERG: Q. You may answer.
3  A. Who recruited me. I'm just trying to think
4  of the best way to respond to this question.
5  Q. Sure.
6  A. Through contact with one of the faculty --
7  one of the advising faculty I learned about the
8  school.
9  Q. And who was that faculty member?
10 A. Pat DiRubbo.
11 Q. Is Pat DiRubbo a faculty member of Saybrook?
12 A. She's an advising faculty, I believe.
13 Q. Do you recall any administrators at Saybrook
14 with whom you interviewed?
15 A. I do. William Bruff and Art Bohart.
16 Q. Were those separate individual interviews or
17 did they interview you together?
18 A. Together, yes.
19 Q. Can you tell me what you recall about that
20 interview only with respect to any discussion of
21 services or instructions you might provide at
22 Saybrook regarding licensure standards for
23 psychologists?
24 A. Nothing was discussed in that interview.
25 Q. How did Saybrook learn that you had an

16

1  interest in psychology licensure?
2  MS. GARCIA: Objection.
3  THE WITNESS: Yes. I didn't have an
4  interest in psychology licensure.
5  MR. VARTAIN: You've answered it.
6  THE WITNESS: I didn't really have a
7  specific interest in licensure.
8  MR. MORENBERG: Q. At some point did a
9  colleague at Saybrook ask you if you would have an
10 interest in providing information or guidance to
11 students regarding psychology licensure?
12 MS. GARCIA: Objection.
13 THE WITNESS: Yes. I was asked to help
14 develop -- to do some research and develop a
15 licensing information bulletin.
16 MR. VARTAIN: I would like to interject and
17 I am going to make a standing objection to all other
18 questions as being not relevant to the action and not
19 discoverable under the standard. Attorney Garcia
20 said this individual came to the school after the
21 matriculation of plaintiff with the school already.
22 And I realize you're going to ask the questions and
23 we're not going to stop the examination, but I would
24 like this marked Attorney Vartain's opening statement
25 -- marked in the front of the transcript. That this

17

1  appearance pursuant to subpoena is not a waiver of
2  the fact that this is not a discoverable -- of
3  discoverable set of information. And I won't further
4  state that objection today.
5       MR. MORENBERG: Q. Could you tell me who
6  asked you to help develop the licensing information
7  bulletin?
8       A. Catherine Clark and Art Bohart.
9       Q. And did they ask you to consider developing
10 that in an individual meeting -- strike that.
11      Did you meet with them individually or did
12 you have a group meeting with all?
13      A. It was a joint meeting.
14      Q. And do you recall when that meeting took
15 place?
16      A. I do not.
17      Q. Was it shortly after you joined Saybrook or
18 some considerable time afterwards?
19      MS. GARCIA: Objection.
20      THE WITNESS: Some considerable time
21 afterwards.
22      MR. MORENBERG: Q. Can you provide your
23 best estimate as to when in your employment that
24 discussion occurred?
25      A. Maybe three or four months.

18

1       Q. And tell me everything you can recall about
2  that discussion?
3       A. It was over lunch and we were talking about
4  -- I came in sort of mid-year and so it was over
5  lunch and we were talking about some of the things
6  that they might need done given my background. And I
7  was actually learning the technology. And they asked
8  me if I would help them develop a web page that would
9  be -- would provide additional education to students
10 on the regulatory scheme of the field of psychology
11 and to facilitate interaction between the students
12 and their local psychology boards and then to consult
13 with students. If questions specific to the statutes
14 -- state statutes of what a psychology rules arose
15 that needed some clarification. So it was
16 specifically in a consultive capacity to the
17 students.
18      Q. When you refer to your background, is it
19 fair to say you're referring to your legal education
20 as well as your psychology background?
21      A. I'm not -- I don't understand the question.
22      Q. Maybe it was unclear. During your testimony
23 I believe you made reference to your background --
24 strike that.
25      MR. MORENBERG: Could you read back the last

19

1  part of his answer.
2       (The record was read back as follows:
3       Q. "It was over lunch and we were
4  talking about -- I came in sort of mid-year and so
5  it was over lunch and we were talking about some
6  of the things that they might need done given my
7  background. And I was actually learning the
8  technology. And they asked me if I would help
9  them develop a web page that would be -- would
10 provide additional education to students on the
11 regulatory scheme of the field of psychology and
12 to facilitate interaction between the students and
13 their local psychology boards and then to consult
14 with students. If questions specific to the
15 statutes -- state statutes of what a psychology
16 rules arose that needed some clarification. So it
17 was specifically in a consultive capacity to the
18 students.")
19      MR. MORENBERG: Q. I just want to ask you
20 what you meant by the word background, were you
21 referring to your legal education?
22      A. I'm sorry. I was -- just got absorbed with
23 everything she said so my -- what was it again that I
24 said about the background?
25      Q. I don't want to put words in your mouth.

