UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO.: 04- 11572 JLT

|  |  |
|---|---|
| SUSAN COONEY,<br>       Plaintiff,<br><br>v.<br><br>SAYBROOK GRADUATE SCHOOL<br>AND RESEARCH CENTER and<br>MAUREEN O'HARA,<br>Individually,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO SUBMIT FURTHER DOCUMENT REQUESTS

Saybrook Graduate School and Research Center ("Saybrook") and Maureen O'Hara ("Dr. O'Hara"), oppose the plaintiff's Motion for Leave to Submit Further Document Requests (Docket #43) on the grounds that these new requests are irrelevant to the case and unreasonably burdensome to the defendants.

## BACKGROUND

In 1995, Susan Cooney enrolled as a student at the Saybrook Graduate School and Research Center. In October 2002, she graduated from Saybrook with a Ph.D. in Psychology. This case centers on plaintiff's contention that the defendants promised her in 1995 that, upon graduation, she would be eligible for licensure as a psychologist in Massachusetts, whereas, in fact, after her 2002 graduation, she claims that she was advised that she was ineligible to sit for the licensing exam. See Amended Complaint. Despite the apparently straightforward factual predicate to these claims, the plaintiff has already taken extensive discovery. Now she demands the right to take more.

988861v1

To date, the plaintiff has taken the following discovery, all of which have been responded to by the defendants:

- Thirty-nine requests for production of documents to Saybrook;

- Thirty-eight requests for production of documents to Dr. O'Hara;

- Two sets of interrogatories, one to Saybrook and one to Dr. O'Hara;

- The two day deposition of Dr. O'Hara;

- The deposition of John Reho;

- The deposition of Dr. Ruth Richards;

- The deposition of Dr. William Bruff;

- The deposition of Dr. Eugene Taylor;

- The deposition of Dr. Alan Vaughn;

- The deposition of Dr. Donald Cooper.

In addition to the foregoing, Plaintiff has scheduled the depositions of Dr. Karen Schwartz and Dr. Dennis Norman to take place April 28, 2006 and May 2, 2006, respectively.

- Plaintiff is currently in the process of scheduling the deposition of Dr. Arthur Bohart.

- Plaintiff has participated in the deposition of Attorney Daniel Finn.

- Recently, this Court allowed the plaintiff to serve twenty written questions on Dr. Thomas Greening, which defendants anticipate will be served by May 1, 2006.

Based on the discovery above, defendants argue that plaintiff's request for further discovery is not only irrelevant but redundant. As a result, these latest discovery requests should be barred.

2

988861v1

## ARGUMENT

Unless there is a showing of good cause, parties are only entitled to seek discovery of information "that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). In these proposed discovery requests, plaintiff seeks documents relating to Dr. O'Hara's bonuses between 1999 through 2005, as well as reports showing enrollment, tuition revenues, and faculty expenditures for the same years. Such discovery is irrelevant to this case as it not only seeks information that is not related to the claims or defenses, but also seeks information during a time the plaintiff was not even a Saybrook student.

For all of the plaintiff's claims, breach of contract, promissory estoppel, violation of Mass. Gen. Laws ch. 93A, negligence, and negligent infliction of emotional distress, the plaintiff must prove that the defendants had a duty, whether by agreement or in law, to disclose licensing information to the plaintiff. See Singarella v. Boston, 342 Mass. 385, 387, (1961) (to prove breach of contract plaintiff must prove there was an agreement that was breached); Cottam v. CVS Pharmacy, 436 Mass. 316, 320 (2002) (to prove a negligence claim, the plaintiff must show a duty and a breach of the duty). Plaintiff argues it is entitled to these financial documents in order to prove *why* she believes the defendants did not disclose licensing information to students. Any speculative reason on why Saybrook or Dr. O'Hara did not convey licensing information is irrelevant to the issue of whether they had a duty or were under a contractual obligation to convey such information.

Moreover, the plaintiff is now seeking discovery that she has already obtained through deposition testimony. For example, Dr. O'Hara, during her two-day deposition, already testified that her bonuses were not linked to Saybrook's revenues or enrollment. See Deposition Transcript of Dr. O'Hara, at 85, 87, attached as Exhibit A. Therefore, the plaintiff's request for

3

information regarding Dr. O'Hara's employment bonuses is redundant and unnecessary and an unreasonable invasion of her privacy.

