# EXHIBIT 4A

# ORIGINAL

VOLUME: I
PAGES: 1-275
EXHIBITS: 1-16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO: 04 11572 JLT

---

SUSAN COONEY,  )
                              Plaintiff,  )
                                          )
v.                                        )
                                          )
HUMANISTIC PSYCHOLOGY                     )
INSTITUTE, d/b/a SAYBROOK                 )
INSTITUTE and MAUREEN O'HARA,             )
Individually,                             )
                              Defendants. )

---

AUDIOVISUAL DEPOSITION OF SUSAN COONEY, taken on behalf of the Defendant, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Marcia Danilecki, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at Morrison Mahoney LLP, 250 Summer Street, Boston, Massachusetts, on Thursday, January 26, 2006, commencing at 10:16 a.m.

DANILECKI REPORTING
234 Governors Road
Quincy, MA 02169
(617) 745-9786

1   A.  Okay.  It was looking poorly but I had hope.
2   Q.  What was looking poorly?
3   A.  Well, there seemed to be some issues, but I
4 wasn't clear on whether it was definitively -- until
5 more information came across in the later months.
6   Q.  When did it start becoming in your mind that
7 there were issues that might prohibit you from becoming
8 licensed as a psychologist?
9   A.  In early 2003.
10  Q.  What do you mean by 'early 2003'?
11  A.  February, March.
12  Q.  And from whom were you getting communication
13 about those issues in February and March of 2003?
14  A.  As you stated, from the board.
15  Q.  The board being who?
16  A.  Dr. Karen Schwartz.
17  Q.  And were those communications over the phone?
18  A.  There were phone and e-mail.  I'm not sure at
19 that period.  I believe it was phone.
20  Q.  And were the things she was telling you as
21 follows:  The law doesn't let us license Saybrook people
22 anymore because Saybrook isn't registered with the APA?
23  A.  No.  She never said the APA.
24  Q.  What did she say?

57

1  A.   She said that the regulations do not permit Saybrook students to get licensed in Massachusetts.

3  Q.   When did she say that for the first time?

4  A.   Early 2003, I believe.

5  Q.   February or March of 2003?

6  A.   Right. Right.

7  Q.   So you already knew that you were going to have difficulty or impossibility of getting licensed as a psychologist because you went to Saybrook when Dr. Norman sent you this e-mail?

11 A.   No. I had -- I had some hopes of other avenues to pursue, being reciprocal, being -- getting a respecialization class, trying to try remedies. So I hadn't given up hope yet.

15 Q.   I heard -- I heard -- I understand you. But my question is, as of February or March you had received information that what you thought could be done, that is, you could get licensed by just being in Massachusetts, was not going to happen. You were going to have to, at best, go out of state or do some other things, correct?

22 A.   I hadn't given up hope that it wasn't going to happen. I thought there were problems and perhaps there was a way around it.

72

1    Q.    What was the contact you had with the Board
2 of Psychology in 1995?
3    A.    I was asking if I could get a copy of their
4 regulations because I was going to pursue a Ph.D. in
5 psychology.
6    Q.    Okay. And who did you speak with?
7    A.    I don't know.
8    Q.    You just called someone at the Board of
9 Psychology?
10    A.    Correct.
11    Q.    Do you know where their offices are at?
12    A.    Is it Staniford Street? I'm not positive.
13 Staniford Street downtown, I think. I'm not positive.
14    Q.    Did you go down there to get the regs?
15    A.    No. They told me to go to the statehouse
16 bookstore, and I went there and got the regulations.
17    Q.    How did you get there?
18    A.    Drove.
19    Q.    You drove. How far is that from Mass.
20 General?
21    A.    Well, two seconds, but I think I drove from
22 home so it was like eight miles.
23    Q.    It's two seconds?
24    A.    Yeah.

```
 1        Q.    What do you mean, two seconds?
 2        A.    Three blocks.
 3        Q.    That's what I thought.  I used to live in
 4   Boston.
 5        A.    Oh, really.
 6        Q.    Yeah.  It's three blocks from Mass. General
 7   to the location where you can get the regs?
 8        A.    The statehouse to Mass. General, about three
 9   blocks, I think.
10        Q.    Yeah.
11        A.    Yeah.
12        Q.    And it's at the statehouse where in 1995 you
13   got a copy of the regs governing licensure of
14   psychologists?
15        A.    Yes.
16        Q.    Did you read them?
17        A.    I perused them, but I was told to bring them
18   out to Saybrook for the orientation.  And so that's
19   where I had gotten them to bring.
20        Q.    Did you read them?
21        A.    I read through them, yes.
22        Q.    You were not interested in -- or were you
23   interested in what they had to say?
24        A.    Was I, yes.
```

