# EXHIBIT 4B

1

# ORIGINAL

<u>VOLUME: II</u>
<u>PAGES: 1 - 325</u>
<u>EXHIBITS: 17 - 28</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO. 04 11572 JLT

---

SUSAN COONEY,                          )
    Plaintiff,                         )
vs.                                    )
                                       )
HUMANISTIC PSYCHOLOGY INSTITUTE,       )
d/b/a SAYBROOK INSTITUTE and           )
MAUREEN O'HARA, Individually,          )
    Defendants.                        )

---

**AUDIOVISUAL DEPOSITION OF SUSAN COONEY**, taken

on behalf of the Saybrook Institute, pursuant to the

Federal Rules of Civil Procedure, before Kristin L.

Tucker, Notary Public and Certified Shorthand Reporter

within and for the Commonwealth of Massachusetts, at the

Law Offices of Morrison Mahoney LLP, 250 Summer Street,

Boston, Massachusetts, on January 27, 2006, at 9:10

a.m., as follows:

**DANILECKI REPORTING**
234 Governors Road
Quincy, Massachusetts 02169
(617) 745-9786

1      A.    Okay.

2      Q.    How many blocks was your place of employment

3  from this state bookstore during those years?

4      A.    I think we established three.

5      Q.    Three blocks?

6      A.    Yes.

7      Q.    Did you ever contact the National Psychology

8  Advisory Association during those years to join it?

9      A.    No.

10     Q.    Did you ever contact that association to get

11  information they had on licensure of people who wanted

12  to practice psychology in Massachusetts?

13              MR. MORENBERG:  Objection.

14     A.    No.  I trusted Saybrook.  They had told me

15  they would -- they would monitor that for me.

16              MR. VARTAIN:  Motion to strike.

17  Nonresponsive.  You know what you're doing.

18              THE WITNESS:  I'm answering the

19  question.

20              MR. VARTAIN:  I'm gonna get the

21  question back again.

22              THE WITNESS:  Okay.

23              MR. MORENBERG:  And, again, do not

24  admonish or comment on the witness's testimony.  Ask



59

1    Q.    Setting aside the Saybrook '94/'95 Interim

2    Catalog --

3    A.    Yes.

4    Q.    -- did Saybrook ever promise you that it

5    would keep you informed of changes in licensing laws

6    specifically?

7    A.    When I went out to the orientation and I was

8    supposed to bring my regulations, we met with that

9    person who went over each person's regulations and she

10   said that Massachusetts met the criteria and -- and she

11   said, You're good to go.

12   Q.    Is that all she said?

13   A.    To the best of my recollection.

14   Q.    What else, if anything, did that person say

15   about future changes, if any, that might happen in

16   Massachusetts?

17   A.    Nothing that I can recall.

18   Q.    Didn't she promise you that -- Didn't she say

19   to you, We are going to track Massachusetts laws and

20   keep you informed?

21   A.    Did I say that?

22              MR. MORENBERG:   Answer the question.

23   A.    No.

24   Q.    She never said that?

60

1    A.    No.

2    Q.    She never said anything to that effect; is

3  that correct?

4    A.    It was 11 years ago.  I would say she

5  basically said, You meet the criteria.  We'd love to

6  have you come here, and, you know, we understand you

7  want to be a psychologist in Massachusetts and you'll be

8  able to be.

9    Q.    That's what she said?

10   A.    Yes.

11   Q.    Did she say to you that she would, or

12  Saybrook would, monitor the regulations over the years

13  that you would be at Saybrook and keep you informed?

14   A.    It was an understanding.

15   Q.    I didn't -- I know you -- Did she say that?

16   A.    Did she specifically?  I don't recall.

17   Q.    She never said that as best you can recall,

18  correct?

19   A.    I can't recall.  It was a long time ago.  I

20  can't recall specific conversation.  The tone was

21  that --

22   Q.    I'm not interested --

23   A.    -- they would be on top of it.

24   Q.    I'm not interested in the tone.  I'm

93

1    A.    I sent an original to O'Hara not cc.

2    Q.    What tells you that?

3    A.    Because I remember it.

4    Q.    I see.

5    A.    I did it.

6    Q.    How come you sent a copy to O'Hara yet

7   nowhere does the document show that the letter was

8   either addressed to O'Hara or that it was copied to

9   O'Hara?

10    A.    Because the letter that was addressed to

11   O'Hara was sent to O'Hara, and the cc's were sent to you

12   and these cc's.  Obviously she had to have a letter.

