# EXHIBIT 6

# Commonwealth of Massachusetts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN COONEY,<br>        Plaintiff | Exhibits: 88-112 |
| VS | |
| SAYBROOK GRADUATE SCHOOL<br>AND RESEARCH CENTER, and<br>MAUREEN O'HARA, Individually,<br>        Defendants | DOCKET NO.<br>04 11572 JLT |

      DEPOSITION of **DR. KAREN SCHWARTZ**, a Witness called by Counsel on behalf of the **Plaintiff**, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Arlene Boyer, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Division of Professional Licensure, 239 Causeway Street, Boston, Massachusetts, on Friday, April 28, 2006, commencing at 10:30 a.m.

*Accurate Reporting Services*
36 West Street
Whitman, MA  02382
(781) 447-9520

1   A   Yes.
2   Q   Could you tell me when you first became affiliated
3       with the Board of Registration of Psychologists?
4   A   May of 1995.
5   Q   What position did you accept with the board in May
6       of 1995?
7   A   Program coordinator.
8   Q   Is that your current position?
9   A   Yes.
10  Q   Has there been any time between May of 1995 and
11      the present where your job duties changed?
12  A   You know, they've expanded over the years due to
13      my experience here, but they haven't essentially
14      changed. They've just expanded.
15  Q   Could you tell me what your job duties were as of
16      May of 1995 when you joined the board?
17  A   They were undefined. My position was created. I
18      was the first one to have the position, and so I
19      essentially had to create the job. When I was
20      hired, my understanding was that I was to assist
21      the board in their functions.
22  Q   When you joined the board in May of 1995, was that
23      a part-time or full-time position?
24  A   I just want to clarify that when you say join the

Page 21

1  this building, which was July of '99, so it might
2  have been in the year preceding that, but I'm not
3  certain.
4  Q  Did your duties change in any material way when
5     the executive director came on board?
6  A  No.
7  Q  How did your duties change over time with respect
8     to licensure?
9  A  Over time, the process of reviewing applications
10    changed so that more authority was delegated to me
11    by the board.
12 Q  Could you explain what additional authority was
13    delegated to you with respect to licensing?
14 A  So initially when I joined this organization, the
15    process of reviewing applications was not very
16    well organized and not very consistent, and at the
17    time, there was an application deadline of January
18    1 or July 1, and applications would come in in a
19    large group at those deadlines because the
20    national exam was given twice a year only, in
21    April and October, and so those were the deadlines
22    to apply for those exams.
23              The applications would be brought down
24    to the board.  They would as a group sit around a

Page 22

1 table, review applications in a completely sort of
2 chaotic fashion. The decisions that were made
3 would be communicated to the AA, who would write
4 the letter.
5        When I joined the board as their program
6 coordinator, I became, in essence, the first
7 reviewer, and there would still be two board
8 members for sort of a standard application, so
9 basically it would get three reviews. Over time,
10 I became the first reviewer, and there would be a
11 second review. And then over more time, I became
12 the sole reviewer of applications that had no
13 problems in them.
14 Q   At what point, to the best of your recollection,
15     did you assume duties with respect to reviewing
16     applications for individuals seeking to become
17     licensed psychologists?
18 A   I began looking at applications probably within a
19     couple of months of working here, but it took a
20     while to kind of figure out the process, and I was
21     in close collaboration with the chairman at the
22     time about course requirements and basically the
23     interpretation of the material. So it was
24     probably over the course of six to twelve months

Page 35

```
 1        are you referring to?
 2    A   The Division of Professional Licensure.
 3    Q   Who at the Division of Professional Licensure, to
 4        your knowledge, would maintain control over the
 5        interested parties' list?
 6    A   I am not sure whether it was board counsel or
 7        whether it might have been somebody in the office
 8        of investigations.
 9    Q   In 1995, did the board have any regular mailings
10        to graduate programs in psychology?
11    A   No.
12    Q   Did there come a point in time after '95 where the
13        board was making regular mailings or
14        communications to graduate programs in psychology?
15    A   Never.
16    Q   If a graduate program in psychology wanted to stay
17        abreast of regulatory changes in Massachusetts
18        affecting psychologists, what would they do?
19           MS. GARCIA:  Objection.
20    A   I don't know.
21    Q   I want to turn your attention back to Exhibit 91
22        and ask you to look at Section 3.03, which is on
23        Pages 10 and 11, and tell me when you've finished
24        reviewing that.
```

