# EXHIBIT 7

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--oOo--


SUSAN COONEY,                                No.  04-11572JLT

    Plaintiff,

vs.

SAYBROOK GRADUATE SCHOOL
AND RESEARCH CENTER and                   
MAUREEN O'HARA, Individually,

    Defendants.
_____/


Deposition of

MAUREEN O'HARA

_____

Monday, March 13, 206



NOTICING ATTORNEY:  PAUL W. MORENBERG


REPORTED BY:  JANICE M. JOBE, CSR NO. 4734

G O L D E N   G A T E   R E P O R T E R S LLC
35 Mitchell Boulevard, Suite 8
San Rafael, CA  94903-2010
(415) 491-4611 * 1-800-442-4611
FAX (415) 491-4635

email: ggr35@depos.com        web: http:/www.depos.com

printed/copied on recycled paper

1    Q.  Have you been a resident ever since?

2    A.  I have.

3    Q.  You're still a British citizen?

4    A.  I am.

5    Q.  Do you have U.S. citizenship or just residency?

6    A.  No.  I have residency, but not citizenship.

7    Q.  What is your current residence address?

8    A.  138 Altura Way, Greenbrae, California 94904.

9    Q.  How long have you lived at that address?

10   A.  Three years.

11   Q.  Do you have any present intentions to move?

12   A.  No.

13   Q.  Does anyone live at that address with you?

14   A.  Yes, my husband.

15   Q.  And what is your husband's occupation?

16   A.  He's a web designer.

17   Q.  Can you tell me about your post secondary

18   education?

19        Are you familiar with the term post secondary

20   the way we use it here, anything beyond your elementary

21   and high school?

22   A.  Yes, I do.

23   Q.  They may use a different terminology in

24   England, so college, college equivalent and graduate

25   school.

6

1          THE WITNESS:    I don't understand the

2    question.

3          MR. MORENBERG:    Q.  Let me restate it.

4          You said you were aware that Saybrook was

5    training psychologists who became clinically licensed,

6    and Saybrook continued to train students that became

7    clinically licensed after you became its vice

8    president.  So my question is:  How were these changes

9    in managed care affecting Saybrook's graduates who were

10   able to qualify for licensure?

11         MS. GARCIA:    Objection.

12         THE WITNESS:    Saybrook didn't train people to

13   become clinical psychologists.  We were not a training

14   program.

15         Saybrook provided education in psychology to

16   students who came seeking education in psychology, and

17   if they satisfied our requirements, they would get a

18   Ph.D. in psychology.

19         Some of those students went on additionally

20   beyond Saybrook to qualify for eligibility to sit for

21   licensing as psychologists.  Some states call

22   psychologists clinical psychologists, some don't, but

23   their eligibility for licensing is a state-by-state

24   issue.

25         What Saybrook provided was an education in

63

1    psychology.  We did not train clinical psychologists.

2          MR. MORENBERG:   Q.  Didn't you offer clinical

3    courses?

4          MS. GARCIA:   Objection.

5          THE WITNESS:   The courses that we offered

6    were a broad spectrum of courses, and I don't remember

7    what the names of all of those courses were.

8          MR. MORENBERG:   Q.  Dr. O'Hara, you don't

9    remember if you were offering courses with a clinical

10   focus at Saybrook?

11       A.  There were courses with a clinical focus at

12   Saybrook.

13       Q.  And there were student groups that were called

14   clinical interest groups, correct?

15       A.  Not when I came.

16       Q.  So it's your testimony that after you were

17   president, there were no clinical interest group

18   meetings after that?

19          MS. GARCIA:   Objection.

20          THE WITNESS:   Tell me what you mean by a

21   clinical interest group.

22          MR. MORENBERG:   Q.  Well, Saybrook had

23   periodically, at residential conferences, meetings of a

24   clinical interest group.  So why don't you tell me what

25   that is.

                                                    64

1       Q.  You mentioned that there was a concern about an

2   APA model licensing act.  Was that discussed at the

3   faculty meeting?

