UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO. 04 11572  JLT

*******************************************

SUSAN COONEY,                              )
    Plaintiff                          )
                               )
v.                                         )
                               )
SAYBROOK GRADUATE SCHOOL AND               )
    RESEARCH CENTER.                       )
    Defendant                              )

*******************************************

## PLAINTIFF SUSAN COONEY'S OPPOSITION TO
## DEFENDANT SAYBROOK'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Susan Cooney, by her counsel, opposes the Rule 56 motion of Defendant

Saybrook Graduate School and Research Center ("Saybrook").  Plaintiff voluntarily

dismissed her claims against Maureen O'Hara, Saybrook's former president, and also

dismissed her negligence claim against Saybrook.   Defendant Saybrook has moved for

summary judgment on the four remaining counts of plaintiff's Amended Complaint:

breach of contract; promissory estoppel; M.G.L. Chapter 93A; and negligent infliction of

emotional distress.   Defendant's Rule 56 motion is without merit and should be denied.


## I.      PLAINTIFF'S CONCISE SUMMARY OF MATERIAL FACTS

When Cooney applied to Saybrook in 1995, she informed Saybrook that her

professional objective was to become a licensed clinical psychologist in Massachusetts.

Cooney's Responses to Defendants' Interrogatories, (**Ex. 4** to Plaintiff's Opposition), No.

8, pp. 5-6. Deposition of Susan Cooney, Vol. II, (**Ex. 3** to Plaintiff's Opposition, p. 118).

In its <u>1994-95 Interim Catalogue</u> ("Catalogue"), Saybrook advised prospective students that its graduates had been licensed in many jurisdictions, including Massachusetts. <u>Catalogue</u> (**Ex. 2** to <u>Garcia Affidavit</u>), p. 3.   Saybrook assured Cooney and other students that Saybrook would assist students to become licensed in the state of their choice.  <u>Id</u>. ("To this end, the Institute is a member of the Consortium of Diversified Psychology Programs (CDPP), which is active in state-by-state efforts to monitor and influence existing and changing regulations….")

Saybrook advised Cooney and other clinical students to "contact the licensing board in the state in which they plan to practice to obtain the detailed requirements, because regulations differ from state to state." <u>Catalogue</u> (**Ex. 2** to <u>Garcia Affidavit</u>), p. 2. After students have obtained licensure requirements, Saybrook does not direct students to monitor regulatory changes—a function that Saybrook and CDPP agreed to perform.  <u>Id</u>.  Saybrook students are "bound by the catalogue that they're admitted with." <u>Deposition of Dr. Bruff,</u> (**Ex. 6** to <u>Plaintiff's Opposition</u>), pp, 21, 49.   Saybrook did not mail or distribute subsequent catalogues to Cooney or her classmates absent a specific request. <u>Id</u>, pp. 51-53.

Per Saybrook's instructions, Cooney contacted the Massachusetts Board of Registration of Psychology ("the Board") in the summer of 1995 and obtained licensure standards for psychologists. <u>Deposition of Cooney, Vol. I</u> (**Ex. 2** to Plaintiff's Opposition),   pp. 71-72.  At an orientation conference in the Fall of 1995, Cooney met with a Saybrook representative, who reviewed Massachusetts regulations and advised her that Saybrook's program complied with Massachusetts requirements for licensure. <u>Deposition of Cooney, Vol. II</u> (**Ex. 3** to <u>Plaintiff's Opposition</u>), pp. 48-49.  Saybrook provided Cooney with a list of jurisdictions that do not accept Saybrook degrees for

licensure as a psychologist.  The list included Oregon, Iowa, Connecticut, Georgia, and Maryland.  Information about the CDPP and NPAA (**Ex. 7** to Plaintiff's Opposition). Cooney was informed that Saybrook would stay abreast of licensure standards and changes.  See Cooney Deposition, Vol. II (**Ex. 3** to Plaintiff's Opposition), pp. 48-49, 52-53, 59-64; Catalogue (**Ex. 2** to Garcia Affidavit)., p. 3.

