1

 **COPY**

<u>VOLUME: II</u>
<u>PAGES: 1 - 325</u>
<u>EXHIBITS: 17 - 28</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO. 04 11572 JLT

---

SUSAN COONEY,                          )
    Plaintiff,                     )
vs.                                    )
                                   )
HUMANISTIC PSYCHOLOGY INSTITUTE,       )
d/b/a SAYBROOK INSTITUTE and           )
MAUREEN O'HARA, Individually,          )
    Defendants.                    )

---

**EXHIBIT 3**

to <u>Plaintiff's Opposition</u>

        **AUDIOVISUAL DEPOSITION OF SUSAN COONEY**, taken

on behalf of the Saybrook Institute, pursuant to the

Federal Rules of Civil Procedure, before Kristin L.

Tucker, Notary Public and Certified Shorthand Reporter

within and for the Commonwealth of Massachusetts, at the

Law Offices of Morrison Mahoney LLP, 250 Summer Street,

Boston, Massachusetts, on January 27, 2006, at 9:10

a.m., as follows:

**DANILECKI REPORTING**
234 Governors Road
Quincy, Massachusetts 02169
(617) 745-9786

48

1  there were any changes in regulations and that when I

2  started that, I met the criteria and I trusted them to

3  let me know if anything changed.

4                    MR. VARTAIN:  Move to strike,

5  nonresponsive.  Let's -- I'm gonna have the last

6  question read back.

7                    (Question read.)

8      A.    Well, I presume the catalog, the catalog that

9  I started with.

10     Q.    Okay.  Let's open up to the catalog.  Is that

11  the only document that you have that states that

12  Saybrook would stay abreast of the changes about

13  licensure in the different states and keep you informed?

14     A.    I feel like I saw it in a bulletin, but I

15  can't be specific right now.

16     Q.    As you sit here today, is there any document

17  that you know of, other than the Saybrook Interim

18  Catalog, '94/'95, that caused you to believe that

19  Saybrook was promising to stay abreast of the changes on

20  licensing in the different states and to keep you

21  informed about it?

22                    MR. MORENBERG:  Objection.

23     A.    At the orientation I was promised it.  When I

24  brought my regulations to the orientation and they had

49

1  the specialist go over the regulations, they said we met

2  the criteria and we will keep abreast of it.

3                    MR. VARTAIN:  Move to strike,

4  nonresponsive.  Let's get the question back.  I'm only

5  talking about documents right now.

6                    THE WITNESS:  Okay.

7                    MR. VARTAIN:  You know that.  You

8  can hear it.

9                    (Question read.)

10     A.    The ones that I've stated.

11                    MR. VARTAIN:  Motion to strike,

12  nonresponsive.  Listen to the question, if you would,

13  please.

14                    THE WITNESS:  Okay.

15                    (Question read.)

16                    MR. MORENBERG:  Objection.

17     A.    I believe there was also a bulletin.

18     Q.    You told me earlier that you don't have any

19  specific memory of even reading any bulletin.

20                    MR. MORENBERG:  Objection.

21     A.    I did not say that.

22     Q.    Do you have a specific --

23     A.    I said I'm sure I've read them.  I don't

24  remember any specific, you know, moment sitting reading

52

1            BY MR. VARTAIN:

2       Q.    Point to me -- Tell me on what page there

3    exists language that promised you that Saybrook would

4    keep you informed about --

5       A.    On Page 3?  I'm sorry.

6       Q.    --.about changing licensure.

7       A.    On Page 3 on the right-hand side around

8    three-fourths down.

9       Q.    On what other pages?

10      A.    That would be the area that it was addressed,

11   I believe.

12      Q.    Why don't you look at the catalog and tell me

13   on what other pages, besides Page 3, Saybrook assured

14   you that it would keep you informed of changing

15   regulations.

16      A.    It's Page 3.  I said that.  Page 3.

17      Q.    And in what column on Page 3?

18      A.    The right-hand side column.

19      Q.    And what place of the right-hand side column?

20      A.    Three-fourths down.

21      Q.    And read me the language in -- the entire

22   language --

23      A.    Well, it's all along --

24      Q.    Would you let me finish the question?

53

1      A.     I have no problem letting you finish.

2      Q.     Then please let me do so.  Okay?  Would you

3  agree to do that?

