UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS



EXHIBIT 19
to Plaintiff's Opposition

SUSAN COONEY,

    Plaintiff,

vs.    Docket No. 0411572 JLT

SAYBROOK GRADUATE SCHOOL and
RESEARCH CENTER, and MAUREEN
O'HARA, Individually,

    Defendants.
_____/

Deposition of

ALAN G. VAUGHAN, Ph.D.

MARCH 16, 2006

NOTICING ATTORNEY, PAUL W. MORENBERG, ESQ.

REPORTED BY:  JEANINE FARRELL, CSR NO. 7774

G O L D E N  G A T E  R E P O R T E R S  L L C
35 Mitchell Boulevard Suite 8
San Rafael CA 94903-2010
(415) 491-4611 * 800-442-4611
FAX (415) 491-4635

e-mail: ggr35@depos.com   web: http://www.depos.com

1  appearance pursuant to subpoena is not a waiver of
2  the fact that this is not a discoverable -- of
3  discoverable set of information. And I won't further
4  state that objection today.
5       MR. MORENBERG: Q. Could you tell me who
6  asked you to help develop the licensing information
7  bulletin?
8       A. Catherine Clark and Art Bohart.
9       Q. And did they ask you to consider developing
10 that in an individual meeting -- strike that.
11      Did you meet with them individually or did
12 you have a group meeting with all?
13      A. It was a joint meeting.
14      Q. And do you recall when that meeting took
15 place?
16      A. I do not.
17      Q. Was it shortly after you joined Saybrook or
18 some considerable time afterwards?
19      MS. GARCIA: Objection.
20      THE WITNESS: Some considerable time
21 afterwards.
22      MR. MORENBERG: Q. Can you provide your
23 best estimate as to when in your employment that
24 discussion occurred?
25      A. Maybe three or four months.

17

1    Q.  And tell me everything you can recall about
2 that discussion?
3    A.  It was over lunch and we were talking about
4 -- I came in sort of mid-year and so it was over
5 lunch and we were talking about some of the things
6 that they might need done given my background.  And I
7 was actually learning the technology.  And they asked
8 me if I would help them develop a web page that would
9 be -- would provide additional education to students
10 on the regulatory scheme of the field of psychology
11 and to facilitate interaction between the students
12 and their local psychology boards and then to consult
13 with students.  If questions specific to the statutes
14 -- state statutes of what a psychology rules arose
15 that needed some clarification.  So it was
16 specifically in a consultive capacity to the
17 students.
18    Q.  When you refer to your background, is it
19 fair to say you're referring to your legal education
20 as well as your psychology background?
21    A.  I'm not -- I don't understand the question.
22    Q.  Maybe it was unclear.  During your testimony
23 I believe you made reference to your background --
24 strike that.
25       MR. MORENBERG:  Could you read back the last

18

1  part of his answer.
2          (The record was read back as follows:
3          Q.  "It was over lunch and we were
4  talking about -- I came in sort of mid-year and so
5  it was over lunch and we were talking about some
6  of the things that they might need done given my
7  background.  And I was actually learning the
8  technology.  And they asked me if I would help
9  them develop a web page that would be -- would
10 provide additional education to students on the
11 regulatory scheme of the field of psychology and
12 to facilitate interaction between the students and
13 their local psychology boards and then to consult
14 with students.  If questions specific to the
15 statutes -- state statutes of what a psychology
16 rules arose that needed some clarification.  So it
17 was specifically in a consultive capacity to the
18 students.")
19         MR. MORENBERG:  Q.  I just want to ask you
20 what you meant by the word background, were you
21 referring to your legal education?
22         A.  I'm sorry.  I was -- just got absorbed with
23 everything she said so my -- what was it again that I
24 said about the background?
25         Q.  I don't want to put words in your mouth.

