# EXHIBIT A

## PAGE 98

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SUSAN COONEY,
       Plaintiff              Exhibits: 88-112

VS

SAYBROOK GRADUATE SCHOOL            DOCKET NO.
AND RESEARCH CENTER, and            04 11572 JLT
MAUREEN O'HARA, Individually,
       Defendants

DEPOSITION of DR. KAREN SCHWARTZ, a Witness called by Counsel on behalf of the Plaintiff, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Arlene Boyer, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Division of Professional Licensure, 239 Causeway Street, Boston, Massachusetts, on Friday, April 28, 2006, commencing at 10:30 a.m.

## PAGE 99

APPEARANCES:
Paul W. Morenberg, Esq.
Kerstein, Coren, Lichtenstein, Finkel, LLP
60 Walnut Street
Wellesley, MA 02481
REPRESENTING THE PLAINTIFF

Grace V.B. Garcia, Esq.
Morrison, Mahoney, LLP
250 Summer Street
Boston, MA 02210-1181
REPRESENTING THE DEFENDANTS

Alexander P. Borre, Esq.
The Commonwealth of Massachusetts
Division of Professional Licensure
239 Causeway Street, 4th floor
Boston, MA 02114
REPRESENTING DR. KAREN SCHWARTZ

## PAGE 100

I N D E X
Witness              Direct  Cross  Redirect
Dr. Karen Schwartz
  (By Mr. Morenberg)    6
  (By Ms. Garcia)             112
  (By Mr. Morenberg)                  153

E X H I B I T S
| Number | Description | Page |
|---|---|---|
| 88 | Schedule of Documents Requested | 8 |
| 89 | Letter from Mr. Borre to Mr. Morenberg dated April 21, 2006 | 9 |
| 90 | Dr. Schwartz's Curriculum Vitae | 14 |
| 91 | Regulation Filing and Publication dated December 1, 1993 | 24 |
| 92 | Memo from Susan Manning to William Wood and Anne Collins Re: Proposed Regulatory Change dated November 15, 1995 | 45 |
| 93 | E-Mail from Dr. Schwartz to J. Brown at Saybrook dated March 21, 2003 | 51 |

## PAGE 101

E X H I B I T S
| Number | Description | Page |
|---|---|---|
| 94 | Consortium for Diversified Psychology Programs Public Comment dated December 14, 1995 | 53 |
| 95 | Letter from Rudy Melone to Robert Coutu dated February 13, 1996 | 54 |
| 96 | Letter from Rudy Melone to David Ramsey dated February 13, 1996 | 54 |
| 97 | Letter from William Wood to Union Institute dated March 20, 2006 | 60 |
| 98 | Letter from Union Institute to Robert Coutu Regarding Second Regulatory Change Proposed by the Board dated February 28, 1997 | 63 |
| 99 | Fax from Marsha Hammond to Licensing Board dated January 11, 1996 | 66 |
| 100 | May 2, 1997 Change in Section 3.03 of the Regulations | 72 |
| 101 | Letter from Union Institute to William Wood dated May 8, 1997 | 76 |
| 102 | E-Mail from Susan Cooney to Dr. Schwartz dated November 7, 2003 | 79 |
| 103 | Letter from Susan Cooney to Dr. Schwartz dated September 27, 2004 | 85 |
| 104 | Letter of Reply from the Board to Susan Cooney dated October 20, 2004 | 86 |
| 105 | Application Form from Richard Francis | 92 |
| 106 | Cover of Richard Francis's Application | 94 |

Cooney v Saybrook et al

Dr. Karen Schwartz, April 28, 2006

SHEET 15   PAGE 154

**Page 154**

1  Q  Was she the administrative assistant?
2  A  Yes.
3  Q  Did the board itself receive a copy of all these
4     public comments?
5  A  Yes. May I amend that?
6  Q  Sure.
7  A  I do not remember if copies were made of these.
8     The board would have seen the folder.
9  Q  Is it fair to say that what you've produced in
10    response to the deposition subpoena, which
11    includes Exhibits 95 and 96, were part of the
12    public comments folder that was available to the
13    board?
14 A  Yes.
15 Q  Would it appear from the nature of this document
16    and the fact that it was in the public comments
17    folder that the board itself received notice that
18    Saybrook, through its interim president, was
19    objecting to the proposed regulation on completed
20    in residence?
21 A  Yes.
22 Q  These letters, Exhibits 95 and 96, are addressed
23    to David Ramsey and Robert Coutu. Was Mr. Coutu
24    the chair of the Board of Registration of

**Page 155**

1     Psychologists in February 1996?
2  A  Yes.
3  Q  Do you know when he stepped down as chair?
4  A  July of '97.
5  Q  Who became chair after Mr. Coutu?
6  A  Dennis Norman.
7  Q  David Ramsey is also a psychologist?
8  A  I have never heard of David Ramsey.
9  Q  So you don't know if David Ramsey was ever
10    affiliated with the Board of Registration of
11    Psychologists?
12 A  I don't think David Ramsey was ever affiliated
13    with the Board of Registration of Psychologists as
14    a board member. I don't know whether he ever
15    worked for the agency, Division of Professional
16    Licensure. I don't know who he is. He was a who
17    is this guy.
18 Q  Did you ever have any discussions with Dr. Coutu
19    about Saybrook specifically?
20 A  No.
21 Q  Do you know if Dr. Coutu would have been present
22    when Saybrook candidates for licensure were
23    discussed?
24    MS. GARCIA: Objection.