20

1       MR. VARTAIN: Let's have it read back.
2       THE WITNESS: Yes.
3       (The record was read back as follows:
4       Q. "It was over lunch and we were
5  talking about -- I came in sort of mid-year and so
6  it was over lunch and we were talking about some
7  of the things that they might need done given my
8  background. And I was actually learning the
9  technology.")
10      MR. MORENBERG: Q. When you referred to
11 your background as being of interest to Dr. Clark and
12 or Dr. Bohart, what did you mean?
13      A. Just that I had a lot of experience in
14 clinical practice and teaching a range of courses.
15 And so my general background -- so what exactly I was
16 going to do -- which courses I was going to teach and
17 the concentration and how I might be able to help
18 them with this project.
19      Q. With respect to the project, did they
20 indicate to you that your legal background would be
21 an asset in helping students to understand licensing
22 standards?
23      MS. GARCIA: Objection.
24      THE WITNESS: They thought that I would
25 understand the regulations and that I would be able

5 (Pages 17 to 20)

**21**

1 to help the students with that.
2     MR. MORENBERG: Q. And do you agree that
3 you felt that you would be able to understand the
4 regulations?
5     THE WITNESS: I did.
6     MS. GARCIA: Objection.
7     THE WITNESS: I do.
8     MR. MORENBERG: Q. And do you recall any
9 other discussions with Saybrook administrators
10 regarding this project?
11     A. I just agreed to do it and then undertook
12 the research to do it and then produced a document.
13     Q. And, Dr. Vaughan, when you agreed to do the
14 research, was this a part of your job
15 responsibilities as a member of the executive faculty
16 or was this a special consulting project in addition
17 to that?
18     MR. VARTAIN: Objection.
19     MR. MORENBERG: Q. You may answer.
20     MR. VARTAIN: Compound.
21     THE WITNESS: It was part of my job
22 responsibility as an executive faculty member.
23     MR. MORENBERG: Q. And when did you do the
24 research for purposes of developing the information
25 bulletin?

**22**

1     A. I started doing the research maybe -- if I
2 started -- maybe April or May would have been a time
3 that I started.
4     Q. Is that April or May of 2003?
5     A. Of 2003.
6     Q. And did Dr. Bohart or Dr. Clark -- strike
7 that.
8         Did Dr. Bohart indicate to you why he wanted
9 you do develop the legal information -- strike that.
10        Did Dr. Bohart indicate to you why he wanted
11 you to develop the licensing information bulletin at
12 that time?
13     A. Yes.
14     Q. What did he tell you?
15     A. Well, both of them together -- I met with
16 both of them together -- and I'm trying to recall the
17 conversation. I think that they wanted to take
18 additional steps to educate students on the
19 regulatory scheme and to facilitate the interaction
20 between the students and their local psychology
21 boards. And so to have that information available to
22 them and to have somebody available to consult with
23 them about the reading of the statutes and the board
24 of psychology rules I think was important.
25     Q. Do you have any specific memories of

**23**

1 comments attributable to Dr. Bohart or Dr. Clark
2 individually?
3     A. I do not.
4     MR. VARTAIN: Delayed objection.
5     MR. MORENBERG: Q. Can you recall anything
6 else that either Dr. Bohart or Dr. Clark said to you
7 regarding the reasons for developing this licensing
8 information bulletin?
9     A. No.
10    Q. Do you recall any mention or discussion of
11 student requests for additional support regarding
12 licensing information?
13    MS. GARCIA: Objection.
14    MR. MORENBERG: Q. You can answer.
15    A. Could you repeat your question, please.
16    MR. MORENBERG: Sure. Could you read that
17 back.
18        (The record was read back as follows:
19        Q. "Do you recall any mention or
20    discussion of student requests for additional
21    support regarding licensing information?")
22    THE WITNESS: No.
23    MR. MORENBERG: Q. Do you recall any
24 statements made by Dr. Bohart or Dr. Clark regarding
25 student complaints regarding the lack of support and

**24**

1 understanding licensing standards in various
2 jurisdictions.
3     MS. GARCIA: Objection.
4     THE WITNESS: No.
5     MR. MORENBERG: Q. And do you recall any
6 mention by Dr. Bohart or by Dr. Clark that they were
7 concerned about legal action against Saybrook?
8     A. No.
9     Q. Did either Dr. Bohart or Dr. Clark advise
10 you of any jurisdictions in which Saybrook graduates
11 were encountering licensure obstacles at that time in
12 or about April or May of 2003?
13    MR. VARTAIN: Objection.
14    THE WITNESS: No, they did not.
15    MR. MORENBERG: Q. Did Dr. Clark or
16 Dr. Bohart provide you with any materials on
17 licensing standards or licensing obstacles to assist
18 you with your project?
19    A. No, they did not.
20    Q. Did Dr. Bohart or Dr. Clark advise you that
21 Saybrook had documents regarding licensing standards
22 in any jurisdictions?
23    MS. GARCIA: Objection.
24    THE WITNESS: Could you read that back,
25 please.