Furthermore, the plaintiff has no basis to state that Saybrook's annual reports contain references to licensing obstacles. The plaintiff refers to a Report dated 2001-2003 to argue that Saybrook's annual reports "may contain references to Saybrook's policies on licensing or its knowledge of licensing obstacles." However, within this report there is neither a reference to Saybrook's policies on licensing or licensing obstacles. Rather, the only mention of licensing within this thirty-seven page report is that a faculty member is noted as being "Executive Faculty, and Consultation on Professional Licensure in Psychology," and a single sentence that states: "As the requirements for licensing as a psychologist continue to evolve, the faculty has adjusted the curriculum to specifically address licensing requirements." See Exhibit B at 33. Neither the faculty profile nor the cited sentence gives the plaintiff a basis to argue that Saybrook's annual reports contain information relating to licensing obstacles in Massachusetts. Therefore, it is appropriate to deny the plaintiff's motion to obtain the requested documents. See e.g. Heidelberg Americas, Inc. v. Tokyo Kikai Sisakusho, Ltd., 333 F. 3d 38, 41 (1st Cir. 2003), quoting, Micro Motion, Inc. v. Kane Steel Co., Inc., 894 F.2d 1318, 1328 (Fed. Cir. 1990) ("A litigant may not engage in merely speculative inquires in the guise of relevant discovery.")

## CONCLUSION

WHEREFORE, Defendants request that this Court all the deny plaintiff's Motion for Leave to Submit Further Document Requests.

4

Defendants,
By its attorneys,

/s/ *Grace V. Bacon Garcia*

_____
Michael F. Aylward, BBO #024850
Grace V. Bacon Garcia, BBO# 640970
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210-1181
(617) 439-7500

## CERTIFICATE OF SERVICE

    I certify that this document has been served upon all counsel of record in compliance with the F.R.C.P.

/s/ *Grace V. Bacon Garcia*

_____
Grace V. Bacon Garcia

Date: April 25, 2006

988861v1

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
--oOo--

SUSAN COONEY,                No.  04-11572JLT
    Plaintiff,
vs.
SAYBROOK GRADUATE SCHOOL
AND RESEARCH CENTER and
MAUREEN O'HARA, Individually,
    Defendants.
_____/

Deposition of
MAUREEN O'HARA
_____
Monday, March 13, 206

NOTICING ATTORNEY:  PAUL W. MORENBERG

REPORTED BY:  JANICE M. JOBE, CSR NO. 4734
G O L D E N   G A T E   R E P O R T E R S LLC
35 Mitchell Boulevard, Suite 8
San Rafael, CA  94903-2010
(415) 491-4611 * 1-800-442-4611
FAX (415) 491-4635
email: ggr35@depos.com   web: http://www.depos.com

---

1      --oOo--
2      Pursuant to Notice of Deposition, and on
3  Monday, March 13, 2006, commencing at the hour of
4  9:25 a.m., at the Court Reporting Offices of GOLDEN GATE
5  REPORTERS, Corporate Office Center, 388 Market Street,
6  Suite 400, San Francisco, California, before me, JANICE
7  M. JOBE, a Certified Shorthand Reporter and Deposition
8  Officer of the State of California, there personally
9  appeared
10
11      MAUREEN O'HARA,
12
13  called as a witness by the Plaintiff, who, having been
14  duly sworn by me, was examined and testified as
15  hereinafter set forth.
16      --oOo--
17      PAUL W. MORENBERG, Attorney at Law, Law Offices
18  of KERSTEIN, COREN, LICHTENSTEIN, FINKEL, LLP, Newton
19  Wellesley Executive Office Park, 60 Walnut Street,
20  Wellesley, Massachusetts 02481, appeared as counsel on
21  behalf of the Plaintiff.
22      GRACE V.B. GARCIA, Attorney at Law, Law Offices
23  of MORRISON, MAHONEY, LLP, 250 Summer Street, Boston,
24  Massachusetts, appeared as counsel on behalf of the
25  Defendants.
                                           3