1 like -- when you compared the regulations with the
2 courses in the catalog at Saybrook that there was a
3 pretty good match there, that you could do this?
4     A.    Yes.
5     Q.    So you rendered a judgement on your own
6 before -- You wouldn't have gone out to Saybrook, paid
7 all the money, if you had read the regulations and it
8 said something that made it look like Saybrook people
9 couldn't get licensed, correct?
10     A.    Correct.
11     Q.    So before you went out to Saybrook in the
12 summer of 1995 and you read the regulations, you made
13 the judgement that you probably could get licensed by
14 attending Saybrook, correct?
15     A.    Correct.
16     Q.    And that was confirmed when you went out
17 there --
18     A.    Correct.
19     Q.    -- by someone at Saybrook?
20     A.    Yes.
21     Q.    They basically told you what you had thought
22 was true from reading the regulations that the program
23 at Saybrook would be such that it would allow you to
24 apply for a psychology license if you did the whole

1  catalog of the school in the summer of 1995. You
2  already said that. And you were at home when you read
3  it, correct?
4      A.   Perused through it, right.
5      Q.   Well, you told me that you actually read it
6  and you formed a judgement that if you took the Saybrook
7  program that you could get licensed in Massachusetts.
8      A.   I came to that definitive decision after the
9  Saybrook orientation.
10     Q.   And you told me and is it true that you
11  actually read the catalog and came at least to the
12  tentative decision before you even flew out to Saybrook
13  and went to the residential conference and conferred
14  with the Saybrook people, correct?
15     A.   That it looked plausible and possible, yes.
16     Q.   And what looked plausible and possible that
17  from the Saybrook catalog it looked plausible and
18  possible that you could get licensed in Massachusetts,
19  correct?
20     A.   Correct.
21     Q.   And that was from your reading of the
22  Saybrook catalog even before you flew out to Saybrook in
23  San Francisco, correct?
24     A.   Yes.

1    A.    Right, right.  But not for a psychologist
2 program.
3    Q.    Right.  Just to take psychology courses.
4    A.    Classes, yeah.
5    Q.    So the question again is, other than these
6 six, you have never applied for admission to any program
7 that offers a Ph.D. in psychology, correct?
8    A.    Correct.
9    Q.    After you applied and was accepted at
10 Saybrook, did you ever consider transferring to another
11 Ph.D. program in psychology, that is, after you started
12 at Saybrook?
13    A.    I don't think so, no.
14    Q.    Did you ever, once again, after you applied
15 at Saybrook make efforts to get literature from any
16 other school of psychology for the purpose of
17 considering whether to apply there or to transfer there?
18    A.    Not that I recall.
19    Q.    When you -- withdraw that question.
20         When that point in time came that you decided
21 to go to Saybrook, had you already been rejected by the
22 other five schools that you applied to?
23    A.    Yes.
24    Q.    Was Saybrook your first choice?