13    Q.    Okay.  You can put that exhibit away.  Did

14   you ever have a conversation one-on-one with Dr. O'Hara

15   regarding licensuring in Massachusetts?

16    A.    No.

17    Q.    Did you ever have a conversation with

18   Dr. O'Hara with a small number of other people present

19   where the topic was licensure in Massachusetts?

20    A.    A small number being like five?  No.

21    Q.    Do you have any notes of any presentations

22   Dr  O'Hara made regarding licensure?

23    A.    No.

24    Q.    Do you have any documents that evidence any

94

1 presentations Dr. O'Hara made concerning licensure in

2 Massachusetts or in any other state?

3     A.    No.

4     Q.    When you attended a residential conference

5 where the question of the school potentially going for

6 APA accreditation came up, what year was that?

7     A.    I don't know specifically.  Somewhere -- I

8 was going to say in the '90s.  Somewhere, I believe,

9 like '98-ish.  '99, '98 -- I don't know specifically.

10 Not in the beginning.  Somewhere later.

11     Q.    Did Massachusetts come up specifically in

12 that?

13     A.    No.

14     Q.    Dr. O'Hara mentioned nothing about

15 Massachusetts?

16     A.    No.

17     Q.    Did any other representative mention anything

18 about Massachusetts specifically?

19     A.    Well, they were talking about the APA, and I

20 knew the APA was in the regulations for Massachusetts,

21 but not specifically, I guess.  The answer's no I guess.

22     Q.    What did you know as of then --

23              MR. MORENBERG:  Objection.  I'm

24 sorry.  I'm sorry.  I should have waited until the end

116

1    Q.    Were any of those people who had a license

2  from other states?

3    A.    I don't know.

4    Q.    How do you know that all of them had licenses

5  from the board of psychology in Massachusetts?

6    A.    I don't know.  I have no idea.

7    Q.    Do you know that they -- those people

8  practicing as psychologists under Mass. General actually

9  needed to have a psychology license to do that job, that

10 is, a license from Massachusetts?

11   A.    The ones at Mass. General were a lot of

12 postdoc, and they didn't have their license yet.  So I'm

13 not sure what you're saying.  Some did.  Some didn't.

14   Q.    Were there any people who actually had the

15 job of a staff psychologist who did not have a

16 psychology license from Massachusetts?

17   A.    I have no way of knowing.

18   Q.    What did Dr. Bush say other than what you've

19 already told us in this little group of people?

20   A.    That's all that I remember.

21   Q.    Did Professor Wagener ever talk to you about

22 Massachusetts licensing?

23   A.    No.  Not that I recall.

24   Q.    Did he tell -- ever talk to you about

117

1    anything about getting a license with a Saybrook degree?

2        A.    Not that I recall.

3        Q.    Did you ever ask him anything about that?

4    That is --

5        A.    No.  No.

6        Q.    Did you ever talk to Dr. Richards about

7    whether you could get a license in Massachusetts as a

8    psychologist with a Saybrook degree?

9        A.    We had so many conversations, but I don't

10   recall such a conversation, no.

11       Q.    Did you ever talk to any other faculty

12   members or employees of Saybrook about whether you could

13   get a license -- psychology license in Massachusetts

14   with a Saybrook --

15       A.    Not that I recall.

16       Q.    -- with a Saybrook degree?

17             Is the only person you talked about that with

18   that person with whom you spoke at the residential

19   orientation in 1995?

20       A.    Right.  They all -- My --

21       Q.    Is that the only person you spoke about --

22       A.    Correct.

23       Q.    -- the topic of can I get licensed in

24   Massachusetts?

122

1  know what the changing Massachusetts rules are on

2  licensing psychologists?

3      A.    I have no way to know.

4      Q.    What is the name of the person with whom you

5  met at the 1995 residential conference?

6      A.    I don't know.  I have racked my brain.

7      Q.    You racked your brain?  Have you ever seen it

8  written anywhere?

9      A.    I've tried.  I've tried really hard.  I don't

10  know.  I know how important that is.

11     Q.    Do you know if she was faculty?

12     A.    I don't.  I presumed that she was faculty,

13  but she could have been student services, so I can't --

14  I just can't say, and I know how important it is, and I

15  just don't know.

16     Q.    Do you know where she might be in the chain

17  of command?

18     A.    No.

19     Q.    Do you know if she was a --

20     A.    Doesn't Saybrook know?  I mean, she went

21  through everyone's at that orientation.

22                 MR. MORENBERG:  He asks the

23  questions, remember.  Okay?