Page 48

1  Q  Do you know if it was circulated to schools?
2  A  It was definitely not circulated to schools.
3     There are hundreds of doctoral programs across the
4     United States, and the board does not correspond
5     with them.
6  Q  You indicated that the January '96 public hearing
7     was attended by many people, including
8     representatives of Union Institute?
9  A  Correct.
10 Q  Did you have an understanding of how Union
11    Institute came to know about the proposed change?
12 A  I had no idea.
13 Q  Did you attend the January 12, 1996 public
14    hearing?
15 A  Yes, I did.
16 Q  Do you recall anyone who attended other than
17    representatives of Union Institute?
18 A  I don't recall the full attendee list.
19 Q  Do you recall if representatives of Union
20    Institute indicated that they were speaking on
21    behalf of other similar programs?
22              **MS. GARCIA:**  Objection.
23 A  I don't recall.
24 Q  Do you know if any representatives from Saybrook

Page 69

1        spoke to a Saybrook representative?
2  A   No.
3        **MR. MORENBERG:** Why don't we take a
4        five-minute break.
5        (Break taken.)
6  Q   Dr. Schwartz, when the board received public
7        comments from a graduate program such as Union
8        Institute, did the board have an understanding as
9        to whether the students of the Union Institute
10       were informed of the proposed regulatory changes?
11  A  The board would have no idea about that.
12  Q  Did the board have any expectation that graduate
13       programs in psychology that were accepting
14       Massachusetts students met the board's regulations
15       for graduate programs in psychology?
16  A  No.
17  Q  Turning your attention back to Exhibit 95, if you
18       could look at the second page of that letter, I'm
19       going to read you a sentence from Rudy Melone's
20       letter to Dr. Coutu. "The Saybrook Institute
21       board of trustees, administration" --
22  A  Excuse me. Where are you?
23  Q  The last sentence.
24  A  Oh, the last paragraph, okay.

Page 73

1   A   Sort of.  I don't understand what the handwritten
2       things are on it.
3   Q   I'll represent to you this is one of the documents
4       that was produced in response to our subpoena, and
5       excluding your uncertainty about the handwriting
6       on Page 2 of this exhibit, do you recognize the
7       document otherwise?
8   A   Yes, I do.
9   Q   What is this document?
10  A   This is the 5/2/97 change in Section 3.03 of the
11      regulations.
12  Q   What was the impact of this change on the way the
13      board recognized graduate programs in psychology?
14  A   Well, the reg passed 5/2/97, so it had no
15      immediate impact, but as of 9/1/2000, for
16      applications filed after 9/1/2000, it meant that
17      it was a very black and white answer.  You either
18      did come from a designated doctoral program or you
19      didn't.  And if you didn't, you couldn't qualify
20      for licensure, and if you did, your application
21      would be reviewed to see if it met the other
22      requirements.  So it made it a very quick process.
23  Q   If you didn't come from a program that was
24      designated by the ASPPB and you filed an

1  application after September 1, 2000, would you be
2  eligible for licensure in Massachusetts?
3  A  No.
4  Q  Did this regulatory change include a grandfather
5  clause?
6  A  It depends what you mean by a grandfather clause.
7  It had those three years leading up to it.
8  Q  How did the three years leading up to the
9  regulatory change impact applicants for licensure?
10       MS. GARCIA:  Objection.
11 A  Should I still answer?
12 Q  Sure.
13 A  My belief is that once it's on the books, people
14 are supposed to be reading the regulations.  They
15 see uh oh, I'm not in a designated doctoral
16 program.  I either better talk to my program about
17 getting it designated, or I better get out of this
18 program and go to one that will let me get
19 licensed.
20 Q  Did the board have any capacity to provide notice
21 of the updated regulation to individuals who had
22 received the older version of this regulation?
23 A  What does that mean?
24 Q  Well, for individuals who had an interest in