4       A.  I don't recall.

5       Q.  But that's an example of your awareness of

6   cultural and other changes impacting the future of

7   humanistic psychology?

8       A.  I was aware of that.

9       Q.  When did you become aware of that APA licensing

10  act?

11      A.  I think about 1995.

12      Q.  You mentioned that Saybrook was facing

13  increased competition from for-profit institutions.  Is

14  Saybrook a nonprofit institution?

15      A.  Yes, it is.

16      Q.  For how long has it been a nonprofit

17  institution?

18      A.  Always.

19      Q.  And does -- strike that.

20          Did anyone in that faculty committee mention

21  that Saybrook was considering a change for-profit

22  status?

23      A.  No.

24      Q.  Have there ever been any discussions at

25  Saybrook during the time of your tenure as its vice

                                                    66

1    specific kinds of changes that at that time would have

2    had to have been made for Saybrook to be eligible for

3    APA accreditation.

4         I'll repeat what I've said is that at that time

5    Saybrook was not a professional psychology program.  It

6    was not a program that had been developed to train

7    psychologists.

8         Q.  But at that time, Dr. O'Hara, Saybrook was

9    actively training a large number of students whose

10   objective was to sit for and qualify for clinical

11   licensure.

12        MS. GARCIA:    Objection.

13        THE WITNESS:    Actually, I stated very clearly

14   that we were not training students.  We were offering an

15   education in psychology, and the education in psychology

16   was very varied because of the kind of educational model

17   that we had.  And some of the students who got their

18   education at Saybrook subsequently went on and sought

19   licensing in their various states.

20        But Saybrook provided an education for students

21   in psychology.  It was not a professional psychology

22   program and did not set up the program with the

23   intention that students go on to seek licensing.  If

24   they so chose to do, they did, but that's not what

25   Saybrook was about.

97

1    A.   I don't know.

2    Q.   Well, Dr. O'Hara, between 1997 and 1999, you

3  were the vice president of academic affairs, correct?

4    A.   Correct.

5    Q.   And between 1999 and 2005, you were its

6  president?

7    A.   Correct.

8    Q.   As president, you had overall responsibility

9  for the administration of the school?

10    A.   Correct.

11    Q.   And it's your testimony that you can't tell me

12  who would know how many Saybrook students were

13  documenting internships?

14         MS. GARCIA:   Objection.

15         THE WITNESS:   That's what I'm saying.

16         MR. MORENBERG:   Q.   Who documented

17  internships?

18    A.   The internship coordinator.

19    Q.   And who is Saybrook's internship coordinator

20  presently?

21    A.   I don't know.

22    Q.   Who was Saybrook's internship coordinator in

23  1997?

24    A.   Dr. Zania Johnson.  Oh, no, '97.  I'm sorry.

25  But she wasn't --

103

1    Q.  But you would agree that for those students

2  whose objective was clinical licensure, this type of

3  information would be helpful in determining whether a

4  Saybrook education was appropriate and was a good value?

5    A.  I would agree with that.

6    Q.  If that's your opinion, why was this type of

7  communication not provided to students consistently

8  before February of 2004?

9    A.  We became aware as a consequence of the letter

10  from Susan Cooney that the situation in Massachusetts

11  was that students were not -- because Saybrook was not

12  APA accredited, there was a bar to students in

13  Massachusetts sitting for the licensing exam no matter

14  what educational program they had taken.

15      At that point, we realized that Susan Cooney,

16  despite warnings, despite communications to all

17  students, that it was her obligation to be up to date

18  with what was going on in her state, that despite all of

19  our communications to students to that effect, she had,

20  in fact, not done that.  And we felt that now we had to

21  go an extra step in communicating formally and in

22  writing specifically to alert students once again to

23  their obligation to do that and to give them a context

24  of the change in context with regards to the licensing

25  situation so that they would once again be reminded.

137

1          And we believed it was a good thing to do and

2    we were alerted to the importance of doing that because

3    Susan Cooney clearly had not taken advantage of all the

4    other verbal and catalog information and exhortation

5    that we had given to our students to make sure that they

6    kept up to date with the licensing laws.  This was an

7    extra.