Saybrook's Interim President, Rudy Melone, represented Saybrook on the CDPP and served as its co-chair.  See CDPP Memorandum and Conference Call Documents (**Ex. 7** to Plaintiff's Opposition), p. 1.  Before Cooney matriculated at Saybrook in the Fall of 1995, Saybrook and Melone were aware that Saybrook students would face licensure obstacles in Massachusetts.  Letter of Rudy Melone dated March 20, 1995 (**Ex. 8** to Plaintiff's Opposition).  See also Greening's Memorandum re APA Accreditation, (**Ex. 9** to Plaintiff's Opposition), p. 13 ("..Saybrook students have on occasion hired themselves a lawyer… and indicated that a suit would be pending…. John Burke was successful in so challenging the Massachusetts board…").  Dr. Karen Schwartz of the Board testified that the Board failed to determine if Dr. Burke met its residency requirement, and that a mistake was made as to Dr. Burke's file.  See Deposition of Karen Schwartz (**Ex. 10** to Plaintiff's Opposition), p. 101.

On behalf of Saybrook, Melone continued to monitor regulatory changes in Massachusetts and other states in 1996.  Melone led a CDPP conference call regarding five states that were considering regulations that could harm students from humanistic psychology programs.  CDPP Memorandum and Conference Call Documents (**Ex. 7** to Plaintiff's Opposition), pp. 3-5.  CDPP identified five "Hot spots," including Massachusetts.  Id., p. 4.  Melone noted a "need for continued vigilance."  Id.  In February, 1996, Melone wrote two letters to the Board to protest a proposed regulation to

amend Massachusetts residency standards for graduate schools.  Letters of Melone to Board Dated February 13, 1996 (**Ex. 11** to Plaintiff's Opposition), pp. 1-4.

In or about late 1996, Dr. Gerald Bush assumed the presidency of Saybrook. Saybrook produced one document showing Gerald Bush's awareness of recent licensure obstacles in Massachusetts.  See Letter of Lawrence Ryan Dated January 16, 1996 with Handwritten Note from Bush to Melone.  (**Ex. 12** to Plaintiffs' Opposition).

In 1996 and early 1997, the Board proposed and adopted a new regulation to require applicants for Massachusetts licensure to have graduate degrees from schools that are designated by the Association of State and Provincial Psychology Boards ("ASPPB"). Melone and Saybrook received notice of these developments from Union Institute. Letters of Lawrence Ryan, Ph.D. to Board Dated February 28 and May 8, 1997 (**Ex. 11** to Plaintiff's Opposition), pp 1-7.  Dr. Ryan sent both letters to Rudy Melone of Saybrook. Id., pp. 4, 7.  Dr. Ryan also sent copies to Marcia Hammond, whom Saybrook hired as a consultant on licensing issues.  Id.

Maureen O'Hara joined Saybrook as a vice-president and faculty member in 1997 and became president in 1999.  Deposition of Maureen O'Hara, (**Ex. 7** to Garcia Affidavit), p. 103.  In 1997, O'Hara claims that she learned Saybrook graduates "may face challenges in obtaining a license as a psychologist in Massachusetts."  See Maureen O'Hara's Answers to Interrogatories, (**Ex. 14** to Plaintiff's Opposition), p. 8.

Dr. O'Hara claims that she was unaware, in 1997, that Massachusetts had adopted regulations mandating ASPPB-designation of graduate programs in psychology.  Dr. O'Hara alleges that she learned of this regulatory change after Cooney graduated in 2002. Id., p. 9.  However, the Union Institute had informed both Rudy Melone and Marsha Hammond, in May of 1997, that the Board approved the new regulation.  Letters of Dr.

4

Ryan to Board (**Ex. 12** to <u>Plaintiff's Opposition</u>), pp. 5, 7.   Upon information and belief,

O'Hara and Melone were informed that Massachusetts had adopted the ASPPB

regulation through CDPP meetings and communications in 1997.

     ·     Prior to joining Saybrook, O'Hara had published an article to inform humanistic

psychology schools that many jurisdictions were considering new regulations to mandate

that prospective psychologists graduate from a ASPPB-approved schools.   "Wake Up

Call for Humanistic Warriors," <u>AHP Perspective</u>, January/February, 1995 (**Ex. 15** to

<u>Plaintiff's Opposition</u>), p. 2.  O'Hara warned humanistic psychology schools that once

students become aware that "degrees from alternative schools will fare badly in the

marketplace, graduate opportunities for humanistic psychology will dry up." <u>Id</u>.