4      A.     Absolutely.

5      Q.     Please read me the language on the right-hand

6  side column of Page 3 that -- whereby you believed or

7  you believe that the catalog promised you that Saybrook

8  would keep you informed of changing licensure

9  regulations in different states.

10     A.     Okay.  Now?  "Saybrook is committed to

11  assisting those students who plan to seek licensure in

12  the state of their choice.  To this end, the institute

13  is a member of the national Consortium of Diversified

14  Psychology Programs, which is active in state-by-state

15  efforts to monitor and influence existing and

16  changing" -- sorry -- "regulations which permit

17  graduates from alternative programs to sit for

18  licensure."

19              It goes on to say that the National

20  Psychology Advisory Association is a related

21  organization comprised of dues-paying members who are

22  students or graduates of alternative programs.  This

23  group is actively involved in the monitoring process,

24  basically, lobbying process.  That is where.

57

1  just quoted to me, that the laws governing licensure of

2  psychologists do, in fact, change over time in different

3  states?

4      A.    I don't actually remember that specifically,

5  but I remember that the understanding was Saybrook, as

6  stated, would monitor and was committed to helping us

7  and they would monitor and notify us of any changes.

8  And I trusted Saybrook.

9      Q.    So you did -- You must have known then that

10 there was a possibility that there would be changes in

11 laws.

12     A.    I was unaware of that specifically.

13     Q.    You just told me that Saybrook promised you

14 to -- that they would monitor changes in laws.

15     A.    Saybrook, if there were any problems for my

16 education that I was paying for with them, they would

17 let me know.

18     Q.    Did they promise you that they would let you

19 know if there were any problems with your education, or

20 did they promise you that if there were changes in laws,

21 they would let you know?

22     A.    If there were any problems, that we were a

23 team and we were gonna see this through together and if

24 there were problems, they would let me know.

58

1    Q.    Okay.  When Saybrook said that they would let

2  you know if there were problems, did they say as well

3  that they would let you know if there were changes in

4  licensing laws?

5    A.    I do not remember that.

6    Q.    So you have no recollection of Saybrook ever

7  saying to you that if there were changes in licensing

8  laws they would let you know; is that correct?

9                    MR. MORENBERG:   Objection.

10   A.    They said in the paper here that --

11   Q.    I don't --

12   A.    -- they were monitoring.  Well, in your

13  bulletin, they said that they were monitoring what was

14  going on with the CDPP and any policy changes.  And I

15  felt comfortable leaving that to them and that they

16  would notify me of anything that concerned me, as I was

17  paying them tuition every year, they would alert me to.

18   Q.    You were pointing to Exhibit 16; is that

19  correct?

20   A.    I don't know.

21   Q.    Well, would you look at it, please.

22   A.    Fifteen.

23   Q.    Fifteen.  That's the interim catalog.

24   A.    Oh, wait -- Yes, 15.

59

1       Q.      Setting aside the Saybrook '94/'95 Interim

2   Catalog --

3       A.      Yes.

4       Q.      -- did Saybrook ever promise you that it

5   would keep you informed of changes in licensing laws

6   specifically?

7       A.      When I went out to the orientation and I was

8   supposed to bring my regulations, we met with that

9   person who went over each person's regulations and she

10  said that Massachusetts met the criteria and -- and she

11  said, You're good to go.

12      Q.      Is that all she said?

13      A.      To the best of my recollection.

14      Q.      What else, if anything, did that person say

15  about future changes, if any, that might happen in

16  Massachusetts?

17      A.      Nothing that I can recall.

18      Q.      Didn't she promise you that -- Didn't she say

19  to you, We are going to track Massachusetts laws and

20  keep you informed?

21      A.      Did I say that?

22              MR. MORENBERG:   Answer the question.

23      A.      No.

24      Q.      She never said that?

DANILECKI REPORTING (617) 745-9786

60

1      A.    No.

2      Q.    She never said anything to that effect; is

3   that correct?

4      A.    It was 11 years ago.  I would say she

5   basically said, You meet the criteria.  We'd love to

6   have you come here, and, you know, we understand you

7   want to be a psychologist in Massachusetts and you'll be

8   able to be.

9      Q.    That's what she said?

10     A.    Yes.

11     Q.    Did she say to you that she would, or

12  Saybrook would, monitor the regulations over the years

13  that you would be at Saybrook and keep you informed?