1          MR. VARTAIN: Let's have it read back.
2          THE WITNESS: Yes.
3          (The record was read back as follows:
4          Q. "It was over lunch and we were
5     talking about -- I came in sort of mid-year and so
6     it was over lunch and we were talking about some
7     of the things that they might need done given my
8     background. And I was actually learning the
9     technology.")
10         MR. MORENBERG: Q. When you referred to
11    your background as being of interest to Dr. Clark and
12    or Dr. Bohart, what did you mean?
13         A. Just that I had a lot of experience in
14    clinical practice and teaching a range of courses.
15    And so my general background -- so what exactly I was
16    going to do -- which courses I was going to teach and
17    the concentration and how I might be able to help
18    them with this project.
19         Q. With respect to the project, did they
20    indicate to you that your legal background would be
21    an asset in helping students to understand licensing
22    standards?
23         MS. GARCIA: Objection.
24         THE WITNESS: They thought that I would
25    understand the regulations and that I would be able

20

```
 1  to help the students with that.
 2          MR. MORENBERG:  Q.  And do you agree that
 3  you felt that you would be able to understand the
 4  regulations?
 5          THE WITNESS:  I did.
 6          MS. GARCIA:  Objection.
 7          THE WITNESS:  I do.
 8          MR. MORENBERG:  Q.  And do you recall any
 9  other discussions with Saybrook administrators
10  regarding this project?
11      A.  I just agreed to do it and then undertook
12  the research to do it and then produced a document.
13      Q.  And, Dr. Vaughan, when you agreed to do the
14  research, was this a part of your job
15  responsibilities as a member of the executive faculty
16  or was this a special consulting project in addition
17  to that?
18          MR. VARTAIN:  Objection.
19          MR. MORENBERG:  Q.  You may answer.
20          MR. VARTAIN:  Compound.
21          THE WITNESS:  It was part of my job
22  responsibility as an executive faculty member.
23          MR. MORENBERG:  Q.  And when did you do the
24  research for purposes of developing the information
25  bulletin?
```

21

1    A.  I started doing the research maybe -- if I
2 started -- maybe April or May would have been a time
3 that I started.
4    Q.  Is that April or May of 2003?
5    A.  Of 2003.
6    Q.  And did Dr. Bohart or Dr. Clark -- strike
7 that.
8        Did Dr. Bohart indicate to you why he wanted
9 you do develop the legal information -- strike that.
10       Did Dr. Bohart indicate to you why he wanted
11 you to develop the licensing information bulletin at
12 that time?
13   A.  Yes.
14   Q.  What did he tell you?
15   A.  Well, both of them together -- I met with
16 both of them together -- and I'm trying to recall the
17 conversation.  I think that they wanted to take
18 additional steps to educate students on the
19 regulatory scheme and to facilitate the interaction
20 between the students and their local psychology
21 boards.  And so to have that information available to
22 them and to have somebody available to consult with
23 them about the reading of the statutes and the board
24 of psychology rules I think was important.
25   Q.  Do you have any specific memories of

1   Q. Did you receive any documents from Bill
2   Bruff that were useful in your project?
3   A. Not that I can recall.
4   Q. And I have asked you about a series of
5   individual faculty members and administrators, can
6   you think of anyone else at Saybrook who ever
7   provided information to you in the form of documents
8   that was relevant to your project?
9   MR. VARTAIN: Objection.
10  THE WITNESS: Not that I can recall.
11  MR. MORENBERG: Q. And can you tell me when
12  you completed your bulletin on licensing standards?
13  A. I think it was probably by July -- by the
14  end of July.
15  Q. An that's July of 2003?
16  A. 2003.
17  Q. And do you know what became of that
18  document?
19  A. Yes.
20  Q. What was it used for?
21  A. It was used to put on -- to put on a web
22  page.
23  Q. Was that Saybrook's web page?
24  A. Yes.
25  Q. And is that --

```
 1        A.  It was the Saybrook website.  It was a web
 2   page on the website.
 3        Q.  Is that a document that's accessible to
 4   Saybrook students?
 5        A.  Yes.
 6        Q.  And how long a document is it?
 7        A.  I would say maybe four pages.
 8        Q.  And does it provide information on specific
 9   jurisdictions?
10        A.  It does.
11        Q.  Does it provide information on
12   Massachusetts?
13        A.  Well, no.  It just lists Massachusetts as
14   one of the states that's problematic.
15        Q.  I see.
16        A.  That's it.
17        Q.  And do you know if that bulletin is
18   distributed to students in any other way such as at
19   residential conferences?
20        A.  Yes.
21        Q.  And how is it distributed?
22        A.  I distribute it.
23        Q.  And when do you distribute it?
24        A.  In the context of a general orientation on
25   licensure.
```