**Page 156**

1  A  I don't recall Saybrook candidates for licensure
2     being discussed.
3  Q  Do you recall there being a discussion at any
4     board meetings about Dr. Richard Francis?
5  A  Yes.
6  Q  Do you recall there being any discussions at board
7     meetings about Dr. John Burke?
8  A  No.
9  Q  The fact that you recall Dr. Francis was discussed
10    at a board meeting, would that affect your prior
11    answer as to whether you recall Saybrook students
12    being discussed at board meetings?
13 A  Yes.
14    MS. GARCIA: Objection.
15 Q  So it's fair to say that --
16 A  But it's not Saybrook students. It's an
17    applicant. Applicants are -- were at the time
18    reviewed individually, not as representatives of a
19    particular program. Each application got an
20    individual review, and the board had a standard
21    policy, which was we review applicants, not
22    programs.
23 Q  Can you recall any other Saybrook graduates that
24    were reviewed by the board between 1995 and 1997?

**Page 157**

1  A  Any other? What do you mean by any other?
2  Q  Any other graduates of Saybrook whose application
3     --
4  A  Other than whom?
5  Q  Other than Richard Francis.
6  A  Richard Francis was much later.
7  Q  Do you recall any Saybrook graduates whose
8     application for licensure as a psychologist was
9     discussed by the board during the period of 1995
10    through 1997?
11 A  I don't think there were any.
12 Q  Do you recall any Saybrook graduates whose
13    application for licensure as a psychologist was
14    discussed by the board between 1997 and 2000 other
15    than Richard Francis?
16 A  No.
17 Q  What decision was made about the proposed
18    regulation that appears as Exhibit 92 after the
19    public hearing in January of '96?
20 A  I'm not sure if you would call it a decision, but
21    I believe the board chose to put forward a
22    different regulation, as I explained.
23    (Exhibit Number 97, Letter from
24    William Wood to Union Institute

Cooney v Saybrook et al

Dr. Karen Schwartz, April 28, 2006

SHEET 24   PAGE 190

93

1  Q  When you say it's "a fraction of an application
2      packet," is that because it's the application form
3      itself with no supporting material?
4  A  Correct.
5  Q  If you could turn to the last page of the
6      document, it appears that this application was
7      submitted on or about September 24, 2000.
8         MS. GARCIA: Objection.
9  A  Actually, you can't tell from that date. There's
10     another piece of the application that tells you
11     when we received it, and that is the application
12     file itself. It has the date that we received it.
13 Q  Is that date on the cover of the file?
14 A  Yes.
15 Q  Do you know if the cover was produced?
16 A  The cover was produced.
17        MR. BORRE: The cover was produced.
18 A  Because a lot of people fill these things out and
19     then, you know, just take forever to send them in.
20        MR. BORRE: This is the original cover.
21     If you want to --
22        MR. MORENBERG: I do have that. Hold
23     on. Let's just go off the record for a second.
24     (Off the record.)

PAGE 191

94

1      (Exhibit Number 106, Cover of
2       Richard Francis's Application, was
3       Marked for Identification.)
4  Q  I'm putting before you what's been marked as
5      Exhibit 106 for identification. Do you recognize
6      this document?
7  A  Yes.
8  Q  What is this?
9  A  This is the cover of Richard Francis's
10     application.
11 Q  Does this document refresh your recollection as to
12     the date when Dr. Francis submitted his
13     application?
14 A  Yes.
15 Q  What date was that?
16 A  June 23, 2000.
17 Q  Is this document maintained in the ordinary course
18     of business?
19 A  Yes.
20 Q  Is this a public record maintained by the board?
21 A  Yes.
22 Q  Is it fair to say that because Dr. Francis
23     submitted his application prior to September 1,
24     2000, he did not have to come from a program

PAGE 192

95

1      designated by the ASPPB?
2  A  Correct.
3  Q  Did the board accept Dr. Francis's application for
4      licensure?
5  A  Not initially.
6  Q  Why did it not accept it initially?
7  A  I'd have to look back at the documents, but my
8      guess is that they denied him based on the
9      residency requirement that was on the books.
10 Q  Now, I don't want you to guess, but to your
11     understanding, was the reason he was denied
12     initially because he did not meet the residency
13     requirement?
14 A  Correct.
15 Q  To your understanding, why did Dr. Francis not
16     meet the board's residency requirement?
17 A  I believe that the way he claimed to meet it was
18     through rather than being at the institution for a
19     year, as it says in the old regs, that he had, you
20     know, what the programs would call sort of
21     residential events where students would come
22     together at a hotel and do stuff together and call
23     that residency.
24 Q  To your understanding, did the board view that as