**Page 25**

```
1       (The record was read back as follows:
2       Q. "Did Dr. Bohart or Dr. Clark advise
3  you that Saybrook had documents regarding
4  licensing standards in any jurisdictions?")
5       THE WITNESS: They did not advise me of any
6  documents that they had regarding licensing
7  standards.
8       MR. MORENBERG: Q. Did they advise you of
9  any resources they could provide to help you in your
10 project?
11      A. They provided a laptop computer for me to do
12 online search.
13      Q. Did they share with you any documents that
14 Saybrook possessed from the consortium for
15 diversified psychology programs?
16      MS. GARCIA: Objection.
17      THE WITNESS: I did see some documents from
18 the consortium.
19      MR. MORENBERG: Q. And can you tell me
20 which documents you saw?
21      A. I can not, no, sorry.
22      Q. Can you tell me the years in which those --
23 strike that.
24      If it's okay with you, Dr. Vaughan, I am
25 going to ask questions where I use the acronym CDPP;
```

**Page 26**

```
1  is that okay?
2       A. Okay.
3       Q. Do you recall the year or years of the CDPP
4  publications that you reviewed?
5       A. No, I don't recall.
6       MR. MORENBERG: Can you show the witness
7  Exhibit 17.
8       MS. GARCIA: No, I don't have Exhibit 17.
9       MR. MORENBERG: Sorry.
10      MR. VARTAIN: Would that be 17 from
11 Plaintiffs?
12      MR. MORENBERG: Yes.
13      Q. Dr. Vaughan, is this one of the documents
14 that you received?
15      A. I don't recognize it. I don't recall that
16 -- I do recall the name Rudy Melone.
17      Q. Do you recall receiving any documents that
18 were authored by Rudy Melone?
19      MR. VARTAIN: Objection.
20      MR. MORENBERG: Q. You may answer.
21      A. Yeah, I do recall receiving some documents
22 that were related to the consortium, but I threw
23 those documents away.
24      Q. Why did you throw those documents away,
25 Doctor?
```

**Page 27**

```
1       A. Because I had them for three years and they
2  just -- I wasn't really using them. There weren't
3  many. Just a few documents that I sorted through in
4  doing some research on setting up this licensing
5  information bulletin and they were just old documents
6  that were in a box.
7       Q. Did you receive the documents from
8  Maureen O'Hara?
9       A. No.
10      Q. Who at Saybrook provided the documents to
11 you?
12      MS. GARCIA: Objection.
13      MR. MORENBERG: Q. You may answer.
14      A. I just looked through some files and just
15 took what documents I thought might be relevant to
16 the research involved in setting up a licensing
17 information bulletin.
18      Q. And were any of those documents authored or
19 co-authored by Rudy Melone?
20      MS. GARCIA: Objection.
21      THE WITNESS: I think I recall Rudy Melone's
22 name being mentioned in the documents. And that's
23 how I learned about this consortium of diversified
24 psychology programs.
25      MR. VARTAIN: When you have a chance,
```

**Page 28**

```
1  Counsel, I would like to take a brief five minute
2  break.
3       MR. MORENBERG: When did we start this
4  deposition?
5       THE REPORTER: We started at 3:05.
6       MS. GARCIA: We have been going all day,
7  Counsel.
8       MR. MORENBERG: That's true but you had a
9  break or at least Attorney Vartain and I had a break.
10 We can break in about five minutes.
11      If you could show the witness Exhibit 37 to
12 Dr. O'Hara's deposition.
13      Q. Could you tell me if you have ever reviewed
14 that particular document and you can take a minute to
15 flip through it if you need to.
16      A. No, I don't recall reviewing this document.
17      Q. I would like to turn your attention to page
18 four of the document.
19      A. There are actually no page numbers.
20      Q. Fourth page of the document.
21      MS. GARCIA: Is that the Bates Stamp 1982.
22      MR. MORENBERG: Yes, it is.
23      Q. I would like to ask you if any of the other
24 CDPP documents included an analysis of various
25 jurisdictions similar to the format of this document?
```

7 (Pages 25 to 28)