---

1          I N D E X
2
3  EXAMINATION BY                   PAGE
4  MR. MORENBERG:                    4
5  AFTERNOON SESSION:               111
6
7          EXHIBITS
8  PLAINTIFFS FOR
   IDENTIFICATION     DESCRIPTION        PAGE
9
   32    Curriculum Vitae of Maureen O'Hara    7
10
11    33    Defendant, Maureen O'Hara's Answers   73
      to Plaintiff's First Set of
      Interrogatories
12
   34    Saybrook's Guiding Values          114
13
   35    Draft - New, Principles of Ethical  117
14       Business Conduct
15 36    Saybrook, The 18 states that Saybrook  129
         Graduate School currently believes
16       have the APA or Residence obstacles
         are:
17
   37    Consortium for Diversified Psychology  142
18       Programs (CDPP)
19 38    Board of Psychology Examiners of the  176
         State of Iowa, Findings of Fact
20       Conclusions of Law Decision and Order
21 39    Graduated Students with Massachusetts  202
         Addresses with attachment
22
23
24
25
                                           2

---

1          EXAMINATION BY MR. MORENBERG
2      MR. MORENBERG:  Q. Good morning.
3      A.  Good morning.
4      Q.  I am attorney Paul Morenberg.  I am counsel for
5  the plaintiff Susan Cooney.
6      Could you please state your full name for the
7  record?
8      A.  Maureen O'Hara.
9      MS. GARCIA:  I would like to enter into some
10  stipulations at some point.
11      MR. MORENBERG:  Sure, we can do that right
12  now.  Are we using the usual stipulations we used in the
13  prior depositions?  Are we reserving objections except
14  as to form and motions to strike to the time of trial?
15      Anything else that you wanted --
16      MS. GARCIA:  I would like my client to read
17  and sign and she will have 30 days after we obtain
18  the deposition transcript to do so.
19      MR. MORENBERG:  That's fine.
20      Q.  And Dr. O'Hara, I'm just going to tell you a
21  little bit about how I conduct a deposition.
22      As you know, we have a court reporter who is
23  creating a transcript, so it's very important that we
24  have verbal responses to all questions as opposed to
25  nods or pauses.
                                           4

1    Q.  You mentioned that the incentive was linked to
2  performance objectives.  Were there any objective
3  criteria based on the revenues of the school?
4    A.  No.
5    Q.  Were there any objective criteria based on
6  enrollment?
7    A.  No.
8    Q.  What were the criteria by which the incentives
9  were awarded?
10    A.  We would -- on the basis of the strategic plan,
11  we would develop certain goals for the year.  And those
12  goals were the basis of my agreement with the board for
13  that year on what the school was going to achieve.  And
14  the report was made at the end of the year as to the
15  degree to which those objectives had been achieved or
16  not.
17    Q.  Didn't the strategic plan for the school
18  include issues relating to enrollment?
19      MS. GARCIA:  Objection.
20      THE WITNESS:  Please clarify what you mean by
21  issues.
22      MR. MORENBERG:  Q.  Well, you said there
23  were -- you testified there was not a specific incentive
24  linked to enrollment or school revenues, but that it was
25  linked to generally the strategic plan.
85

1    Q.  So how was your incentive decided?
2    A.  The board and I discussed what we wanted to
3  achieve that year and what aspects of what we wanted to
4  achieve that year would be considered performance goals
5  for me as the president of the school, and that was
6  different every year.
7    Q.  I understand that.
8    A.  And we -- and it was developed jointly between
9  me and the Board of Trustees.
10    Q.  Were those goals put in writing?
11    A.  Yes.
12    Q.  Is it your testimony that those written goals
13  made no mention of a desire to increase enrollment at
14  Saybrook for the year 1999/2000?
15    A.  I don't recall what was in the specific
16  performance goals for 1999 and 2000, but I am pretty
17  sure they did not include any specific requirements for
18  performance goals.
19    Q.  Do you recall if any of the subsequent
20  strategic plans by which your incentive was evaluated
21  included goals for enrollment?
22    A.  There was never a performance expectation for
23  me that I would increase enrollment by any particular
24  amount.
25    Q.  That's not my question.  Did any of the
87

1    A.  No, no.  That's not what I said.
2    Q.  So please explain how I'm getting it wrong.
3    A.  What I said was each year we identified the
4  goals that we were going to be working on that year that
5  were based on some aspect -- on the strategic plan, but
6  they were the goals for that year.
7    Q.  I see.
8    A.  And the board and I agreed on what I was to
9  accomplish that year.
10    Q.  One of the goals for your first academic year
11  was to increase student enrollment, correct?
12    A.  No.
13    Q.  You mentioned a strategic plan.  Is it your
14  testimony that there was no discussion in the strategic
15  plan that Saybrook was trying to improve its enrollment?
16    A.  I think you're misconstruing what I'm saying.
17    Q.  I'm listening.
18    A.  It would be easier if you put your question the
19  other way.
20    Q.  I think the question was clear, but I will
21  restate it.
22      You said that your incentive was linked to your
23  accomplishing in the judgment of the Board of Trustees
24  the goals articulated in the strategic plan?
25    A.  No, I didn't say that.
86