205

1  right?
2      A.   Yes.
3      Q.   And by "expected to graduate," I mean
4  expected as of when you started?
5      A.   Yes.  Little longer, but yes.
6      Q.   Did you ever tell anyone after you graduated
7  in writing that you were proud to have gone to Saybrook?
8      A.   I was very happy with Saybrook.  I don't
9  remember writing that specifically.  But until I found
10 out all the problems, I was very happy with Saybrook.
11     Q.   So you -- Other than the thing with the
12 Massachusetts Board, you got what you paid for.  They
13 gave you the product that you purchased other than the
14 license issue; is that true?
15              MR. MORENBERG: Objection.
16     A.   It's hard to say yes to that.
17     Q.   Well, you just told me you were very happy
18 with the school.  What did you mean by that?
19     A.   Well, the experience was fine.  The results
20 were horrible.
21     Q.   Was the academic experience fine?
22     A.   Yes.
23     Q.   Was the teaching fine?
24     A.   It was fine.

237

1  Q.  For the record, let's make sure that the document dated January 18th, 1995 is Exhibit 12 and the document dated April 26th, 1995 is Exhibit 13. Is that what's in front of you?

5  A.  Yes.

6  Q.  Did you read Exhibit 12 carefully before you signed it?

8  A.  Yes. I'm sure I did.

9  Q.  And did you, in fact, intend to accept the Saybrook Institute offer of admissions as set forth in Exhibit 12 when you signed it?

12           MR. MORENBERG: Objection.

13  A.  I must have.

14  Q.  Same questions for Exhibit 13. Does Exhibit 13 reflect that you changed the date of your enrollment at Saybrook from that which is stated in Exhibit 12?

18  A.  Yes.

19  Q.  You changed it from March 1, 1995 to September 1, 1995, correct?

21  A.  Correct.

22  Q.  Otherwise, did you intend to agree to the same terms of enrollment as stated in Exhibit 12?

24  A.  Yes.

238

1   Q.   Did you -- When you signed the document, you
2   read the first sentence, "I accept the offer of
3   admissions to Saybrook Institute and understand the
4   conditions of my admission to the Ph.D Psychology
5   program are stated in the 1994/1995 Catalog," did you
6   see that?
7   A.   Yes.
8   Q.   Did you also read the next sentence, "I
9   understand, upon initial review of my graduate
10  transcripts, that I qualify for 18 transfer units."
11  Did you read that?
12  A.   Yes.  I would imagine I did.
13  Q.   And did you read the rest of Exhibit 13?
14  A.   I would imagine I did, yes.
15  Q.   Okay.  You have no reason to doubt that --
16  A.   No.
17  Q.   -- you read all of 13 and all of 12 before
18  you signed those respective documents?
19  A.   Correct.
20  Q.   And after you signed them, did you return to
21  Saybrook those documents with your signature on them?
22  A.   I must have, yes.
23  Q.   And when you returned them to Saybrook, you
24  intended to agree to the offer of admission that they

```
 1  had made, correct?
 2       A.    Yes.  Correct.
 3       Q.    And the terms that they made them under,
 4  correct?
 5       A.    Yes.  Correct.
 6       Q.    Both exhibits state that you, quote,
 7  understand the conditions of my admission into the Ph.D.
 8  Psychology program are stated in the 1994/1995 Catalog.
 9  My question is this, you told me earlier in this
10  deposition that you read that catalog before you first
11  went out to Saybrook right around Labor Day of that
12  year, but my question really is, do you remember when it
13  was you first received from Saybrook a copy of that
14  catalog, the 94/95 catalog?
15       A.    I don't recall.  I would have imagined it was
16  summer, but now with this earlier, I just don't recall.
17       Q.    Isn't it -- Isn't it your recollection that
18  you received the catalog at the time that you received
19  Exhibit 13 --
20                 MR. MORENBERG:  Objection.
21       Q.    -- I'm sorry, Exhibit 12?
22                 MR. MORENBERG:  Objection.  You can
23  answer the question again.
24       A.    I just don't know.  I mean, I just don't know
```

243

1    A.    Yes, I did.

2    Q.    -- back in 1995 before you went to the
3 school?

4    A.    I did.

5    Q.    And you also read the part that said, quote,
6 Such students are advised that they should contact the
7 licensing board in the state in which they plan to
8 practice to obtain the detailed requirements, because
9 regulations differ from state to state.  Did you read
10 that?