24                 THE WITNESS:  All right.  I'm sorry.

123

1          BY MR. VARTAIN:

2      Q.     You don't know what level in the chain of

3  command she was at?

4      A.     I don't.

5      Q.     You don't know how old she is?

6      A.     (Witness shaking head.)

7      Q.     Do you know how old she was then?

8      A.     No.

9      Q.     Do you know what she looked like?

10     A.     This -- I was meeting so many new people, you

11 know, I don't remember.

12     Q.     Did you take any notes of the conversation

13 with her at the time?

14     A.     I don't believe so.

15     Q.     Did you write down anything that she said?

16     A.     Not to my knowledge.

17             MR. VARTAIN:  I'm gonna propose we

18 take our lunch break now.

19             THE WITNESS:  Okay.  Should we take

20 that?

21             MR. VARTAIN:  You take Exhibit 16

22 and read that.

23             MR. MORENBERG:  Actually, I have my

24 own copy.  Let's leave them together.

189

1     Q.    Other than painting for Reagan Development

2 and your work at Town & Country, do you have any other

3 current source of income at all?

4     A.    No.

5     Q.    Do you get alimony at all?

6     A.    No.

7     Q.    Have you ever met Dr. O'Hara?

8     A.    I'm not sure.  I'm not sure whether I've seen

9 her, whether we've met one-to-one, no.

10     Q.    Do you have any memory of meeting her

11 one-on-one?

12     A.    One-on-one, no.

13     Q.    So if you had met her, it would be more in a

14 group setting; would that be accurate?

15     A.    Correct.

16     Q.    And where -- If you had seen her in a group

17 setting, where would that have been?

18     A.    I would imagine the residential conferences.

19     Q.    Are you aware of when she became president at

20 Saybrook?

21     A.    After Gerry Bush passed away.

22     Q.    Do you recall what year?

23     A.    '97 or '8.  I'm not sure which.

24     Q.    Have you had any conversations or

190

1   communications at all with Dr. O'Hara ever?

2       A.     No.

3       Q.     So no e-mails?  No written correspondence,

4   correct?

5       A.     Things have come to the house that she has --

6   you know, standard letters from Saybrook.  But I can't

7   remember what about, but she signed the bottom, but it's

8   a copy, so that's the extent of it.

9       Q.     So other than form letters that are sent to

10  students on various issues, there's been no other direct

11  correspondence between her and you, correct?

12      A.     Correct.

13      Q.     Now, earlier you testified that she was one

14  of the individuals who had withheld information

15  regarding licensing.  What's that information on?

16      A.     Well, she was -- She did succeed Gerry Bush,

17  and she had access to his files and his records and knew

18  that -- and Dr. Bush had been in contact with the board.

19             She was also a member of the Consortium of

20  Diversified Professional Psychology and was aware of

21  what was going on with regulations way back in '95.  And

22  so I feel she had information that she was not -- she

23  was withholding.

24      Q.     Did she ever have information that Saybrook

DANILECKI REPORTING (617) 745-9786

194

1     Q.    So you have no knowledge that she's ever been

2  to Massachusetts?

3     A.    Correct.

4     Q.    And are you aware of whether anyone on behalf

5  of Saybrook has made a physical appearance here in

6  Massachusetts?

7     A.    I thought that Dr. Bush had, but I'm not

8  sure.

9     Q.    And what's that thought based on?

10    A.    A conversation I had with Dr. Francis.

11    Q.    When did you have that conversation with

12  Dr. Francis?

13    A.    In around summer of 2003.

14    Q.    And was that a conversation over the phone or

15  in person?

16    A.    On the phone.

17    Q.    Was that the only telephone conversation you

18  had with Dr. Francis?

19    A.    I think there was just one.

20    Q.    And what did that conversation consist of?

21    A.    He was very upset that Saybrook -- His

22  statements -- Am I supposed to say what he said?

23    Q.    Yes.

24    A.    He said, and I quote, that he was upset that

44

1   Q.    So you're saying that the contract was the

2   1994/1995 Interim Catalog?

3   A.    The criteria of the agreement was specified

4   in that catalog.

5   Q.    Okay.  And your Complaint also goes on to say

6   at Paragraph 32 that Saybrook breached this contract by

7   violating its own policies.  My question is this:  By

8   "policies," do you mean the policies stated in the

9   catalog?

10  A.    Yes.

11  Q.    Were there any policies that Saybrook

12  violated and breached a contract that were not stated in

13  the Saybrook catalogs?