Page 76

| | | |
|---|---|---|
| 1 | Q | Was one of the pathways an individual could take |
| 2 | | receiving notice from the graduate school they |
| 3 | | attended of the regulatory change? |
| 4 | | **MS. GARCIA:** Objection. |
| 5 | A | It's my opinion that -- and this is just based on |
| 6 | | my experience in the 11 years here -- that |
| 7 | | graduate programs tend to track regulations for |
| 8 | | the state in which they're located.  And given |
| 9 | | that there are 50 states plus the territories and |
| 10 | | the Canadian jurisdictions, that graduate |
| 11 | | programs, in my experience, don't track individual |
| 12 | | state regulations.  It's my experience that they |
| 13 | | tell their students to make inquiries about any |
| 14 | | state in which they're seeking licensure. |
| 15 | Q | Where a graduate program in psychology has |
| 16 | | specific information about a regulatory change in |
| 17 | | another jurisdiction, is it the board's |
| 18 | | expectation that they'll inform students from that |
| 19 | | jurisdiction? |
| 20 | | **MS. GARCIA:** Objection. |
| 21 | A | I don't have an answer to that. |
| 22 | | **MR. MORENBERG:** Could you mark this as |
| 23 | | 101. |
| 24 | | (Exhibit Number 101, Letter from |

1  would have had no idea who Rudy Melone was. I
2  learned today.
3  Q  Turning your attention back to Exhibit 100, do you
4  have an understanding of whether Saybrook is a
5  program in psychology that's designated by the
6  ASPPB?
7  A  At the present time?
8  Q  Yes.
9  A  At the present time, I do not believe it is.
10 Q  Assuming you're correct, that Saybrook is not a
11 program that's designated by the ASPPB, is it
12 correct that its students who apply for licensure
13 in Massachusetts after September 1, 2000 cannot be
14 licensed?
15 A  That's correct.
16 Q  I'm putting before you a document that was
17 previously marked as Exhibit 61 to Maureen
18 O'Hara's deposition. Have you ever seen this
19 article?
20 A  Never.
21 Q  I have no questions about that. You can put it
22 down.
23         (Exhibit Number 102, E-Mail from
24         Susan Cooney to Dr. Schwartz dated

Page 94

1       (Exhibit Number 106, Cover of
2       Richard Francis's Application, was
3       Marked for Identification.)
4   Q   I'm putting before you what's been marked as
5       Exhibit 106 for identification. Do you recognize
6       this document?
7   A   Yes.
8   Q   What is this?
9   A   This is the cover of Richard Francis's
10      application.
11  Q   Does this document refresh your recollection as to
12      the date when Dr. Francis submitted his
13      application?
14  A   Yes.
15  Q   What date was that?
16  A   June 23, 2000.
17  Q   Is this document maintained in the ordinary course
18      of business?
19  A   Yes.
20  Q   Is this a public record maintained by the board?
21  A   Yes.
22  Q   Is it fair to say that because Dr. Francis
23      submitted his application prior to September 1,
24      2000, he did not have to come from a program