8          Q.  I see, this was an extra effort.

9          Dr. O'Hara, those same catalogs told students

10   that through the CDPP, Saybrook was actively monitoring

11   licensure requirements in all 50 states?

12         MS. GARCIA:   Objection.

13         THE WITNESS:   CDPP is not Saybrook.

14         MR. MORENBERG:   Q.  CDPP is an organization

15   that is comprised of humanistic or diversified

16   psychology programs, correct?

17     A.  Correct.

18     Q.  And Saybrook is one of its members, correct?

19     A.  Correct.

20     Q.  Saybrook, in fact, is a founding member of

21   CDPP, correct?

22     A.  One of the founding members.

23     Q.  And for the period of 1995 through at least

24   1997, Rudy Malone was co-chair of CDPP, correct?

25     A.  Yes.

138

1    Q.  Have you ever been in Massachusetts on Saybrook

2  business?

3    A.  Yes.

4    Q.  And could you tell me when that occurred?

5    A.  I don't remember the date, but I went to do a

6  meeting with Saybrook students in the New England area

7  and it was held in Cambridge at the Swedenborgian

8  Chapel, and it was an evening kind of come and meet the

9  president for primarily Saybrook students, a few

10  alumni.  There was about nine or ten people there.

11    Q.  And can you give me a rough time frame when

12  that occurred?

13    A.  I knew you were going to ask that.  I can't

14  remember, three years ago, four years ago.  I don't

15  know, 2002.  I don't know.  I actually don't remember.

16  About that length of time.

17    Q.  Were there any perspective students in

18  attendance?

19    A.  I don't think so.  I'm not sure who was in

20  attendance.  I knew that there was people from

21  different -- Saybrook students.  It really was a

22  gathering for Saybrook students and alumni.

23    Q.  Did Susan Cooney attend that meeting?

24    A.  Not as far as I know.

25    Q.  Do you know if you ever met Susan Cooney?

185

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

SUSAN COONEY,                          )
                                       )
                    Plaintiff,         )
                                       )
                                       )
vs.                                    )
                                       ) DOCKET NO: 04 11572
SAYBROOK INSTITUTE AND                 )            JLT
MAUREEN O'HARA, Individually,          )
                                       )
                    Defendants.        )
_____)

COPY

Deposition of

MAUREEN O'HARA

PAGES 208 - 464

March 14, 2006

Volume 2

NOTICING ATTORNEY:    PAUL W. MORENBERG, ESQ.

REPORTED BY:          MARGARET GURULE, CA CSR No. 12976

G O L D E N   G A T E   R E P O R T E R S, LLC
35 Mitchell Boulevard, Suite 8
(415)491-4611 * 1-800-442-4611
FAX (415)491-4635

email:   ggr35@depos.com     web: Http://www.depos.com

1    Q.   Would you agree that Saybrook recruited a

2  fair number of students from Massachusetts?

3    MS. GARCIA:  Objection.

4    THE WITNESS:  What would you characterize -- I

5  don't know what you would characterize as "a fair

6  number."

7    BY MR. MORENBERG:  Q.  Well, more than a few.

8    During your tenure as vice-president,

9  president, do you have any idea how many students

10  from Massachusetts started a Saybrook Ph.D. program?

11    A.   I don't know how many started a Ph.D.

12  student program from Massachusetts.

13    Q.   Can you approximate?

14    A.   No.

15    Q.   While you were vice-president and

16  president, did you ever review any Massachusetts law

17  or regulations to determine if Saybrook graduates

18  were eligible for licensure?

19    A.   No.

20    Q.   And in your capacity as president and

21  vice-president, did you ever review the laws or

22  regulations of any other states to determine if

23  Saybrook graduates would be eligible for a

24  licensure?

25    A.   No, I did not.

1       Q.    Was there anybody at Saybrook who was

2   reviewing laws or regulations in states to determine

3   if Saybrook graduates would be eligible for

4   licensure during your tenure as president?

5       A.    No.  Saybrook isn't a licensing board and

6   has no capacity to make judgments about eligibility

7   for our graduates; so, no, we didn't have anybody

8   that was responsible for that.