     In or about late 2000, Richard Francis advised Saybrook that he was rejected for

licensure in Massachusetts. *See* <u>Letter of William Bruff, Ph.D. to the Board Dated</u>

<u>November 30, 2000</u> (**Ex. 16** to <u>Plaintiff's Opposition</u>).   The Board determined that

Saybrook students like Dr. Francis did not meet the Board's residency requirements

under pre-1997 standards.  <u>Letter of Dr. Vicki Lyall to Richard Francis</u>, **Ex. 17** to

<u>Plaintiff's Opposition</u>, p. 1.   Nonetheless, the Board granted licensure to Francis on

account of his disability.  <u>Id</u>.

     In 2003, Saybrook requested that Dr. Alan Vaughan develop a web page to help

students understand licensing standards in various jurisdictions.  <u>Deposition of Alan</u>

<u>Vaughan</u> (**Ex. 18** to <u>Plaintiff's Opposition</u>), pp 17-22.  In April or May of 2003,

Vaughan began to research licensure standards and obstacles in various jurisdictions, and

made this information available to the Saybrook community in or about July, 2003.  <u>Id</u>.,

pp. 39-40.  Dr. Vaughan determined that Massachusetts would not accept Saybrook

graduates for licensure.  <u>Id</u>., p.40.  On or about February 18, 2004, Saybrook provided

notice to current students about licensure obstacles in twenty-five jurisdictions, including Massachusetts.  <u>Saybrook Letters re APA and Residence Obstacles</u> (**Ex. 19** to <u>Plaintiff's Opposition</u>).

Between March, 2000 and March, 2003, Saybrook's total enrollment increased from 430 to 521.  For the same period, enrollment of new and readmitted student increased from 138 (1999-2000) to 191 (2002-2003).  President's Report (**Ex. 21** to Plaintiff's Opposition), p. 9.  However, for the 2003-2004 academic year, Saybrook's new enrollment figure declined to 156.  According to Jack Reho's data for 2004-2005, new enrollment further declined to about 120.  <u>Deposition of Reho</u> (**Ex. 14** to <u>Plaintiff's Opposition</u>), pp. 62-65.

In or about October, 2004, O'Hara reported to Saybrook's Board that Saybrook's enrollment had declined because "external pressures <u>we were anticipating in 1998</u> are accelerating."  <u>President's Report of Dr. O'Hara to Saybrook's Board</u> (**Ex. 20** to Plaintiff's Opposition), p. 1 (emphasis added).  These pressures included "accreditation issues arising in professional licensing...."  Id.  Dr. O'Hara noted that "in some 17 states a clinical student from Saybrook may not be eligible to sit for licensing as a clinical psychologist... <u>On advice from counsel we have moved to warn students wishing to sit for licensing that Saybrook may not be the right school....</u>"  Id., p. 5.

On or about October 24, 2004, the Board provided formal notice to Cooney that Board determined she was ineligible for licensure as a Massachusetts psychologist, as she had not attended an ASPPB-designated program.  <u>Letter from Richard Monahan, Ph.D.</u> (**Ex. 21** to Plaintiff's Opposition).  The Board advised Cooney that 251 CMR 3.03(1)(b) went into effect on May 2, 1997.  Id.  As Cooney did not graduate from an ASPPB-designated program, there was nothing she could do to become eligible for licensure with a

6

Saybrook degree.  Deposition of Schwartz (**Ex. 10** to Plaintiff's Opposition), pp. 85-89.

Cooney has asserted a claim for negligent infliction of emotional distress against Saybrook.  Amended Complaint (**Ex. 1** to Garcia Affidavit), p. 10.  Cooney testified that she has experienced "depression" and "existential los[s]" due to Saybrook's failure to fulfill its obligations to her.  Deposition of Cooney, Vol. II (**Ex. 2** to Plaintiff's Opposition), pp. 289-90.  Cooney has treated with her primary care physician, Dr. Catherine Taylor, and a therapist, Dr. David Reisen.  Id., p. 294.  Defendant's counsel did not ask Cooney about physical symptoms at her deposition.  Id., pp. 289-95.  Cooney has experienced sleeplessness, difficulties in working and concentrating, anxiety and depression.  Amended Complaint (**Ex. 1** to Garcia Affidavit), p. 10.