14     A.    It was an understanding.

15     Q.    I didn't -- I know you -- Did she say that?

16     A.    Did she specifically?  I don't recall.

17     Q.    She never said that as best you can recall,

18  correct?

19     A.    I can't recall.  It was a long time ago.  I

20  can't recall specific conversation.  The tone was

21  that --

22     Q.    I'm not interested --

23     A.    -- they would be on top of it.

24     Q.    I'm not interested in the tone.  I'm

61

1  interested in, is it your sworn testimony that the

2  person you met with in the fall of 1995 to go over

3  these -- the Massachusetts regulations never promised

4  you that Saybrook would stay up on changes, future

5  changes in Massachusetts regulations and inform you of

6  any?  Do you want the question --

7       A.    I just -- I can't recall specifically.  I

8  can't say yes to that, and I can't say no to that.

9       Q.    So you have no --

10      A.    The way you've placed the question, I can't.

11      Q.    You have no clear recollection that that

12 person told you that Saybrook would stay on top of

13 future changes in Mass. law and keep you informed,

14 correct?

15      A.    My understanding -- And I'm supposed to say

16 yes or no?  I can't say them to that.

17            MR. VARTAIN:  I'm gonna have the

18 question read back, because I want no complications

19 here.  Would you like that?

20            THE WITNESS:  Fine.

21            (Question read.)

22      A.    Not correct.

23      Q.    So you do have a clear recollection?

24      A.    Not a clear recollection, but I have a -- I

62

1  cannot give you her exact words, but I can tell you that

2  the conversation went as such, that she was saying that

3  I was -- met the criteria, that Massachusetts met the

4  criteria, and that they work hand-in-hand with you and

5  that we were a team, was the word she used, and that

6  they would -- that I was going to pay them money and

7  that I was going to be able to get my license in

8  Massachusetts.

9       And, therefore, with the things that I saw in

10 the catalog saying that they were committed to assisting

11 students and that they were part of the CDPP and would

12 be monitoring things, that I was quite safe to proceed

13 and that they would alert me if there were any changes.

14      Q.   Where did it say in the catalog that they

15 would alert you to any changes?  It never specifically

16 said that.

17      A.   Well, they're specifically saying we're

18 committed to assisting students and we monitor what's

19 going on.  I would think that -- I would have thought

20 that if they knew of a change, that they would have

21 passed it on as opposed to not passing it on.

22      Q.   Does it say specifically anywhere in the

23 catalog that Saybrook would give you information about

24 changes in Mass. law?

63

1      A.      I believe it says something in the bulletin

2  about they would let you know about changes.

3      Q.      We've already talked about that you don't

4  have a specific recollection of the bulletin; is that

5  correct?

6      A.      Of anything specific.  You're saying, do you

7  have a direct memory of sitting down with the bulletin.

8  I don't.  But I believe there was something mentioned in

9  there.

10      Q.      And that's something you have no specific

11  recollection of, correct?

12      A.      It's a general recollection.

13      Q.      What's the difference between a general

14  recollection --

15      A.      You taught me.  You said earlier, that's not

16  specific.  That's just general.  One is more detailed.

17      Q.      Do you have -- What's -- Do you have a date

18  or -- that you read this in the bulletin?

19      A.      That would be specific, no.

20      Q.      Do you have a year?

21      A.      I don't.  It's a decade ago.

22      Q.      Coming back to the catalog, do you have --

23  Did you have that catalog with you when you went out to

24  Saybrook in 1995?

64

1      A.      I'm pretty sure I did.

2      Q.      You did.  Okay.  Let's come back to the

3  conversation with the person in 1995 when you were going

4  over the regs.

5      A.      Um-huh.

6      Q.      Did she say to you that Saybrook would inform

7  you of any changes in Mass. law?

8      A.      She said that they would inform us of any

9  changes.  Specific to Mass. law, she did not say.  They

10 would inform us.  They would keep on top of everything.

11     Q.      Did she say that?

12     A.      She said that they were going to work

13 hand-in-hand with us in a team and that as it stands,

14 come on board, I can get my psychology license in

15 Massachusetts.

16     Q.      She guaranteed you that you could get your

17 psychology license?