PAGE 193

96

1      residency that met the requirements of the
2      regulation?
3         MS. GARCIA: Objection.
4  A  Not in those years.
5  Q  In the past, had the board recognized meetings and
6      seminars at hotels as qualifying for residency?
7  A  Not specifically.
8  Q  Was Dr. Francis eventually approved for licensure?
9  A  Yes, he was.
10 Q  To your understanding, why was he approved for
11     licensure?
12 A  He appealed the board's denial. He produced
13     documentation of a physical disability that
14     affected his mobility, and the board made an
15     exception for him based on his disability.
16 Q  Was it your understanding that the board approved
17     his application for licensure as a reasonable
18     accommodation under the Americans With
19     Disabilities Act?
20        MS. GARCIA: Objection.
21 A  Yes.
22 Q  Would Dr. Francis have qualified for licensure if
23     he did not have a disability?
24        MS. GARCIA: Objection.

PAGE 198

```
 1       applied?
 2    A  Well, in the production of the documents for this
 3       deposition, we came up with John Burke's
 4       application. I have no idea if Mr. Finn was
 5       involved in that, and I don't know of another.
 6    Q  Do you know if the board determined whether John
 7       Burke met the residency requirements of the
 8       board's regulations?
 9    A  In my review of the documents before today, I
10       looked at that file, because I was not familiar
11       with it, and it appeared to me that they failed to
12       make a determination about the residency in that
13       file. I believe a mistake was made in that file.
14    Q  But you would agree that the board did approve Dr.
15       Burke's application for licensure as a
16       Massachusetts psychologist?
17    A  In 1995.
18          MR. MORENBERG: Could we mark this.
19          (Exhibit Number 109, A Piece of
20          John Burke's Application File dated
21          March 20, 1995, was Marked for
22          Identification.)
23    Q  Dr. Schwartz, I've put before you what I've marked
24       as Exhibit 109 for identification. Do you
```

PAGE 199

```
 1       recognize this document?
 2    A  Recognize, no.
 3    Q  Let me ask it a different way. Dr. Schwartz, is
 4       what I've put before you as Exhibit 109 a document
 5       that the board produced in response to my
 6       deposition subpoena?
 7    A  Is that a question?
 8    Q  Yes.
 9    A  Say that again.
10    Q  Sure. The document that I put before you which is
11       marked as Exhibit 109, is this a document that the
12       board produced in response to my deposition
13       subpoena?
14    A  Yes.
15    Q  Is this a document that the board maintained in
16       the ordinary course of business?
17    A  Yes.
18    Q  Is this a public record maintained by the board?
19    A  Yes.
20    Q  Do you recognize what Exhibit 109 is?
21    A  Yes.
22    Q  What is it?
23    A  It is a piece of John Burke's application file, I
24       believe.
```

PAGE 200

```
 1    Q  Were you aware that Saybrook's former president,
 2       Rudy Melone, submitted a letter on behalf of Dr.
 3       Burke in support of his application for licensure?
 4          MS. GARCIA: Objection.
 5    A  Not until yesterday.
 6    Q  I want to quote from the third paragraph of this
 7       letter.
 8    A  I'm sorry, not yesterday. It was just the
 9       previous day I was here, was Wednesday.
10    Q  I want to quote from the last sentence of the
11       third paragraph of this letter from Rudy Melone.
12       "Dr. Burke and I have worked to ensure that
13       prospective Saybrook Institute Ph.D. candidates in
14       Massachusetts understand and keep abreast of the
15       regulations pertaining to the practice of
16       psychology."
17          Based on this letter, would you agree
18       that it appears that Saybrook was committed to
19       keep its students abreast of Massachusetts
20       regulations?
21          MS. GARCIA: Objection.
22    A  The letter is dated March 20, 1995, and as of that
23       day, it appears that way.
24    Q  Based on this statement from Dr. Melone, would you
```

PAGE 201

```
 1       expect that Saybrook would advise its students of
 2       other regulatory changes to the extent that it was
 3       aware of them?
 4          MS. GARCIA: Objection.
 5    A  I just don't have those kinds of expectations. If
 6       you expect little, you never get disappointed.
 7    Q  At any time in your tenure as program coordinator
 8       for the board, have you ever had occasion to
 9       review Saybrook's academic offerings?
10    A  No. Until this deposition subpoena, I couldn't
11       have even told you what state Saybrook was in.
12    Q  Prior to the regulatory change on May 2, 1997,
13       would you or anyone at the board have been able to
14       advise a Massachusetts resident whether Saybrook's
15       program met the board's regulations?
16    A  What was the first half, prior to what?
17          MR. MORENBERG: Can you read that back?
18          (Court Reporter repeated last question.)
19    A  So I can answer for me. I don't know, because I
20       don't -- you know, 5/2/97 is kind of a turning
21       point in my memory, and stuff before that is quite
22       foggy. I don't know what I would or wouldn't have
23       said in the years before that, nor do I know what
24       board members may or may not have said.
```