1  strategic plans, which you testified are in writing,
2  indicate that your incentive would be evaluated partly
3  on the basis of Saybrook's goal of building enrollment?
4    A.  No.
5    Q.  Are you sure about that?
6    A.  Yes.
7    Q.  And the goals, as both parties intended them,
8  were memorialized in a writing that was done each
9  academic year?
10    A.  Yes.
11    Q.  Did you receive a copy of those agreements?
12    A.  Yes.
13    Q.  Do you still have a copy of those agreements?
14    A.  No.
15    Q.  And I assume that Saybrook or its board has a
16  copy of those agreements?
17      MS. GARCIA:  Objection.
18      THE WITNESS:  I don't know.
19      MR. MORENBERG:  Q.  Did the incentives include
20  any evaluation of Saybrook's progress in modernizing its
21  curriculum?
22    A.  In a generic sense, yes.
23    Q.  Perhaps it would be easier to ask you for the
24  1999/2000 calendar year what were the performance goals
25  for Saybrook by which your incentive was evaluated?
88

22 (Pages 85 to 88)

EXHIBIT B

GRADUATE SCHOOL • RESEARCH CENTER






# THE SAYBROOK REPORT
## 2001–2003

*President's Message (continued from page 2)*

pace with the changing needs of our students. Our human science degree, for instance, is no longer a heavily philosophical and theoretical degree but places a greater emphasis on the integration of practice and theory building. As the requirements for licensing as a psychologist continue to evolve, the faculty has adjusted the curriculum to specifically address licensing requirements.

Organizationally, we have continued to invest in our future. We have dramatically upgraded our capacity in terms of staff skill level, technology, and senior management. We have expanded Web and IT staff; increased the budget to accommodate new library resources, databases, web documents and digital materials production; and added a second librarian to help with a mandatory on-line resources utilization course.

We have continued to enhance our "customer service" by installing comprehensive data management systems that allow students and faculty to transact much of their administrative business via our website. By automating the registration process, staff are now able to deal with problems that need personal attention. Our new on-line payment system has reduced student costs and made payments easier.

These developments, taken together, comprise a transformational shift in Saybrook's operations, and its success has involved the creativity, effort, and patience of everyone on the Saybrook team. With the addition of two key leadership positions, Dr. Katherine Clarke, Vice President of Academic Affairs and Jack Reho, Vice President of Finance and Operations, Saybrook has been able to maintain its focus on academic excellence and fiscal sustainability while moving through this comprehensive transformational process. Like whitewater rafting, there have



*Eugene Taylor, Natalie Rodgers, and Maureen O'Hara*

(continued on page 34)

---

## FACULTY PROFILE
# Alan Vaughan, Ph.D., J.D.



*Present Position:*
Executive Faculty, and Consultation on Professional Licensure in Psychology

*Teaching area:*
I teach in the Humanistic and Transpersonal Concentration.

*Why did you choose to teach at Saybrook?*
It is an innovative institution with global vision offering the opportunity to work in a Humanistic community. It affords the opportunity to pursue scholarly interests while teaching highly motivated mature students with the aid of advanced technology. I am able to use my interdisciplinary education and training in useful ways.

*What do you find to be the most interesting and/or fulfilling aspect of teaching at Saybrook?*
The organization of curriculum into concentrations and the range of courses offered in psychology; the flexibility to teach courses of interest across concentrations; development of the clinical tract in HTP; the talented faculty.

*What keeps you motivated?*
Motivation comes from the time afforded to pursue my scholarly interests, the opportunity to structure my own time and the belief that the institution has a primary goal of creating a more humane equitable and just and society.

*What are some of your interests/hobbies outside of your work?*
Hobbies: Painting, Art History, Health and Fitness (Swimming, Yoga, Meditation, Moderate Weight Training and limited Sailing)

*Advice to current Saybrook students:*
Develop Global consciousness, pursue your dreams, do not participate in racism or destruction of the ecosystem and help other people.

33