11    A.    I did.

12    Q.    Did you understand that when you read it?

13    A.    I did.

14    Q.    Did you read and understand the rest of the
15 section under Licensure?

16             MR. MORENBERG:  Before you answer
17 that, you should read the entire section unless you're
18 already familiar with it.

19    A.    (Witness reviewing document.)  Okay.  What's
20 the question?

21             MR. VARTAIN:  The witness is saying
22 she's now read the rest of Section E on Page 3 and she
23 wants the question re-read to her.

24             MR. MORENBERG:  Objection.

244

1           MR. VARTAIN:  Would you like the
2   question re-read to you or do you remember the question?
3           THE WITNESS:  I do not remember it.
4           MR. VARTAIN:  Okay.
5           (Question read.)
6      A.   I presume that I did.
7      Q.   I'm going to direct your attention to part of
8   the rest of this Section E under Licensure in Column 2.
9   At the bottom, "Students are advised to be aware,
10  however, that states review applications individually to
11  be sure all requirements of the state licensing board
12  have been met.  Regulations are constantly changing."
13  Do you see that?
14     A.   I see that.
15     Q.   Did you understand that when the school was
16  telling you that regulations are constantly changing,
17  that they were telling you that regulations governing
18  the licensure in various states are constantly changing?
19          MR. MORENBERG:  Objection.
20     A.   I don't actually recall that specifically.
21     Q.   As you read it today --
22     A.   Do I understand it, yes.  Do I remember
23  reading it, no.
24     Q.   Fair enough.  As you sit here today, when you

245

1  read that the school is telling you that regulations are
2  constantly changing, does it appear to reference
3  regulations of different states regarding clinical
4  psychology licensure requirements?
5      A.   I guess so, yes.
6      Q.   Aside from the school telling you in the
7  catalog that regulations of different states governing
8  requirements for licensure are quote, constantly
9  changing, did you also -- didn't you also when you read
10 this catalog become informed by the school that they
11 wanted you to check the specific requirements of the
12 state in which you were to practice?
13     A.   Yes.
14     Q.   In fact, they told you on Page 4 under
15 Section G that, quote, Students should check the
16 specific requirements of the state in which they wish to
17 practice; the requirements differ in each state.  Do you
18 see that?
19     A.   Yes.
20     Q.   Did you read that back in 1995?
21     A.   I don't -- You know, it's 11 years ago.  I
22 don't remember specifically.
23     Q.   Okay.  You also see on Page 3 that the school
24 told you that Saybrook graduates have been licensed.

```
                                                              249
 1        Q.    Do you have any notes or any basis which
 2   you could refer to that would refresh your
 3   recollection?
 4        A.    No.
 5        Q.    No?
 6        A.    I've given everything I have.  No.
 7        Q.    When you read the part of the catalog that
 8   said applicants should read the catalog carefully and
 9   are expected to abide by the terms and policies
10   contained therein, did you have any objection to abiding
11   by the terms and the policies of the catalogs?
12        A.    No.
13                  MR. MORENBERG:  Objection.
14        BY MR. VARTAIN:
15        Q.    Did you ever tell anybody at Saybrook that
16   you were no longer willing to abide by the terms of
17   their catalogs?
18        A.    No.
19        Q.    On Page 10 of the catalog, there's a section
20   called Number 13, Grievance Procedures.  It tells you,
21   does it not, that the procedures to settle student
22   grievances are outlined in the student handbook?  Do you
23   see that?
24        A.    Yes.
```