14  A.    I don't know.

15  Q.    Do you know of any policies that Saybrook

16  violated with regards to you that were not stated in the

17  Saybrook catalogs?

18                  MR. MORENBERG:  Objection.

19  A.    I can't recall.  I don't know.  That's a very

20  convoluted question.  I can't -- I don't know the

21  answer.

22  Q.    Well, do you know -- Where did Saybrook's

23  policies exist other than in the Saybrook student

24  catalog?

148

1    teachers.    Did you consider them representatives of the

2    school?

3        A.    Yes.

4        Q.    As to any of the teachers you ever had, had

5    you ever mentioned to them an intention of applying for

6    a psychology license in Massachusetts?

7        A.    Um-huh.

8        Q.    As you sit here today, do you know of any of

9    them that knew of obstacles to you getting licensed?

10       A.    Not specifically, no.

11       Q.    Do you know generally of any?

12       A.    I don't have that information.    I don't know

13    what they knew.

14       Q.    So you're not telling us that any of those

15    faculty members, any of those teachers, knew of

16    Massachusetts obstacles but withheld that information

17    from you, are you?

18       A.    Of my teachers, I can't say what they knew.

19       Q.    Are you --

20       A.    I can't say what they -- I can't answer that.

21    I don't know what they knew.

22       Q.    You can answer if -- You can tell me if

23    you're testifying that those faculty members withheld

24    information about Massachusetts obstacles to your

149

1  getting licensure.  Did they do that?

2      A.     I have no way of knowing whether they did

3  that or not.

4      Q.     You don't have any information that would

5  enable you to believe that they were, in fact,

6  withholding information; is that correct?

7      A.     On that -- my specific teachers that taught

8  me specific classes that I took?  No.

9      Q.     And as far as administrators go, you've told

10 us you believe that perhaps Dr. Bush and Dr. O'Hara

11 withheld information.

12     A.     Correct.

13     Q.     Are there any other specific people at

14 Saybrook that you believe withheld information regarding

15 licensing obstacles in Massachusetts, information that

16 they themselves knew?

17     A.     It's hard for me to answer because I don't

18 know what people knew to then -- to conclude that they

19 withheld.  I don't know -- I don't know the answer.

20     Q.     You don't know of any information.

21     A.     Right.  I don't know information that someone

22 might have had that they were withholding aside from

23 these people, yeah.

24     Q.     As to the 24 to 36 months that you spent in

191

1  graduates could not be licensed in Massachusetts?

2      A.    Did she have that?

3      Q.    Yes.

4      A.    You're asking for my opinion?

5      Q.    No.  I'm asking, to your knowledge as you sit

6  here today, did Dr. O'Hara ever have information that

7  Saybrook graduates could not be licensed here in

8  Massachusetts as a psychologist?

9      A.    I don't know specifically.  I don't know how

10 to answer that.

11     Q.    Well, there's a difference with I don't know

12 and I don't know how to answer that.

13     A.    I don't know.

14     Q.    So you have no knowledge that Dr. O'Hara

15 actually possessed any information that would indicate a

16 Saybrook graduate could not obtain their psychology

17 license here in Massachusetts, correct?

18                    MR. MORENBERG:  Objection.

19     A.    I can't say that.

20     Q.    Well, what do you mean you can't say that?

21 You either have knowledge that she had --

22     A.    I believe she had knowledge.

23     Q.    -- such information.

24                    And what is that belief on?

DANILECKI REPORTING (617) 745-9786

193

1      Q.    Well, just so the record's clear, you said,

2    "Not specifically, no," so it is correct that you do not

3    have information regarding what files Dr. O'Hara had

4    access to?

5                    MR. MORENBERG:  Objection.  You may

6    answer.

7      A.    I don't know specifically what files

8    Dr. O'Hara had access to.  However, she was the vice

9    president under Dr. Bush, and she was quite versed, I'm

10   sure, on what was going on.

11     Q.    What do you mean "going on"?

12     A.    That there were difficulties, that she -- And

13   I go back to she was a member of the consortium.  She

14   knew that there were issues.

15     Q.    My question to you, though, is were you --

16   were you aware of whether or not she knew that Saybrook

17   graduates could not be licensed in Massachusetts?

18     A.    I don't know the answer.

19     Q.    Are you aware whether Dr. O'Hara ever came to

20   Massachusetts?

21     A.    Was I aware that Dr. O'Hara ever came --

22     Q.    Are you aware of whether Dr. O'Hara has ever

23   come to Massachusetts?

24     A.    I am unaware.