Page 95

```
 1              designated by the ASPPB?
 2       A      Correct.
 3       Q      Did the board accept Dr. Francis's application for
 4              licensure?
 5       A      Not initially.
 6       Q      Why did it not accept it initially?
 7       A      I'd have to look back at the documents, but my
 8              guess is that they denied him based on the
 9              residency requirement that was on the books.
10       Q      Now, I don't want you to guess, but to your
11              understanding, was the reason he was denied
12              initially because he did not meet the residency
13              requirement?
14       A      Correct.
15       Q      To your understanding, why did Dr. Francis not
16              meet the board's residency requirement?
17       A      I believe that the way he claimed to meet it was
18              through rather than being at the institution for a
19              year, as it says in the old regs, that he had, you
20              know, what the programs would call sort of
21              residential events where students would come
22              together at a hotel and do stuff together and call
23              that residency.
24       Q      To your understanding, did the board view that as
```

```
 1              applied?
 2      A       Well, in the production of the documents for this
 3              deposition, we came up with John Burke's
 4              application.  I have no idea if Mr. Finn was
 5              involved in that, and I don't know of another.
 6      Q       Do you know if the board determined whether John
 7              Burke met the residency requirements of the
 8              board's regulations?
 9      A       In my review of the documents before today, I
10              looked at that file, because I was not familiar
11              with it, and it appeared to me that they failed to
12              make a determination about the residency in that
13              file.  I believe a mistake was made in that file.
14      Q       But you would agree that the board did approve Dr.
15              Burke's application for licensure as a
16              Massachusetts psychologist?
17      A       In 1995.
18                      MR. MORENBERG:  Could we mark this.
19                          (Exhibit Number 109, A Piece of
20                          John Burke's Application File dated
21                          March 20, 1995, was Marked for
22                          Identification.)
23      Q       Dr. Schwartz, I've put before you what I've marked
24              as Exhibit 109 for identification.  Do you
```

Page 138

1  requirement.
2  Q  Are you aware of whether Saybrook was ever
3     informed that its students or its program did not
4     meet the residency requirements?
5  A  I am not aware.
6  Q  Would you agree with me that in the board's
7     communications with Richard Francis that Saybrook
8     was never copied on that correspondence, to your
9     knowledge?
10 A  To my knowledge, they were not.
11 Q  I'm going to show you what's been marked as
12    Exhibit 106.
13 A  Okay.
14 Q  Whose handwriting is this?
15 A  So I'd have to go individually through it.
16    6/26/00 is me. The one that says "phone contact,"
17    I don't know. It's not me. 2/23/01 is me.
18    9/14/01 is Rick Cowen, who is a board member, and
19    the other two are me.
20 Q  Are you aware of whether or not there would be
21    notes anywhere else other than on the front of
22    this folder?
23 A  There might have been notes on a document that
24    sort of checks off licensure requirements.

Page 146

1  from the board to Saybrook that confirmed that the
2  board was adopting any particular regulation
3  change, correct?
4  A   Correct.
5  Q   How long was Dennis Norman the chair of the board,
6      to your knowledge?
7  A   One year.
8  Q   That would be from 1997 to 1998, correct?
9  A   Let me think for a second. It might have been '96
10     to '97. I'm not sure. There's a letter in here
11     from Cynthia Chase, so that will tell me. No, I
12     can't figure it out.
13 Q   Okay. I'd like you to go back to Exhibit 111, and
14     just based on the review that you performed there
15     in response to my earlier questions, I just want
16     to be clear. Even if Saybrook was designated by
17     the ASPPB, based on the course work that you can
18     see from that exhibit, would you agree that Susan
19     Cooney would not be eligible to sit for a
20     licensure exam?
21          MR. MORENBERG: Objection.
22 A   Yes.
23 Q   Do you have any information that Saybrook knew
24     that Massachusetts regulations changed to require

Page 147

1              that the program be designated by the AP --
2      A       ASPPB/National Register.
3      Q       Thank you -- in order to be licensed?
4      A       I have no information about what Saybrook did or
5              didn't know.
6              **MS. GARCIA:** Just give me a moment. I'm
7              almost done. I just want to make sure.
8              (Pause.)
9      Q       You have testified a couple of times that
10             especially earlier on, the board was not
11             necessarily consistent with the decisions it made
12             regarding its applicants, correct?
13     A       Correct.
14     Q       Would you agree with me that graduate schools, in
15             terms of psychology graduate programs, were not in
16             the position to know whether the board was
17             consistent in its decisions?
18     A       I think that it kind of depends on whether you
19             have a large volume. So, for example, there are
20             some doctoral programs who may have applicants,
21             26, 35 a year applying to Massachusetts. They
22             would probably have a lot of information about
23             sort of the style that the application review was
24             taking and whether there were certain courses