9       Q.    So it's your testimony on no occasion did

10  a Saybrook employee ever review regulations or

11  statutes in any jurisdiction to determine if

12  Saybrook graduates might qualify for licensure?

13      MS. GARCIA:  Objection.

14      THE WITNESS:  I don't know if any Saybrook

15  agent specifically reviewed such documents.

16      BY MR. MORENBERG:  Q.  You were aware that

17  students were encouraged to bring regulations to a

18  regulation orientation conference for purposes of

19  discussing them with a Saybrook representative?

20      A.    Yes.

21      Q.    And what was Saybrook's policy in that

22  regard?

23      A.    Saybrook's policy was to instruct the

24  student to remain in close contact with their state

25  on any occasions they were advised to join their

1     BY MR. MORENBERG:   Q.   So could you please

2  explain that?

3     A.   I don't think I said that.  I'm sorry, I

4  don't think I said that.

5     Q.   I asked you if there was any policy change

6  with respect to contacting the board and requesting

7  updates, and you -- I believe you said it was more

8  of a procedural issue?

9     MS. GARCIA:  Objection.  Can you just clarify

10  who?

11     MR. MORENBERG:  We're talking about students

12  contacting boards.

13     MS. GARCIA:  Thank you.

14     THE WITNESS:  Students were always advised to

15  contact the boards.  There was no change in that

16  policy or in that procedure.

17     BY MR. MORENBERG:  Q.  Well, Dr. O'Hara, as of

18  February 2004, Saybrook began communicating to

19  students its awareness of licensure obstacles in

20  18 jurisdictions and possibly 7 more.

21        Was that not a change in Saybrook's policy

22  on communicating its knowledge of licensure issues.

23     MS. GARCIA:  Objection.

24     THE WITNESS:  It was a continuation of our

25  policy of informing students that it was their

1  responsibility to be aware of what was going on in

2  their states with regards to regulations for

3  eligibility for licensing.

4      BY MR. MORENBERG:  Q.  Between 1997 and 1995,

5  during your tenure as vice-president and president,

6  did you ever seek the advice of any attorney

7  regarding whether Saybrook graduates would be

8  eligible for licensure in any jurisdiction?

9      MS. GARCIA:  Objection only to the dates.

10     THE WITNESS:  No.

11     BY MR. MORENBERG:  Q.  Do you know if anyone at

12  Saybrook sought legal advice between 1997 and 2005?

13     A.   No, I'm not aware of that.

14     Q.   And let me correct my prior question.

15          I assume your answer is the same, but

16  between 1997 and 2005, you never sought legal

17  counsel to interpret any regulations concerning

18  licensure in any jurisdiction?

19     A.   As far as I know.

20     Q.   Would you agree, as a matter of policy,

21  that Saybrook did not intentionally admit students

22  who were seeking to pursue clinical license as a

23  psychologist from states who do not accept a

24  Saybrook degree?

25     A.   No, I would not agree with that.

1      MS. GARCIA:  Objection.

2      THE WITNESS:  All students who were interested

3   in becoming licensed were recommended to avail

4   themselves of the information provided by the

5   licensing boards and to be aware of the regulations

6   in their state for someone who would be licensed as

7   a psychologist.

8          Saybrook consistently, regularly,

9   routinely and vigorously informs students to do

10  that. Beyond that, I can't tell you if there were

11  any specific courses or specific educational

12  elements in the curriculum that were specifically

13  used.

14     Q.   In other words, Saybrook regularly,

15  routinely, traditionally passed the buck?

16     MS. GARCIA:  Objection.

17     MR. MORENBERG:  You may answer.

18     THE WITNESS:  I'm not going to answer a

19  question phrased that way.

20     BY MR. MORENBERG:  Q.  I'm afraid that --

21     A.   I don't know what you mean by "passed the

22  buck."

23          Would you define "passed and buck,"

24  please?

25     Q.   Yes, I will.

1        Have you ever heard the phrase "passing

2  the buck"?

3        A.   I think it's an American expression.  I'm

4  not exactly sure what it means.