## II.    ARGUMENT

A.    **Summary Judgment Standard**

Summary judgment may only be granted where there are no genuine issues of material fact, and where the moving party is entitled to judgment as a matter of law.  Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991).  The moving party has the burden to show the absence of a triable issue.   The court must evaluate the "entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor…"  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 )(1st Cir. 1995) (internal citations omitted).  In the present case, plaintiff has demonstrated an ample number of genuine issues of material facts that establish triable issues on each of plaintiff's four remaining counts against Saybrook.

**B.**  **Choice of Law Analysis**

Plaintiff Susan Cooney is a Massachusetts resident who contracted to receive graduate training in psychology from Saybrook, a California school that offers "distance learning" within Massachusetts and other jurisdictions.  When Saybrook breached its contractual and other obligations to Cooney, she properly filed suit in Massachusetts Superior Court, asserting jurisdiction over Saybrook under the Commonwealth's long arm statute.  Defendant removed this case to federal court on the basis of diversity.

In diversity cases, federal courts apply choice of law principles of the forum state. Lexington Ins. Co. v. Gen. Accid. Ins. Co., 338 F.3d 42, 46 (1st Cir. 2003).  In the present case, the court must apply the choice-of-law framework of Massachusetts.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 491 (1941).  Here, the choice is between Massachusetts law (Cooney's home) and California law (Saybrook's home). Where there is no material difference between the laws of two jurisdictions, the Court can omit this analysis.  Lexington Ins. Co, 338 F.3d at 46.  Plaintiff submits that Defendant is not entitled to summary judgment under Massachusetts or California law.

**C.**  **Plaintiff has Established the Existence of Genuine Issues of Material Fact as to all Remaining Claims Against Saybrook**

    **1.**  **Plaintiff Has Asserted a Valid Breach of Contract Claim**

To prove breach of contract under Massachusetts law, plaintiff must establish that a valid contract was formed, that defendant breached its duties under the contract, and that defendant's breach caused damages to the plaintiff.  Guckenberger v. Boston University, 974 F. Supp. 106, 150 (D. Mass. 1997).  In Guckenberger, the District Court

noted that the "relationship between a university and its student is contractual in nature."
Id at 150-51.   Statements contained within school handbooks, manuals or catalogues can
form the basis of a valid contract.  See Russell v. Salve Regina College, 890 F.2d 484,
488 (1st Cir., 1989), *rev'd on other ground*, 499 U.S. 225, and *reinstated on remand*,
938 F.2d 315 (1st Cir. 1991).  Any promise contained in a school catalogue must be
"definite and certain so that the promissor should reasonably forsee that it will induce
reliance." Guckenberger, 974 F.Supp., at 150.  See Morris v. Brandeis University, 60
Mass.App.Ct 1119, n. 6 (2004) (detailed procedural standards in Brandeis student
handbook can create a valid contract claim); see also Essigman v. Western New England
College, 11 Mass. App.  Ct. 1013 (1981).

Through its 1994-95 Interim Catalogue,  Saybrook advised Cooney that it was
qualified to provide training to individuals seeking to become psychologists, and that
Saybrook graduates have been licensed in Massachusetts.  Catalogue (**Ex. 2** to Garcia
Affidavit), p. 3.   Saybrook pledged to help Cooney become licensed in Massachusetts.
The Catalogue provides as follows:

> Saybrook is committed to assisting those students who plan
> to seek licensure in the state of their choice. Id.  To this
> end, the Institute is a member of the Consortium of
> Diversified Psychology Programs (CDPP), which is active
> in state-by-state efforts to monitor and influence existing
> and changing regulations….

Id. (emphasis added).   Saybrook advises students to "contact the licensing board in the
state in which they plan to practice to obtain the detailed requirements, because
regulations differ from state to state." Id., p. 2.   After students have obtained licensure
requirements, Saybrook does not direct students to monitor regulatory changes—a
function that Saybrook and CDPP agreed to perform.  Id.   Saybrook deems the

Catalogue as binding throughout the student's studies at Saybrook. Students are "bound by the catalogue that they're admitted with." Deposition of Dr. Bruff, (**Ex. 6**), p. 49. Saybrook does not distribute subsequent catalogues unless requested. Id, pp. 51-53.