18                      MR. MORENBERG:  Objection.

19     A.      She said that.

20     Q.      She said that?

21     A.      Yes.

22     Q.      Did you take any notes of that conversation?

23     A.      No.

24     Q.      You told me before that this is all 11 years

118

1      A.    See, the way you've phrased it, can I --

2                  MR. MORENBERG:  Answer -- Make your

3    answer.

4      A.    I discussed with Ruth Richards.  I discussed

5    with many people that I was -- my intent was to be a

6    licensed psychologist in Massachusetts, so, you know,

7    the, Can I get licensed, was not stated.  My intention

8    is and they knew and we were working together.

9      Q.    Okay.  So you're saying a lot -- that

10   Saybrook knew and different people at Saybrook knew of

11   your desire to become licensed in Massachusetts.

12     A.    Correct.

13     Q.    Did any person other than the person at the

14   Saybrook orientation, the 1995 Saybrook residential

15   orientation, give you information as to what Saybrook

16   could do for you to get a license?

17     A.    It's -- You know, it's ten years.  I know

18   that person spoke.  Was there someone else?  I don't

19   specifically recall.  I don't know how to answer that.

20     Q.    Well, that's a critical thing in the lawsuit.

21   You've told us --

22     A.    Well, I know that the brochure says it.  The

23   person said it.  Were there more people?  You know, I

24   can't specifically give you an instance right now.

289

1    A.    I think Vartain discussed that.  She was a

2  writing instructor at Saybrook.

3    Q.    Okay.  And in looking at Exhibit Number 26,

4  this is your sworn statement that you signed on the

5  fourth page, correct?

6    A.    (Witness reviewing document.)  Yes.  Yes.

7    Q.    And in -- Right under A on Page 1, are those

8  the only damages that you seek against Saybrook

9  Institute and Dr. O'Hara?

10   A.    I'm sorry.  Could I ask you to repeat it?

11   Q.    Yes.  In Paragraph A on Page 1, are those the

12  only damages that you're seeking against the defendants

13  in this case?

14   A.    Okay.  May I read it a moment?

15   Q.    Absolutely.

16   A.    (Witness reviewing document.)  No.  I think

17  in addition, the emotional component has been

18  incorporated.

19   Q.    Okay.  The emotional component.  What

20  component is that?

21   A.    The terrible loss that it's been to my life,

22  and the dreams that I had and what I wanted to do with

23  my life for the next 30 years that I can no longer do.

24  And it's caused me to have a bit of depression, a bit of

290

1  kind of an existential lost, kind of, what to do with

2  the rest of my life feeling.

3     Q.    Have you found that there are many different

4  situations in your life that have given you emotional

5  trouble?

6     A.    Everybody has things.  I'm pretty resilient

7  though.

8     Q.    And do you find that you're -- you've had

9  situations that have given you severe anxiety?

10    A.    Yes.

11    Q.    And have you had those situations other than

12 this lawsuit?

13    A.    I have not liked to fly for a really long

14 time.  I mean, I don't know exactly where you're going.

15    Q.    Other than that, is there anything that -- I

16 mean, do you have often problems with severe anxiety?

17    A.    Often problems with severe anxiety?  Not

18 really.

19                   MS. GARCIA:  Can I have this marked

20 as the next exhibit.

21                   (Exhibit No. 27 marked for

22                    identification.)

23            BY MS. GARCIA:

24    Q.    In looking at Exhibit Number 27, do you

291

1  recognize this document?

2      A.    (Witness reviewing document.)  Not really,

3  but I presume it's from me.

4      Q.    And looking at the third line -- Well,

5  actually, starting with the fourth line from the bottom

6  of Paragraph 1, do you see where it says "It is because

7  of these inconsistencies that I have lost a great deal

8  of time and suffered severe emotional anxiety"?

9      A.    Oh, when I was having to keep rewriting my

10  dissertation?  Yeah.  Uh-huh.  I actually don't see

11  where you're pointing to.  You said the last paragraph?

12      Q.    The first paragraph on Page 1 starting at the

13  fourth line from the bottom of that paragraph.

14      A.    Okay.  It was very frustrating.  It was -- It

15  was so annoying.  I kept trying to finish, and I just --

16  And Marc would send -- he would say write this in, and

17  I'd write it in and then I'd send it back.  And he'd

18  say, Where did you get this sentence?  Which was his

19  sentence.

20      Q.    And -- So, I mean, you had emotional anxiety

21  then that you described as severe, correct?