5        Q.   Okay.  Well, my understanding of what it

6  means is when someone disavows responsibility for

7  something and assigns it to another party.

8        A.   I don't believe that Saybrook abdicated

9  its responsibility in this issue.

10       Q.   But it's your position Saybrook had no

11  responsibility with respect to this issue?

12       MS. GARCIA:  Objection.

13       THE WITNESS:  I didn't say that.

14       BY MR. MORENBERG:  Q.   What was Saybrook's

15  responsibility?

16       A.   Saybrook's responsibility was to provide

17  an education in psychology to students who had

18  applied for the doctoral program, and we did that.

19       Q.   Turning your attention to the first

20  paragraph at page 37, Bates stamped S00537, quote:

21  "Because of the importance of these issues to the

22  future of psychologists, regardless of where they

23  work initially or later, evidence of the guided

24  discussion of these issues should be apparent in the

25  curriculum for doctoral training."

1      Q.   And who are you referring to?

2      A.   Dr. Katherine Clarke.

3      Q.   And do you recall what Dr. Katherine

4  Clarke said in response?

5      A.   No, I don't.

6      Q.   Do you know if Saybrook was ever aware,

7  during your tenure as vice-president or president,

8  that Susan Cooney was pursuing a career objective to

9  become a clinical psychologist in Massachusetts?

10     A.   I was not aware that Susan Cooney had told

11  us that she was intending to seek licensing in

12  Massachusetts.

13     Q.   Well, my question, I think, was anybody at

14  Saybrook.

15           Do you believe that anyone at Saybrook had

16  an understanding of whether Susan Cooney had a

17  career objective to be a clinical psychologist in

18  Massachusetts?

19     A.   It is my understanding that Susan Cooney

20  never expressed her intention to become licensed in

21  Massachusetts.  As far as I know, she did not.

22     Q.   And you are not aware that Susan Cooney's

23  application to Saybrook indicated she had a career

24  objective to become a clinician at a trauma clinic

25  at Massachusetts General Hospital?

1    problems before the board you had no duty to share

2    that with Susan Cooney?

3         A.   I don't believe we did.

4         Q.   And, Dr. O'Hara, did Saybrook or you

5    anticipate a specific problem whereby Massachusetts,

6    and perhaps other jurisdictions, were going to limit

7    licensure to programs that were certified by the

8    state and provincial psychology board?

9         A.   We did know that some states were adopting

10   the state and provincial licensing boards as the

11   standard for graduate schools for their students to

12   be eligible for licensing.

13        Q.   And when did you learn that?

14        A.   After we got the letter from Susan Cooney

15   to find out that this was -- I'm sorry -- me

16   personally?

17        Q.   Well, you can -- if it's a different

18   answer, answer.

19        A.   Okay.  Well, for me -- well, I don't know

20   when the school heard about it.  When I heard about

21   it was when we received the Susan Cooney letter

22   informing us that she had been told that she was

23   ineligible because Saybrook was not a school so

24   designated by the APB -- the APPB.

25        Q.   But before you learned it directly from

1    Dr. Cooney, did you know, or did you have reason to

2    know, that that restriction was being considered by

3    Massachusetts and other jurisdictions?

4        A.    I was not aware that was being considered

5    by Massachusetts.

6        MS. GARCIA:   Paul, it's after 5:00.   Are you

7    almost done?

8        MR. MORENBERG:   We're almost done.

9                         (Exhibit 61 marked.)

10       MR. MORENBERG:   Q.   Dr. O'Hara, can you tell me

11   what this is?

12       A.    This is an article that I wrote for the

13   AHP Prospective magazine which is a magazine for the

14   Association of Humanistic Psychology.

15       Q.    And, Dr. O'Hara, I would like to turn your

16   attention to page 2 of this exhibit --

17       A.    Uh-huh.

18       Q.    -- the fourth paragraph.

19            Quote, "A third threat to humanistic

20   psychology professionals comes from changes underway

21   in accreditation criteria being applied by states

22   for the right to sit for licensure.   Pushed by the

23   same 'turf-war' forces, many state psychology boards

24   are attempting to make graduation from a doctoral

25   program on the designated list of the State and

1        Q.    And in this article, are you and other

2   people interviewed about challenges to the image and

3   the future of humanistic psychology?