Cooney complied with all requirements of the Catalogue regarding licensure. Cooney informed Saybrook and her advisors that her academic objective was to become a licensed psychologist in Massachusetts. Cooney Depo, Vol. II (**Ex. 3**), pp. 48-49, 118. She contacted the Massachusetts Board of Registration of Psychology ("the Board") in the summer of 1995 and obtained its licensure standards. Cooney Depo., Vol. I (**Ex. 2**), pp. 71-72. In the Fall of 1995, Cooney met with a Saybrook representative, who reviewed the Massachusetts regulations and advised her that Saybrook's program complied with Massachusetts requirements. Saybrook provided Cooney with a list of jurisdictions that do not accept Saybrook degrees, including Oregon, Iowa, Connecticut, Georgia, and Maryland. Information about the CDPP and NPAA (**Ex. 7**). Cooney was informed that Saybrook would stay abreast of licensure standards and changes. Catalogue (**Ex. 2** to Garcia Affidavit)., p. 3. Cooney Depo., Vol. II (**Ex. 3**), 52-53, 59-64;

Saybrook breached the clear and unequivocal terms of its contract with Cooney, by failing to inform her of changing regulations and emerging licensure obstacles in Massachusetts. Even before Cooney matriculated, Saybrook was aware of licensure problems in Massachusetts. In March of 1995, President Melone lobbied the Board because a Saybrook graduate was denied licensure. Letter of Melone (**Ex. 8**). Melone led a CDPP conference call in January, 1996 to discuss licensing "hot spots," which now included Massachusetts. CDPP Memorandum and Conference Call Documents (**Ex. 7**), pp. 3-5. Melone noted a "need for continued vigilance." Id. In 1996, Melone and Saybrook's new president, Gerald Bush, exchanged information about Massachusetts

licensure issues.   Letter of L. Ryan, with Note from Bush to Melone (**Ex. 12**).

Between 1995 and 1997, Saybrook and its senior administrators actively monitored regulatory changes in Massachusetts, but failed to provide any information to Cooney.   In 1997, Massachusetts adopted new regulations that required applicants for licensure to graduate from schools that are designated by the Association of State and Provincial Psychology Boards ("ASPPB").   Melone and Saybrook received notice of these developments from Union Institute.   Letters of L. Ryan to Board (**Ex. 11**).   Around this time, Maureen O'Hara joined Saybrook as its vice-president.   Melone and O'Hara were members of CDPP, and presumably received information about the new Massachusetts regulation through this committee.   Between 1997 and 2002, Saybrook continued to collect tuition from Cooney, but failed to inform her that a Saybrook degree would not qualify her for licensure in Massachusetts.

Saybrook's failure to alert Cooney about these critical issues was a breach of its contractual obligations.   The Catalogue describes Saybrook's commitment "to assisting those students who plan to seek licensure in the state of their choice."   The Catalogue also states that Saybrook would monitor licensure standards and regulatory changes in conjunction with the CDPP.   Saybrook may have honored its obligation to monitor regulatory issues through the CDPP, but it failed to honor its concomitant obligation to disclose this information in order to assist Cooney in achieving licensure in Massachusetts.

Saybrook's breach of these contractual obligations caused substantial damages to Cooney.   She devoted seven years of her life to obtain a Saybrook degree, and paid substantial sums in tuitions and fees.   After graduating from Saybrook in the Fall of 2002, Cooney learned that she was ineligible for licensure in Massachusetts with a

Saybrook degree. Cooney explored all possible avenues to qualify for licensure, but the Board informed Cooney that she was ineligible under current regulations. <u>Letter from Richard Monahan</u>, Ph.D. (**Ex. 21**). As a result of Saybrook's breach of its contractual obligations, Cooney cannot pursue her academic and vocational objective to become a Massachusetts psychologist, and Cooney will be deprived of the additional earnings that she could achieve as a licensed psychologist.

2.     **<u>Plaintiff Has Asserted a Valid Claim for Promissory Estoppel</u>**

In order to prove a promissory estoppel claim, Cooney must prove that she reasonably relied on a promise to her detriment, and suffered damages. The District Court has distinguished contract and promissory estoppel claims as follows: "Even in the absence of consideration to support a binding contractual agreement between the parties, a party reasonably relying on a promise may prevail under a theory of promissory estoppel." <u>Guckenberger</u>, 974 F. Supp. at 150. Plaintiff must establish that Saybrook made promises that it reasonably expected would induce Cooney to take action or forbearance of a definite and substantial nature; that Saybrook's promise induced such action or forbearance; and that injustice cannot be avoided unless the promise is enforced. <u>Neuhoff v. Marvin Lumber & Cedar Co.</u>, 370 F.3d 197, 203 (1st Cir. 2004).