22      A.    It was very annoying.

23      Q.    But you described it as severe, correct?

24      A.    That's what I said.  It was severely

292

1   annoying.

2       Q.    And going through marriages and divorces, did

3   that cause you emotional anxiety?

4       A.    Briefly.  I'm very good friends with them.

5   They weren't heated.  They were very peaceful, mellow,

6   nonconfrontational.

7       Q.    And would you agree with me that fertility

8   treatments are an anxiety thing, correct?

9       A.    That was a pain in the neck, yeah.

10      Q.    Are there other reasons in which you've

11  experienced anxiety?

12      A.    No.  I can only -- I can only say that when I

13  was graduating, I was such -- so happy.  I mean, I was

14  just very excited about the future and very looking

15  forward to it and very hopeful and anxious to get going.

16      Q.    And now do you have any family issues that

17  are causing anxiety?

18      A.    No, I'm doing fine.

19      Q.    You testified that your father was in an

20  awful accident.

21      A.    Yeah.  He's doing fine.

22      Q.    Does that cause problems?

23      A.    Not now.  He's -- He ambulates.  He is

24  independent.  You know, he's -- obviously stays in the

293

1    house, but he's clear-headed and happy, and it could

2    have been so awful, but it's fine.  It's a long time ago

3    now.  It's six years.

4         Q.    But it caused you to change what you were

5    doing for work at the time, correct?

6         A.    Yes.

7         Q.    And do something else, correct?

8         A.    Yes.  Absolutely.

9                        THE VIDEOGRAPHER:  Counsel, we need

10   to change the videotape.

11                       MS. GARCIA:  Okay.  I'll mark this

12   really quick, and that way you can look at it off the

13   record.

14                       THE VIDEOGRAPHER:  5:27 and this

15   concludes Tape Number 6 of Susan Cooney's deposition.

16                       (Brief break.)

17                       (Exhibit No. 28 marked for

18                        identification.)

19                       THE VIDEOGRAPHER:  It's now 5:31

20   p.m. on January 27, 2006.  This is Tape Number 7 of

21   Susan Cooney's deposition.

22                  BY MS. GARCIA:

23        Q.    Going back to your emotional distress, do you

24   have a primary care physician that you see?

DANILECKI REPORTING  (617) 745-9786

294

1      A.    I've seen her once.  It's Dr. Catherine

2   Taylor at West Roxbury Medical.

3      Q.    And you've only seen her once?

4      A.    Yeah.

5      Q.    And do you have any therapists that you see?

6      A.    I did see a therapist last spring.  I believe

7   you got --

8      Q.    And who was it?

9      A.    I believe you got the paper.

10      Q.    Who was it?

11      A.    Dr. David Reisen.

12      Q.    And how many times did you see Dr. David

13   Reisen?

14      A.    Probably six.  Maybe seven or eight.

15      Q.    So up to possibly seven or eight times?

16      A.    Yeah.  Somewhere in there.

17      Q.    And other than Dr. Reisen, have you seen any

18   other doctors for therapy?

19      A.    No.

20      Q.    And that was -- So that was the only one?

21      A.    Yes.

22      Q.    Are there any other doctors at all that

23   you've treated with as a result of your claim?

24                    MR. MORENBERG:  Objection.

DANILECKI REPORTING (617) 745-9786

295

1    A.    That I've treated with?  What does that mean?
2  That I've seen?

3    Q.    That you've seen as a result of your claim.

4    A.    No.

5    Q.    And in looking at Exhibit Number 28 --

6              MS. GARCIA:  Did I give you a copy?

7              MR. VARTAIN:  No.

8              MS. GARCIA:  Give it back to -- I

9  don't know what happened to it, but it appears that we

10  don't have a copy for you, so...

11             MR. VARTAIN:  That's fine.  And --

12             MR. MORENBERG:  Would you mind if I

13  just looked at it?  Okay.  Okay.

14        BY MS. GARCIA:

15    Q.    In looking at Exhibit Number 28, these are

16  tax records that were produced.  In terms of your U.S.

17  income tax 2004, can you tell me did you sign this tax

18  document?

19    A.    (Witness reviewing document.)  I would

20  imagine I did.

21    Q.    But there's no signature that appears here,

22  correct?

23    A.    This is probably a copy.  It says copy.

24    Q.    So you don't have a copy of yours with a