4        A.    I have to read it.  I don't remember.  I

5   mean, I remember that this article was published.  I

6   don't remember what was in it.

7        Q.    Okay.  Take a moment and review it.

8        A.    Sure.

9        Q.    If you could take a look at page 4, under

10  "APA accredited."

11       A.    Yeah.

12       Q.    Quote, "But, says O'Hara, when it comes to

13  evaluating clinical outcomes, she believes APA

14  doesn't regard these methods as empirically valid.

15  As a result, most graduate programs in humanistic

16  psychology haven't sought APA accreditation.

17  Consequently, students are often denied an

18  opportunity to take state licensing exams because

19  some state laws require candidates to graduate from

20  APA-accredited programs."

21            Do you recall making that statement?

22       A.    Yes.

23       Q.    And what steps did you or Saybrook take to

24  advise students with a clinical interest that many

25  of them could be denied licensure because they were

1    not from an APA-accredited program?

2         A.    We systematically told students, when they

3    came into the program, that they should consult

4    their local -- their state licensing board to

5    ascertain whether their licensing requirements --

6    what their license requirements were and whether

7    their Saybrook program was going to be appropriate

8    for that for that state.

9              We never undertook to monitor that from

10   students and nor could we have done.

11        Q.    Well, you also never undertook to share

12   information that you had about known problems, did

13   you?

14        A.    I disagree with you.    We shared what

15   information we had when we got it, but we did not

16   undertake to do a systematic monitoring state by

17   state of the changing landscape of licensing for

18   every student, nor could we have done that.

19        Q.    But you didn't share information regarding

20   Richard Francis or Dr. Burke's situation, as well as

21   my client, Susan Cooney?

22        A.    I have already answered that question.

23        Q.    In the next line, quote, "'We have

24   systematically challenged that,' says O'Hara."

25              What were you referring to there?

1   potential problems in 25 jurisdictions?

2       A.   Yes.

3       Q.   And prior to that, I could find no

4   communication where Saybrook had advised students of

5   problems in those jurisdictions.

6       MS. GARCIA:  Objection.

7       MR. MORENBERG:  Let me strike that.

8       THE WITNESS:  Oh, thank you.

9       BY MR. MORENBERG:   Q.   Prior to the

10  February 2004 communication, the only communication

11  that I'm aware of is a notice that Saybrook provided

12  to students matriculation in or around 1995 that

13  advises them of problems in approximately five

14  jurisdictions.

15          Are you aware of any efforts by Saybrook

16  to alert students to problems in licensure as they

17  became known?

18      MS. GARCIA:  Objection.

19      THE WITNESS:  I think there is a statement in

20  every one of our catalogs, which I believe you have

21  been given, which explained to students Saybrook's

22  position with regard to licensing and their -- and

23  the fact that licensing laws are always changing and

24  that they should take it upon themselves to make

25  sure they stay in touch with whether or not the

1   licensing laws in their state would present any

2   obstacles for them.

3              I think I told them that every single

4   year, and we told them that at every single

5   orientation, so we actually did undertake to tell

6   them that.  But we did not undertake to monitor

7   state by state what was going on in the licensing

8   realm.

9        Q.   Nor did you undertake to tell them about

10  the specific knowledge you had about impending

11  changes in Massachusetts.

12       MS. GARCIA:  Objection.

13       A.   I think I've answered the question.

14       MR. MORENBERG:  This will be the last exhibit.

15                    (Exhibit 66 marked.)

16       BY MR. MORENBERG:  Q.  Are you familiar with

17  this document?

18       A.   Yes, I am.

19       Q.   And what is this document?

20       A.   It's a memo to the chair of the board from

21  the president, dated October 28, on enrollment

22  issues and marketing.

23       Q.   And is it fair to say that the board

24  wanted you to address its concern about a recent

25  drop in enrollment that brought Saybrook below its