Based on the factual allegations that are described in the preceding section, Cooney can establish promissory estoppel. In brief, Saybrook promised Cooney that it would assist her in obtaining licensure in Massachusetts. Toward that end, Saybrook made the related promise that it would monitor licensing standards and regulatory changes. Saybrook knew or reasonably should have expected that Cooney would rely on its pledges, and that Saybrook's pledges would induce Cooney to pursue her graduate

studies at Saybrook and to pay tuition and fees.  By enrolling at Saybrook and devoting seven years of her life to obtaining her degree, Cooney took action of a definite and substantial character.   If Saybrook disclosed its knowledge of licensure obstacles in Massachusetts before or during Cooney's studies, it is likely that Cooney would have declined to attend Saybrook or would have sought to transfer to another program. Saybrook has breached its promises to Cooney by failing to inform her of licensures obstacles in Massachusetts, which were known to Saybrook before Cooney matriculated. Between 1995 and 2002, Saybrook repeatedly breached its promises to Cooney by withholding critical information about Massachusetts licensure obstacles and regulatory changes that would affect the value of her Saybrook degree.  Cooney invested seven years of money and time into her Saybrook degree, which she cannot utilize to qualify for licensure in Massachusetts.  As a result, injustice can only be avoided if the Court enforces Saybrook's promises.

### 3.   Plaintiff Has Asserted a Valid Claim Under M.G.L. c. 93A

To prove violations of Chapter 93A, Cooney must establish that Saybrook was engaged in a "trade or commerce" as a threshold matter.  M.G.L.c. 93A, §2.  These terms are defined by G.L. c. 93A,  §1(b), and include "advertising, offering for sale, rent, lease or distribution of any services and any property, tangible or intangible…and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth."  Plaintiff must show that Saybrook's alleged 93A violations took place in a business context.

Plaintiff alleges that Saybrook engaged in a trade or commerce when it provided services to Cooney that did not meet her stated educational objective—to receive a degree that would qualify her to apply for licensure as a Massachusetts psychologist. Before Cooney matriculated, Saybrook knew that its "distance learning" model may not satisfy the Board's "residency" standards. In or about the Spring of 1997, Saybrook learned that Massachusetts had passed new regulations that require prospective psychologists to attend ASPPB-designated schools. Although Saybrook lacked ASPPB approval, Saybrook continued to provide Cooney with graduate studies that could not possibly meet Cooney's educational objective. Saybrook's apparent motive was to collect tuition and fees from Cooney and other Massachusetts students. The foregoing facts create a triable issue as to whether Saybrook provided Cooney with educational services to further its charitable mission, or rather to maintain enrollment levels and tuition revenues.

### A. Saybrook's Alleged Conduct Constitutes Unfair and Deceptive Trade Practices.

Chapter 93A prohibits unfair or deceptive acts or practices. In Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980), the Supreme Judicial Court applied FTC definitions of "unfair" and "deceptive" to assist its evaluation of potential Chapter 93A violations. "The court must inquire: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to

consumers (or competitors or other businessmen)." Id.. (internal citation omitted).  A

practice may be "deceptive" if it "could reasonably be found to have caused a person to

act differently from the way he otherwise would have acted." Id. (citing Lowell Gas. Co.

v. Attorney Gen., 377 Mass. 37, 51 (1979).

According to the 1994-95 Catalogue, Saybrook agreed to assist Cooney to

become licensed in Massachusetts and to track and monitor regulatory changes.

Nonetheless, Saybrook failed to advise Cooney that two other Saybrook graduates had

encountered substantial difficulty in meeting the Board's residency standards under its

former regulations.  Saybrook knew that the Board adopted stricter regulations in May,

1997, requiring applicants to attend ASPPB-designated graduate program.  Plaintiff has

alleged that Saybrook received at least two notices from Union Institute about the

Board's adoption of the ASPPB standard.  Presumably, Saybrook received further notice

through CDPP meetings and communications.  At various times during Cooney's studies,

Saybrook received important information about changing licensure standards in

Massachusetts, but never shared this information with Cooney.

Plaintiff has also alleged facts that suggest Saybrook intentionally withheld

critical information about licensure obstacles in order to protect its enrollment levels.  For

example, in Dr. O'Hara's report to Saybrook's Board about declining enrollment levels in

2004, she explained that "external pressures we were anticipating in 1998 are

accelerating."  President's Report of Dr. O'Hara to Saybrook's Board (**Ex. 20** to

Plaintiff's Opposition), p. 1 (emphasis added).  These pressures included "accreditation

issues arising in professional licensing…."  Id. Dr. O'Hara noted Saybrook students may

be ineligible to sit for licensing as a clinical psychologist in 17 states.  Dr. O'Hara

reports, "On advice from counsel we have moved to warn students wishing to sit for

15

licensing that Saybrook may not be the right school…."  Id., p. 5.  Indeed, after

Saybrook took steps to inform current and prospective students of licensure obstacles in

seventeen to twenty-five jurisdictions in February, 2004, Saybrook's new student

enrollment levels began to plunge.

     Saybrook argues that it could not have deceived Cooney because it lacked specific

knowledge that Cooney intended to pursue licensure in Massachusetts.  Saybrook's

assertion is belied by its own interrogatory answers, which acknowledge that Cooney's

application to Saybrook described her vocational goal of becoming a clinician at

Massachusetts General Hospital.  Saybrook also relies on the deposition testimony of

Cooney's faculty advisor, Ruth Richards.  Dr. Richards inaccurately claims that Cooney

never discussed her desire to become a licensed psychologist.  Dr. Richards admits that

she cannot recall if Cooney ever discussed her clinical interest in psychology, though she

has "the strong leaning to her not saying that."  Cooney has provided conflicting

testimony, noting that she advised Dr. Richards and other Saybrook agents of her goal to

become a licensed psychologist in Massachusetts.  Deposition of Cooney, Vol. II

(Ex. 3), p 118.

     Saybrook committed deceptive acts and omissions in steadfastly refusing to share

information about licensing obstacles with current students.  The intentional concealment

or distortion of important information constitutes evidence of deception.  See Leardi v.

Brown, 394 Mass. 151, 156 (1985).  See also Slaney v. Westwood Auto, Inc., 366 Mass.

688, 703 (1975) (citing Attorney General regulations that define deceptive acts to include

"failure to adequately disclose additional relevant information, [which] has the capacity

or tendency or effect of deceiving buyers … in any material respect").  Saybrook engaged

in deceptive conduct by failing to disclose its superior knowledge of critically important

Massachusetts licensing issues. Saybrook's deception is tantamount to a knowing refusal to disclose material facts to a consumer, which has long been held to constitute a deceptive act. <u>York v. Sullivan</u>, 369 Mass. 157 (1975); <u>Heller v. Silverbranch Construction Corp.</u>, 376 Mass. 621 (1978).

**B.    <u>Saybrook's Non-Profit Status Does Not Preclude Chapter 93A Liability</u>**

When a consumer sues a charitable entity under Chapter 93A, the court must determine if the interaction between the parties was predominantly commercial or charitable. Massachusetts courts focus greater attention on the nature of the transaction than the purported exempt status of an entity. <u>Poznik v. Massachusetts Medical Professional Insurer's Assoc.</u>, 417 Mass. 48, 52 (1994); <u>Barrett v. Massachusetts Insurers Insolvency Fund</u>, 412 Mass. 774, 776 (1992). Charitable status does not insulate a party from liability under Chapter 93A for unfair business conduct. <u>Linkage Corp. v. Trustees of Boston University</u>, 425 Mass. 1, 25 (1997). In <u>Linkage</u>, the Court found that defendant Boston University, a non-profit entity, was engaged in a predominantly commercial transaction with the plaintiff, as its primary objective was to deliver services for lucrative compensation.

Chapter 93A is designed "to encourage more equitable behavior in the marketplace . . . [and to impose] liability on persons seeking to profit from unfair practices." <u>Poznik</u>, 417 Mass. at 53 (citing <u>Manning v. Zuckerman</u>, 388 Mass. 8, 12 (1983). By definition, a qualified non-profit entity does not earn any profits.

Nonetheless, when charitable entities engage in unscrupulous or unethical business practices to secure a financial advantage, it is appropriate to hold the so-called charity accountable under Chapter 93A. <u>Linkage</u>, 425 Mass at 25.

> **4.    Plaintiff Has Alleged A Valid Claim of Negligent Infliction of Emotional Distress.**

To prove the claim of negligent infliction of emotional distress, the plaintiff must establish (1) negligent conduct by the defendant, (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptamology, and (5) that a reasonable person would suffer emotional distress in like circumstances. <u>Payton v. Abbot Labs</u>, 386 Mass. 540, 558 (1982).    When a plaintiff brings a claim for emotional distress, she must do more than allege "mere upset, dismay, humiliation, grief and anger." <u>Sullivan v. Boston Gas. Co.</u>, 414 Mass. 129, 137-39 *(1993)*.  The plaintiff must show physical manifestations of distress through evidence of objective physical symptoms.  In <u>Sullivan</u>, the plaintiffs met this burden by documenting a varied physical symptoms, including but not limited to sleeplessness, weeping, headaches, gastric distress, nightmares, and depression. <u>Id</u>. at 131.

Although Cooney has dismissed her general negligence count against Saybrook, she can still allege emotional distress by demonstrating negligent conduct by Saybrook. The relationship between a university and its students can create a duty of care. <u>Mullins v. Pine Manor College</u>, 389 Mass. 47 (1983); <u>Mounsey v. Ellard</u>, 363 Mass. 693, 706-08 (1973).  Massachusetts courts have broadly recognized a duty to prevent harm that may arise from a "special relationship" between plaintiff and defendant.  <u>Irwin v. Town of Ware</u>, 392 Mass 745, 756-57 (1984).   A duty of care can arise from any "special

relationship" in which "the defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." Id.

Plaintiff has alleged sufficient facts to establish that Saybrook owed Cooney a duty of care in connection with monitoring and disclosing licensing standards and regulatory changes. Through its Catalogue, Saybrook advises students that it is committed to assisting them in obtaining licensure in the state of their choice. Saybrook also pledges to monitor licensing standards and regulatory changes through its affiliation with CDPP. Saybrook could reasonably foresee that such offers of assistance would induce students to rely on Saybrook's greater resources and expertise to evaluate changing licensing standards. Saybrook also knows that its "distance-learning" model is especially attractive to adult learners, who must carefully balance their academic studies with the demands of work and family. Saybrook could reasonable foresee that busy adult learners, like Susan Cooney, would come to rely on Saybrook's offer to monitor licensing standards and regulatory changes, and would face harm if Saybrook neglected to provide these services.

Cooney submits that the facts in this case support a finding that Saybrook was negligent in failing to research and/or to disclose important information about licensing obstacles or regulatory changes to licensing. The evidence in this case also suggests that Saybrook's negligent conduct caused Cooney's emotional distress. Cooney's deposition testimony demonstrates that she was devastated by her inability to become licensed and by Saybrook's failure to share information about Massachusetts licensing issues. Cooney has also alleged a variety of physical symptoms, including sleeplessness, difficulties in working and concentrating, and depression. Amended Complaint, ¶ 58. Moreover,

Cooney's psychotherapist has furnished treatment records that describe various physical symptoms, including sleeplessness, depression, loss of appetite, and feeling wobbly and hazy. Cooney has demonstrated evidence of physical harm manifested by objective symptomology. See *Payton, 386 Mass. at 578; Sullivan,* 414 Mass. at 131.

Plaintiff has demonstrated the existence of genuine issues of material fact as to whether Saybrook acted negligently toward Cooney, whether Saybrook proximately caused her emotional distress; and whether Cooney suffered compensable harm. For these reasons, Saybrook's summary judgment motion on this issue should be denied.

### III.    CONCLUSION

For all the foregoing reasons, plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

SUSAN COONEY,
By her counsel,

/s/ Paul W. Morenberg

_____

E. Steven Coren, BBO #
Paul W. Morenberg, BBO # 631101
Kerstein, Coren, Lichtenstein & Finkel, LLP
233 Needham Street
Newton, Massachusetts   02464
(781) 997-1600

Dated:        September 19, 2006

20